Daniel J. Wadley (10358)
wadleyd@sec.gov
Thomas M. Melton (4999)
meltont@sec.gov
Cheryl M. Mori (8887)
moric@sec.gov
Paul N. Feindt (8769)
feindtp@sec.gov
Attorneys for Plaintiff
Securities & Exchange Commission
15 West South Temple Street, Suite 1800
Salt Lake City, Utah 84101
Tel. 801-524-5796
Fax: 801-524-5262

IN THE UNITED STATES DISTRICT COURT
DISTRICT OF UTAH, CENTRAL DIVISION

| | |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION,<br><br>PLAINTIFF,<br><br>v.<br><br>AMERICAN PENSION SERVICES, INC., a Utah Corporation and CURTIS L. DeYOUNG, an individual,<br><br>DEFENDANTS. | **COMPLAINT**<br><br>Case No.:<br><br>Judge: |

Plaintiff, Securities and Exchange Commission (the "Commission"), for its Complaint against Defendants American Pension Services, Inc. ("APS") and Curtis L. DeYoung ("DeYoung") (collectively, "Defendants") alleges as follows:

## INTRODUCTION

1. This matter involves a long-standing fraudulent scheme resulting in the misappropriation of over $22 million of investor funds. From at least 2005 through the present, DeYoung engaged in a scheme pursuant to which he solicited investors to open self-directed Individual Retirement Accounts ("IRA") with APS and then used those investor funds to benefit himself and his friends.

2. DeYoung touts APS as a third-party administrator allowing, "genuine self-direction" for those seeking alternatives to traditional stock, bond, and mutual fund investments. Once customers transfer their retirement assets to APS, DeYoung misappropriates customer assets, particularly cash, for his own purposes.

3. It appears that DeYoung's primary use of the misappropriated cash is making investments, including unsecured promissory notes, for his own ventures or those of his friends. DeYoung has squandered millions of dollars of customer funds on high-risk investments, resulting in huge losses to investors.

4. After incurring these losses, DeYoung fails to inform customers and their account statements continue to reflect inflated cash balances, or hold worthless assets. This allows DeYoung to continue to collect fees on worthless securities and cash, further victimizing APS's customers.

## JURISDICTION AND VENUE

5. This Court has subject matter jurisdiction by authority of Sections 20 and 22 of the Securities Act of 1933 (the "Securities Act") [15 U.S.C. §§ 77t and 77v], and Sections 21 and 27 of the Securities Exchange Act of 1934 (the "Exchange Act") [15 U.S.C. §§ 78u and 78aa].

6. Defendants, directly and indirectly, singly and in concert, have made use of the means and instrumentalities of interstate commerce and the mails in connection with the transactions, acts and courses of business alleged herein, certain of which have occurred within the District of Utah.

7. Venue for this action is proper in the District of Utah under Section 22(a) of the Securities Act [15 U.S.C. § 77v(a)], and under Section 27 of the Exchange Act [15 U.S.C. § 78aa], because certain of the transactions, acts, practices, and courses of business alleged in this Complaint took place in this district and because the Defendants reside in and transact business in this district.

8. Defendants, unless restrained and enjoined by this Court, will continue to engage in the transactions, acts, practices, and courses of business alleged herein and in transactions, acts, practices, and courses of business of similar purport and object.

9. Defendants' conduct took place in connection with the offer, purchase and/or sale of securities.

## DEFENDANTS

10. **American Pension Services, Inc. ("APS").** Founded in 1982 by DeYoung. APS was incorporated in Utah in 1983 and has its principal place of business is Riverton, Utah. APS is a third-party administrator for retirement accounts.

11. **Curtis L. DeYoung ("DeYoung").** Age 57 is a resident of Riverton, Utah. DeYoung is the President, founder, and Chief Executive Officer ("CEO") of APS.

## STATEMENT OF FACTS

### Background

12. APS is a third-party administrator of self-directed IRAs.

3

13. DeYoung is the President and CEO of APS and controls all aspects of APS.

14. Most IRA custodians are banks and broker-dealers that limit the holdings in IRA accounts to firm-approved traditional investments.

15. APS distinguishes itself from other IRA custodians by promoting the customers' ability to purchase non-traditional assets within their accounts, consistent with applicable Internal Revenue Service ("IRS") rules and regulations.

16. APS customers can open a variety of retirement accounts with APS including IRAs, Simplified Employee Pension plans, Simple plans and Roth IRAs.

17. The responsibilities of APS, as the plan administrator, include setting up the account, ensuring that title to the assets is correct, determining whether investments comply with IRS requirements, processing the investor's instructions, issuing periodic statements and fulfilling IRS reporting requirements.

18. APS has approximately fourteen employees, several of which are DeYoung family members.

19. DeYoung's primary role as president and CEO is marketing APS.

20. DeYoung encourages investors to transfer their current IRA or 401(k) plan assets to APS by touting the increase in available investment options, many of which are not available through other IRA custodians.

21. Many APS customers sell securities in order to transfer their current IRA or 401(k) plan assets to APS. Upon transferring their funds to APS, APS customers then purchase securities which are held in their APS accounts.

22. DeYoung finds potential customers by attending investment seminars and presenting APS's services. For example, on June 13, 2011, DeYoung presented at a Management Solutions, Inc. ("MSI") seminar at which MSI solicited investments in securities.

23. APS customers complete an IRS Form 5305-A to open a traditional IRA custodial account with APS.

24. IRS Form 5305-A states: "[a]dministrator has no discretionary authority or control over Custodial Account assets and is only responsible to disburse funds as directed by Depositor, to receive securities and other property, to record keep in accordance with its agreement with Custodian, and to execute applicable documents at the written direction of depositor."

25. IRS Form 5305-A further states: "depositor has the sole authority and discretion to select and to direct the investment of all assets in the custodial account and depositor accepts full and sole responsibility for the success or failure of any investment made with the funds in the custodial account."

26. At the time the customer opens a traditional IRA custodial account with APS, both an APS representative and the APS customer sign the IRS Form 5305-A.

27. APS's customers are located throughout the United States.

28. At year-end 2012, APS had 5,383 customers with accounts valued at $354,478,757. During 2012, APS customers contributed approximately $25,000,000 in new funds to their retirement plans held at APS.

29. At year-end 2013, APS had approximately 5,488 customers with accounts valued at approximately $351,795,430.

5

30. APS charges its customers an annual fee for its services based on the total value of the customer's account. The annual fee ranges from .0085 for accounts valued at $50,000, and decreases to .0010 for accounts valued at over $450,000.

31. APS also charges its customers a one-time installation fee of $60 and an annual trust fee of $40 on each IRA account.

32. During 2012, APS generated fees on customer accounts of approximately $2.4 million. Fees APS collects for managing the IRA accounts are deposited in APS's operating account at First Utah Bank ("First Utah").

33. In addition, pursuant to a Custodial Services Agreement APS has with First Utah, all cash held in APS customer IRA accounts is held in two bank accounts maintained by APS at First Utah. The accounts are identified as "Master Trust" accounts.

34. Although First Utah serves as the custodian, APS controls the funds maintained in the Master Trust accounts.

35. APS comingles all customer cash in the two Master Trust accounts, including cash deposited by APS customers into their IRA accounts and income generated by customer investments.

36. First Utah does not maintain records of which APS individual customers' funds are in the Master Trust accounts.

37. The Master Trust accounts are interest bearing and, according to DeYoung, all interest earned is passed on to APS customers.

38. Approximately $10-$12 million in transactions is processed through the Master Trust accounts each month.

6

39. DeYoung and four other APS employees are signatories on the Master Trust accounts.

40. If a customer desires to purchase securities in his/her IRA, the customer is required to execute a written buy direction letter in order for APS or the customer to purchase securities in the customer's account.

41. IRS Form 5305-A, which is used to open an IRA account at APS, also mandates that written direction must be given by the customer for each investment.

42. For customers purchasing promissory notes, the buy direction letter requires information regarding the borrower on the note and the terms of the loan.

43. When purchasing promissory notes, the APS customer signs a wire request form to send the funds to the borrower.

44. The new account documentation, signed by APS and the customer, states that customers are solely responsible for investment transactions within their accounts.

45. The new account documentation further states that APS, as the administrator, has no discretionary authority or control over "custodial account assets."

46. Upon opening a new account, DeYoung sends the customer a welcome letter reminding customers that APS does not recommend or sell investments.

## Misappropriation of Customer Funds

47. At the end of each calendar year, APS sends each of its customers an account statement purporting to document the assets held in each account the customer has at APS.

48. The account statement lists the total value of the account and separately lists each asset held in the account, including separately listing the amount of funds the customer has in cash.

49. DeYoung testified that the total cash balances reflected on the customer account statements should equal the amount of cash on deposit in the APS Master Trust accounts at First Utah.

50. For the year ending December 31, 2012, the cash balance in the Master Trust accounts at First Utah was $23,879,948.

51. However, customer account statements prepared and sent out by APS indicate that the total customer cash that should have been in the Master Trust accounts on December 31, 2012 was $45,949,847. The Mater Trust accounts had a shortage of $22,069,899 in customer funds.

52. For the year ending December 31, 2013, the balance in the Master Trust accounts held at First Utah was $34,553,402.

53. However, customer account statements prepared and sent out by APS indicate that the total customer cash that should have been in the Master Trust accounts on December 31, 2013 was $57,311,527. The Master Trust accounts had a shortage of $22,758,125 in investor funds. The amount of the missing customer funds had increased by nearly $700,000 from 2012 to 2013.

54. When questioned about the missing funds during sworn testimony, DeYoung invoked his Fifth Amendment privilege against self-incrimination and refused to answer any questions regarding the missing $22 million in investor funds.

**DeYoung Lost Customer Funds in Unauthorized High-Risk Investments**

55. Numerous APS customers hold promissory notes with a friend of Curtis DeYoung ("Friend A") or Friend A's entities in their APS accounts.

8

56. Friend A and DeYoung are good friends, and DeYoung recommended Friend A promissory notes to APS customers.

57. APS customers hold promissory notes from several Friend A entities, including Innovative Services, LLC, Innovative Equity Partners, LLC ("Innovative Equity Partners"), Prime Utah, LLC, and Sawtell Capital, LLC.

58. Friend A's businesses vary from residential mortgages, loan modification and debt settlement to single purpose investment entities.

59. In addition to individual investments made by APS customers, DeYoung directly invested APS funds with Friend A or his entities without disclosing to customers this use of customer funds.

60. All of the investments DeYoung made for APS customers with Friend A or his entities were unsecured.

61. Memmott's business ventures never generated a profit and since approximately 2010, all promissory notes issued by Friend A to APS and APS customers are in default. In 2010, DeYoung agreed to forgive all investments APS made with Friend A.

62. Although Friend A defaulted on promissory notes in 2010, DeYoung continued to refer APS customers and to transfer APS customer funds to Friend A until at least April 2013.

63. In addition to these direct investments, DeYoung also provided Friend A with money to make purported interest or principal payments to APS customers who held Friend A promissory notes in their APS accounts, giving the impression to APS customers that their investments were profitable.

64. In particular, on December 28, 2012, DeYoung sent Friend A $95,864 with instructions to use the funds to make interest payments to several APS customers.

9

65. Neither DeYoung nor Friend A told APS customers that Friend A defaulted on numerous prior promissory notes with APS or APS customers.

66. Neither DeYoung nor Friend A disclosed to APS customers that purported returns made by Friend A or his companies did not come from funds generated by the investment, but rather were provided by DeYoung.

67. Another venture DeYoung referred to APS customers was Remington Commercial Advisors, LLC ("Remington").

68. Both APS and APS customers invested several million dollars through Remington and Remington's principal ("Remington Principal").

69. DeYoung sent funds from APS customer accounts to Remington Principal, managing member of Remington. Remington Principal never spoke with APS customers prior to the customer investing with Remington.

70. All funds invested with Remington by APS or APS customers were lost. Remington has ceased all operations.

71. APS's 2013 customer account statements still reflected investments with Remington.

72. APS continues to charge fees on the full amounts of the Remington investments, even though the investments are worthless.

73. DeYoung knows or should have known that Remington is no longer in business. DeYoung has not disclosed this information to APS customers who hold Remington assets in their APS accounts.

74. DeYoung also invested approximately $1 million of APS customer funds with Charlevoix Homes LLC ("Charlevoix").

75. In approximately 2006, DeYoung sent Remington two wires of $400,000 and $600,000 for the purpose of investing in Charlevoix. DeYoung told Remington Principal that he needed the money to go through Remington because DeYoung could not make the investment directly from APS. DeYoung indicated that the money was from APS customer accounts.

76. Shortly after the $1 million investment in Charlevoix, DeYoung told Remington Principal he sent an additional $600,000 of APS funds directly to Charlevoix.

77. Charlevoix filed for Chapter 7 bankruptcy protection on August 18, 2008, causing a total loss of APS customer funds.

78. DeYoung also invested approximately $1.5 million of APS customer funds with another friend ("Friend B"). Shortly after the investment, Friend B defaulted on the debt, causing investors to lose their funds.

79. DeYoung invested $2.8 million of APS customer funds in an office building in Wichita, Kansas. Those funds were lost.

80. Other investments widely held in APS customer accounts include National Note of Utah, LC, MSI, and The Companies – all entities against which the Commission has brought enforcement actions. The investments in these entities continued to be held at their full investment value long after they became worthless or significantly reduced in value.

### Forged Buy Direction Letters and Wire Transfer Forms

81. DeYoung placed one customer ("Customer A") in approximately eight investments using forged buy direction letters and wire transfer forms.

82. Customer A opened an IRA account at APS in August 2010. He deposited $96,937.68 in his APS IRA account.

83. Customer A never spoke to anyone from APS or signed any buy direction letters or other documents before investments were made for his APS IRA account.

84. Despite never having signed a buy direction letter or other documentation authorizing investments, the file maintained by APS for Customer A's account contains documents with signatures and initials authorizing investments. Customer A did not sign the documents. The signatures are forged.

85. Beginning in February 2011, all eight investments held in Customer A's APS account defaulted, but as of the end of 2013, the investments remained on Customer A's APS account statement at 100% of face value. APS continues to charge fees in Customer A's account based on the face value of investments that are now worthless.

86. On August 7, 2012, Customer A received a payment of $10,000 from Innovative Equity Partners, one of the purported investments in Customer A's APS account.

87. In August 2012, approximately $1,376, from the Innovative Equity Partners $10,000 payment was taken from Customer A's account, purportedly to satisfy fees APS charged Customer A for administering his APS account.

88. On April 17, 2013, the remaining $8,500 was taken out of Customer A's IRA account and sent to Innovative Equity Partners. These funds were taken from his IRA account without Customer A's consent or written authorization.

89. Another APS customer ("Customer B") opened an IRA account with APS in 2006, with a deposit of $5,000.

90. In August 2008, Customer B requested APS close her account and send her the $5,000 cash she believed was held in her account. APS told Customer B that her account did not hold any cash but instead held a $5,000 interest in Charlevoix.

12

91. APS informed Customer B that in order to close her APS account she would have to transfer the Charlevoix asset to another IRA account or liquidate the asset and incur the tax penalty associated with the liquidation.

92. When Customer B informed APS that she had never authorized an investment with Charlevoix, APS sent Customer B a buy direction letter dated May 2007 requesting a $5,000 investment in Charlevoix. The buy direction letter had a signature purporting to be Customer B's signature.

93. Customer B did not sign the buy direction letter. The buy direction letter is forged.

94. APS also sent Customer B an Assignment of Interest in Promissory Note dated May 6, 2009, in which APS assigned an interest in Charlevoix to Customer B.

95. Charlevoix filed for Chapter 7 bankruptcy protection on August 18, 2008.

96. Customer B never agreed to or authorized the investment in Charlevoix, which is now worthless.

## Inflated Asset Values

97. Many of the investments made by DeYoung, or into which he transferred customer funds, have little or no current value.

98. However, if the investment was listed as an asset in an APS customer account, the asset is reflected on customer account statements at its full face value, and APS assesses its fees based off of these inflated values.

13

## FIRST CAUSE OF ACTION
## EMPLOYMENT OF A DEVICE, SCHEME OR ARTIFICE TO DEFRAUD
### Violation of Section 17(a)(1) of the Securities Act [15 U.S.C. § 77q(a)(1)]

99. The Commission realleges and incorporates by reference the allegations contained in paragraphs 1 through 98 above.

100. Defendants APS and DeYoung, by engaging in conduct described above, directly or indirectly, in the offer or sale of securities, by the use of the means or instruments of transportation or communication in interstate commerce or by use of the mails, with scienter, employed devices, schemes, or artifices to defraud.

101. By reason of the foregoing, APS and DeYoung, directly or indirectly, violated, and unless restrained and enjoined by this Court, will continue to violate Section 17(a)(1) of the Securities Act [15 U.S.C. § 77q(a)(1)].

## SECOND CAUSE OF ACTION
## FRAUD IN THE OFFER OR SALE OF SECURITIES
### Violations of Section 17(a)(3) of the Securities Act [15 U.S.C. § 77q(a)(3)]

102. The Commission realleges and incorporates by reference the allegations contained in paragraphs 1 through 98 above.

103. Defendants APS and DeYoung, by engaging in the conduct described above, directly and indirectly, in the offer and sale of securities, by the use of the means or instruments of transportation or communication in interstate commerce or by use of the mails, engaged in transactions, practices, or courses of business which operate or would operate as a fraud or deceit upon the purchaser.

104. By reason of the foregoing, APS and DeYoung, directly or indirectly, violated, and unless restrained and enjoined will continue to violate, 17(a)(3) of the Securities Act [15 U.S.C. § 77q(a)(3)].

## THIRD CAUSE OF ACTION
## FRAUD IN CONNECTION WITH THE PURCHASE OR SALE OF SECURITIES
Violations of Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5(a) and (c) thereunder [17 C.F.R. § 240.10b-5(a) and (c)]

105. The Commission realleges and incorporates by reference the allegations contained in paragraphs 1 through 98 above.

106. Defendants APS and DeYoung by engaging in the conduct described above, directly or indirectly, by the use of means or instrumentalities of interstate commerce or use of the mails, in connection with the purchase or sale of securities, with scienter, employed devices, schemes, or artifices to defraud, or engaged in acts, practices, or courses of business that operated or would operate as a fraud and deceit upon other persons.

107. By reason of the foregoing, APS and DeYoung violated, and unless restrained and enjoined will continue to violate Section 10(b) of the Exchange Act [15 U.S.C. §78j(b)] and Rule 10b-5(a) and (c) thereunder [17 C.F.R. § 240.10b-5(a) and (c)].

## RELIEF REQUESTED

WHEREFORE, the Commission respectfully requests that this Court:

### I.

Issue findings of fact and conclusions of law that Defendants committed the violations charged herein.

### II.

Issue in a form consistent with Rule 65(d) of the Federal Rules of Civil Procedure orders that permanently enjoin Defendants and their officers, agents, servants, employees, attorneys, and accountants, and those persons in active concert or participation with any of them, who receive actual notice of the order by personal service or otherwise, and each of them, from engaging in transactions, acts, practices, and courses of business described herein, and from

engaging in conduct of similar purport and object in violation of Section 17(a)(1) and (3) of the Securities Act, Section 10(b) of the Exchange Act and Rule 10b-5(a) and (c) thereunder.

### III.

Issue, in a form consistent with Rule 65(d) of the Federal Rules of Civil Procedure, orders that temporarily, preliminarily and permanently enjoin Defendants and their officers, agents, servants, employees, attorneys, and accountants, and those persons in active concert or participation with any of them, who receive actual notice of the order by personal service or otherwise, and each of them, from transferring, changing, wasting, dissipating, converting, concealing, or otherwise disposing of, in any manner, any funds, assets, claims, or other property or assets owned or controlled by, or in the possession or custody of the Defendants.

### IV.

Issue in a form consistent with Rule 65(d) of the Federal Rules of Civil Procedure orders that temporarily, preliminarily and permanently restrain and enjoin Defendants, and each of them, and their officers, agents, servants, employees, attorneys, and accountants, and those persons in active concert or participation with any of them, who receive actual notice of the order by personal service or otherwise, and each of them, from destroying, mutilating, concealing, transferring, altering, or otherwise disposing of, in any manner, books, records, computer programs, computer files, computer printouts, correspondence, including e-mail, whether stored electronically or in hard copy, memoranda, brochures, or any other documents of any kind that pertain in any manner to the business of Defendants.

### V.

Enter an order directing Defendants, and each of them, to pay civil money penalties pursuant to Section 20(d) of the Securities Act and Section 21(d)(3) of the Exchange Act.

## VI.

Enter an order directing Defendants to disgorge all ill-gotten gains received during the period of violative conduct and pay prejudgment interest on such ill-gotten gains.

## VII.

Retain jurisdiction of this action in accordance with the principles of equity and the Federal Rules of Civil Procedure in order to implement and carry out the terms of all orders and decrees that may be entered, or to entertain any suitable application or motion for additional relief within the jurisdiction of this Court.

Dated April 24, 2014.

Respectfully submitted,

/s/ Daniel J. Wadley

Daniel J. Wadley
Thomas M. Melton
Cheryl Mori
Paul Feindt
Attorneys for Plaintiff
U.S. Securities & Exchange Commission