Mark R. Gaylord (#5073)
Melanie J. Vartabedian (#10148)
Ballard Spahr LLP
One Utah Center, Suite 800
201 South Main Street
Salt Lake City, Utah 84111-2221
Telephone: (801) 531-3000
Facsimile: (801) 531-3001
gaylord@ballardspahr.com
vartabedianm@ballardspahr.com

Attorneys for Court-Appointed Receiver,
Diane A. Thompson

IN THE UNITED STATES DISTRICT COURT
DISTRICT OF UTAH, CENTRAL DIVISION

| | |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION,<br><br>PLAINTIFF,<br><br>v.<br><br>AMERICAN PENSION SERVICES, INC., a Utah Corporation and CURTIS L. DeYOUNG, an individual,<br><br>DEFENDANTS. | MOTION AND MEMORANDUM SUPPORTING CLARIFICATION REGARDING ORDER APPOINTING RECEIVER, FREEZING ASSETS, AND OTHER RELIEF<br><br>Case No.: 2:14-CV-00309-RJS-DBP<br><br>Judge Robert J. Shelby<br>Magistrate Judge Dustin B. Pead |

Diane Thompson, court-appointed Receiver for American Pension Services, Inc., Curtis DeYoung and related entities (the "Receiver"), by and through her counsel of record Ballard Spahr LLP, hereby moves the Court to approve and clarify the authority of the Receiver to permit certain self-directed investment transactions and distributions to be made in the ordinary course of the APS clients' requests.

## MOTION

By this Motion, the Receiver seeks an order from the Court clarifying its Order Appointing Receiver, Freezing Assets and Other Relief (the "Receivership Order") so that the Receiver may authorize certain transactions requested by American Pension Services clients. For the reasons articulated in more detail below, the Receiver respectfully requests that the Court enter the [proposed] order granting motion for clarification, which is attached hereto as Exhibit 2. The Receiver has requested that the Court consider this Motion on an expedited basis. A motion for expedited consideration is filed concurrently herewith.

## INTRODUCTION

It has been three (3) weeks since the Court entered the Order Appointing Receiver, Freezing Assets and Other Relief (the "Receivership Order") and the Receiver seized control of American Pension Services, Inc. and its related entities (collectively "APS"). Since then, the Receiver has confirmed that $24 million is missing from APS's Master Trust Account into which APS client funds were commingled. Although the Receiver has reopened APS for business, the challenge she faces at this early stage is how to balance the needs of over 5,700 clients who maintain self-directed IRAs against the need to preserve assets, including the remaining commingled funds deposited in the APS Master Trust Account.

Because of the self-directed nature of the APS clients' IRAs, the Receiver has been asked to exercise her discretion in whether to "continue to" make ongoing periodic distribution payments, as deemed necessary ... to self directed plans of APS clients and to other investors" and/or whether to "reallocat[e] assets within an account to new or additional investments, and away from existing investments." Receivership Order ¶ 3. Requests from clients have come in

many forms involving numerous distributions and transactions. Some of the requests involve a self-directed transaction that was in the process of being consummated when the Receiver took control of APS on April 25, 2014.

Recognizing her duties to the Court, which has exclusive jurisdiction and possession over the Receivership Assets and Estate, the Receiver hereby moves the Court for direction, guidance and approval to allow: (i) certain self-directed investment activities by APS clients to proceed; (ii) to make limited distributions payments; (iii) to facilitate use of existing APS client deposits to complete transactions that were being consummated when all APS client accounts were frozen pursuant to the Receivership Order; and (iv) to continue to facilitate investment transactions during the Receivership.

## STATEMENT OF FACTS

1. On April 24, 2014, the Court appointed Diane Thompson as receiver of American Pension Services, Inc., together with any related entities owned, controlled, and/or under common control by or through American Pension Services, Inc. (collectively "APS"), and all assets of Curtis DeYoung ("DeYoung") (collectively "Receivership Defendants"), pursuant to the Order Appointing Receiver, Freezing Assets, and Other Relief, Docket No. 9 ("Receivership Order").

2. The Court found that the appointment of the Receiver is necessary to "marshal[] and preserv[e] all assets of APS and DeYoung (assets of APS and DeYoung, collectively "Receivership Assets") as well as the assets of any other entities that: (a) are attributable to funds derived from investors or clients of the Defendants; (b) are held in constructive trust for the Defendants; (c) were fraudulently transferred by the Defendants; and/or (d) may otherwise be

includable as assets of the estates of the Defendants (collectively, the "Recoverable Assets")." (Receivership Order at 2.)

3. Since taking control of APS, the Receiver has implemented the Receivership Order by seizing control of APS and its related entities. After closing APS for a short period of time, the Receiver has resumed some APS business operations on a limited basis, which include providing services to APS's clients in a manner similar to those provided prior to the entry of the Receivership Order.

4. The Receiver's preliminary investigation has uncovered that APS and sister company American Pension 401K Services ("APS 401K") jointly administer more than 5,700 retirement accounts holding assets consisting of a reported aggregate book value of approximately $382,000,000. These assets are a mix of cash and investments, both of which may be reported on statements and accounting reports with inflated values that may need to be adjusted.

5. APS maintains a commingled master account at First Utah Bank (the "APS Master Trust Account") which had a balance of approximately $26,067,698 as of April 25, 2014. The cash of all APS clients is and has been deposited into the commingled APS Master Trust Account since 1982 until the Receiver took control on April 25, 2014 (the "Loss Period"). Over the life of the account, a total of 14,000 custodial accounts were opened by APS in which monies were deposited and withdrawn from the APS Master Account. At the present time, APS maintains approximately 5,700 open active custodial accounts.

6. The Receiver has determined that of the approximately 5,700 retirement accounts, a total of 2,010 are held by individuals who have reached age 59 ½ who have either (a) exercised

the right to have periodic distributions made from their individual retirement account or (b) have the right to elect to have periodic distributions made from their accounts. The balance of the retirement accounts, consisting of 3,401 client accounts are held by individuals who have not reached age 59 ½. To the extent any of these 3,401 clients were to request or seek to withdraw assets and/or funds from these accounts could result in a tax penalty. There are also 307 accounts where the individual has or will reach age 70½ in 2014, and will be required to take a minimum required distribution in 2014 or be subject to a tax penalty. In all cases, the individuals have the right to direct the type of investment from funds held by their retirement account.

7. Since approximately July 1992, APS has maintained a trust and/or custodial relationship with First Utah Bank pursuant to a Custodial Services Agreement, dated September 1, 2009. (A copy of the Custodial Services Agreement is attached as Exhibit 1.) As Administrator, APS performs administrative duties, delegated by the Bank, with regards to the Custodial Account established for the benefit of all APS IRA clients. (*Id.* § 2.1.)

8. The ordinary practice of APS in establishing an APS client account required it to comply with the following procedures:

(a) The individual client completes an account application which consists of numerous forms, the first being a 5305-A, RA, SA, SEP, EA, or C depending on the specific type of account. Other forms included in the application are a Fee Schedule which outlines the fees and a payment information form where the client indicates how he/she will pay their setup fee. All three of these forms must be completed before APS proceeds with establishing a Custodial Account. The last two pages contained in the application are a Beneficiary Designation and a Transfer Letter which the client

5

completes if he/she intends to transfer funds or assets from an existing retirement account to a newly established account with APS. This Transfer Letter is signed by the client, as well as APS as the administrator, and gives appropriate instruction to the client's existing custodian, and/or administrator on how the client would like their funds or assets (transferred and the specific amount if they are requesting a partial transfer). Once APS receives the client's completed Transfer Letter, and it was signed by both parties, APS sent it on to their administrator. When funds arrived, APS deposited them into the APS Master Trust Account and then would record a reference on the client's specific self-directed account statement. Clients are also able to transfer assets in-kind to their APS self-directed accounts, although this only comprised about 10% of all incoming transfers. In that rare occasion, the client would complete the same Transfer Letter requesting that their asset be reassigned from their existing retirement account to their self-directed account at APS, in which case their asset would be titled as follows, "American Pension Services Administrator for (client's name act #)."

      (b)     Under § 219(e)(1) of the Internal Revenue Code ("IRC"), it is not permissible to make an annual contribution to an IRA with anything other than cash. However, an individual may rollover from a qualified plan (such as a 401(k)) or another IRA directly into an APS IRA with property rather than cash (known in the industry as an "in-kind transaction" or an "in-kind rollover"). The majority of APS clients arrive at APS via a "rollover," which refers to a distribution of assets from one IRA custodian or other eligible retirement plan, follow by the contribution of some or all of those assets into another IRA or other eligible retirement plan. A rollover from an IRA into another

IRA is permissible under section 408(d)(3) of the IRC. Authority exists under sections 402(c), 403(a)(4), 403(b)(8) and 457(e)(16) to perform rollover of other tax-qualified retirement plans such as 401(k) plans, 403(b) plans and 457 plans into an IRA. Under section 219(d)(2) of the IRC, the annual contribution limit ($5,500 for 2014) applicable to IRAs does not apply to rollover contributions. APS clients originally begin with retirement assets with another custodian, usually invested in assets more typically found in retirement programs, such as stocks and mutual funds. The APS client liquidates those investments with the other custodian and directs the custodian to rollover his account to First Utah Bank/APS via wire transfer or a check.

(c) Once an account was established, APS would deposit funds into the commingled APS Master Trust Account held at First Utah Bank. A client could then provide a direction letter to APS advising APS to purchase an asset, pay an expense or make a distribution. The request would be funded from the commingled Master Trust Account.

9. The Receiver has confirmed the $24 million aggregate loss occurred over a period of many years in the APS Master Trust Account. But, the forensic accountants have not yet been able to specifically identify the date and amount of each individual occurrence of lost funds that comprise the aggregate. Because of the commingling of all APS client cash deposits in the Master Trust Account, there was a constant flow of client cash in and out of that account over time as investments were made or income from investments and cash payments to sustain investments occurred. It is becoming apparent that it may not be possible (or economically prudent) for the forensic accountants to identify or trace the specific APS client's cash that was

affected by the identified $24 million loss that has been confirmed by the Receiver. However, the Receiver is capable of identifying and segregating and accounting for APS's business activity and funds on a Pre-Seizure and a Post-Seizure basis.

10. Pursuant to Paragraph 3.A and 3.B. of the Receivership Order, the Receiver is authorized to use her discretion to "continue to make ongoing periodic distribution payments, as deemed necessary ... to self directed plans of APS clients and to other investors" and to "reallocat[e] assets within an account to new or additional investments, and away from existing investments." Receivership Order ¶ 3. IRS regulations require certain distributions to occur upon an individual attaining age 70 ½ or significant tax penalties will be assessed.[1] The Receiver is striving to preserve adequate cash to make these required annual minimum distributions by December 31, 2014 and/or until a Plan of Liquidation is approved.

11. Over time, many APS clients have transmitted and rapidly reinvested cash in real estate or other assets and desire to continue to make sales and purchases during the Receivership. Others have deposited cash and rapidly deployed that cash into LLCs or other legal entities owned by their IRA. The view expressed by these clients is that the cash now being generated and/or reinvested can and should be segregated from the account balances which might be affected by a prior cash loss allocation. The Receiver agrees with this assertion but is concerned that in exercising her discretion to implement clients' directions regarding the reallocation of assets within an account to new and additional investments and away from existing investments certain considerations are now necessary. First, the APS client and Receiver must confirm that

---

[1] The text of § 401(a)(9) of the IRC applies the minimum distribution requirements only to qualified retirement plans such as 401(k) plans, but § 408(a)(6) of the IRC and Treasury regulation § 1.408-8 Q&A 1 extends the application of the required minimum distribution rules of § 401(a)(9) to IRAs.

the direction complies with the controlling laws.[2] Furthermore, in determining whether to authorize a client request, the Receiver must evaluate it in light of the competing cash requirements discussed herein.

12.     Specifically, the Receiver will be required to balance: (1) the desire of self-directed clients of APS to deploy cash into income producing or value enhancing assets; (2) the preservation of cash for required and periodic distributions; and (3) the potential that the loss of cash from the co-mingled APS Master Trust Account and the inability to identify whose cash was lost and when, may result in a future allocation and/or recoupment of the loss from all clients' accounts existing during the Loss Period. Those accounts may or may not currently contain cash. The reinvestment of <u>all</u> client cash to real property or other illiquid investments could result in many more affected client accounts having little to no cash assets. When a Plan of Liquidation is proposed by the Receiver, which will be subject to Court approval, the Receiver will be faced with having to address the scenario where losses may have to be allocated to all client accounts. Allowing reinvestment of all cash increases the potential that the Receiver will not have sufficient funds in the APS Master Trust Account to make required and periodic distributions. In addition, the Receiver may need to request that the Court order future liquidation of assets or cash infusion to address the APS Master Trust Account cash shortfall caused by the $24 million misappropriation by DeYoung.

13.     In resuming business operations, the Receiver has encountered myriad situations in which APS clients have requested the use of cash for completion of pending transactions and/or sought to direct investments as permitted by controlling laws. For example:

---

[2] The APS client is authorized to direct the investments for the individual IRA subject to the restrictions under § 408 of the IRC, with those restrictions described more fully below.

(a) An APS client has a self-directed IRA that owns a piece of real property. The client has a buyer for its real property. The title company is hesitant to close the APS client's real estate purchase transactions without an order expressly permitting the transaction to close. The title company requests this, despite the broad discretion granted to the receiver in the Receivership Order. The delays associated with title companies' requests are causing APS customers harm because their transactions are being delayed or, in some cases, are not able to close. These clients are or may assert damages that could deplete the Receiver Estate.

(b) Another type of self-directed transaction being requested involves an APS client who is selling an interest by a limited liability company and seeking to reinvest the net sales proceeds into a new limited liability company. The client is reluctant to deposit the sales proceeds with the Receiver in the commingled APS Master Trust Account for fear the funds may be frozen or will then be diminished by a future cash loss allocation. The client risks IRS penalties by not returning these funds to APS and is in violation of the Court Order.

(c) The Receiver has received requests to fund newly formed LLC entities from the cash currently held in the APS Master Trust Account. Once the cash is funded to the LLC, the Receiver has no ability to control the deployment of this cash.

(d) There are also situations in which an APS client deposited funds into the APS Master Trust Account a day or two before the Court froze all APS accounts. The purpose for depositing the funds was to immediately reinvest those funds in a new

offering that will be unavailable if the investment is not completed in a timely manner. These clients may also assert lost opportunity or other damages.

(e)  Another concern of the Receiver involves APS clients who are preventing payment of income on investments to APS, as administrator of their accounts, with the intention of issuing payments from their self-directed IRA to themselves. This is a serious violation of the regulations regarding self-directed IRA's and may result in tax penalties. The Receiver has cautioned these clients to reconsider and consult their tax advisors.

14.  In light of these various scenarios, the Receiver believes that a prudent interim approach is to require that account holders maintain or reach a ratio of twenty percent (20%) cash to asset value prior to any reinvestments and/or that account holders be permitted to make reallocation investments only after written acknowledgment and agreement of the possible requirement to liquidate some of the self-directed investments to generate cash in the future when a Court approved Plan of Liquidation is implemented. In exercising her discretion going forward, and to take ongoing action to preserve and maintain APS investors' assets, the Receiver would further propose forming an investor committee comprised of representatives from account holders of all types and sizes to provide input and facilitate concurrence on an equitable proposed Plan of Liquidation which might avoid costly and protracted intra-account holder litigation. Many of the account holders are in agreement with this approach and have volunteered to participate.

15.  To carry out these goals and to service clients' requests, the Receiver is considering permitting the following types of transactions on a case by case basis:

(a) Payment of ordinary and necessary expenses to maintain and preserve assets (i.e. HOA fees, property taxes, utility bills, repairs and maintenance), provided these monthly or quarterly expenses are covered by individual account income generated from the APS's client investments and do not require the Receiver to fund these expenses from any portion of the APS Master Trust Account.

(b) Cash neutral liquidation of investments and reinvestment into other assets within an APS client's IRA, i.e. liquidation of real estate and reinvestment in stocks, with the acknowledgment, described in paragraph 14 above.

(c) Investment of existing cash held in the APS Master Trust Account into new investments as directed by the APS client (i.e. investments of existing cash into real property) with the limitations and acknowledgements described in paragraph 14 above.

(d) Investment of existing cash held in the APS Master Trust Account into an LLC, partnership or corporation, of which the IRA is greater than 50% member, shareholder or partner and the LLC, partnership or corporation, and has identifiable assets such as real estate, with the limitation and acknowledgements described in paragraph 14 above.

(e) New incoming cash deposited into the APS Master Trust Account in which the depositor, an APS client, directs the funds to be invested in other investments i.e. new or existing account holder or investment of additional funds to client accounts and directed to be invested, subject to paragraph 14 above.

(f) Pre-seizure regularly scheduled monthly, quarterly or semi-annual distributions to clients in accordance with applicable laws.

   (g) Required minimum distributions to clients over 70.5 years of age to comply with IRS guidelines.

  16. By taking this approach, the Receiver will account for and can continue to facilitate most transactions on a going forward basis while concurrently preserving cash and pursuing the Receivership Defendants to recover the misappropriated monies from the APS Master Trust Account.

  17. The Receiver intends to pursue all available means to recover the cash short fall caused by DeYoung's misappropriation of over $24 million from the APS Master Trust Account. This will include securing all Receivership Assets pursuing insurance coverage, ill-gotten gains and, to the extent necessary, liquidating said assets so that the proceeds may be used to reduce the loss from the misappropriated funds.

  18. It is for these reasons the Receiver requests: (1) Authorization from the Court approving the types of transactions listed in paragraph 17 above; and if so authorized, (2) An order of clarification which clarifies paragraphs 3A and 3B of the Receivership Order.

## ARGUMENT

  By this Motion, the Receiver asks the Court for direction and approval to allow certain self-directed transactions to proceed despite the Receivership Order. The Receivership Order mandates the Receiver "marshal[] and preserv[e] all assets of APS and DeYoung (assets of APS and DeYoung, collectively "Receivership Assets") as well as the assets of any other entities that: (a) are attributable to funds derived from investors or clients of the Defendants; (b) are held in constructive trust for the Defendants; (c) were fraudulently transferred by the Defendants; and/or (d) may otherwise be includeable as assets of the estates of the Defendants (collectively, the

"Recoverable Assets")." Receivership Order at 2. In carrying out these duties and resuming APS's business operations, the Receiver has been requested by APS clients to perform certain transactions on behalf of APS's clients. The Receiver has discretion to proceed with certain transactions. *Id.*, ¶¶ 3.A. and 3.B. Except as provided, the Receiver must obtain Court approval. Accordingly, the Receiver hereby seeks authorization from the Court to carry out certain types of transactions, and asks the Court to clarify the Receivership Order.

The Receiver's primary goal is to preserve APS clients' assets and to not do additional harm to those assets. APS customers have requested and/or it is anticipated customers will request the Receiver to allow certain self-directed transactions to proceed despite the freeze imposed by the Court. The Receiver would like to honor these requests under following terms and conditions, subject to paragraph 14 above.

### 1. Payment of ordinary and necessary expenses to maintain and preserve assets i.e. HOA fees, property taxes, utility bills, repairs and maintenance.

Payment of ordinary and necessary expenses of APS clients' IRAs are necessary in order to maintain and preserve assets (mostly real estate) that are owned by specific IRAs. At the APS client's instructions, prior to the Receiver seizing control of APS, APS was paying fees on behalf of clients in order to preserve the real estate such as utility bills, property taxes, and HOA fees. The Receiver proposes only paying such fees so long as the client has a cash account balance equal to at least twice the amount of the bill the client is requesting be paid. Most of the APS client accounts automatically replenish so as to not leave a shortfall because they generate interest income, rent and the like. Not paying such bills and fees may cause harm to APS clients as they would be penalized, incur interest for unpaid bills and fees and/or would not be able to adequately preserve and maintain their asset.

Moreover, if a client were to pay a bill or fee out of his or her general assets rather than IRA assets, it could cause a Prohibited Transaction under § 4975 of the IRC.  A Prohibited Transaction results in the account ceasing to qualify as an IRA under § 408(e)(2) of the IRC.  This results in: (i) the account's earnings ceasing to be tax exempt as of the first day of the taxable year in which the prohibited transaction occurs, (ii) treatment under the IRC of the entire account as a constructive distribution to the APS client equal to the market value of the account as of the first day of the year, and (iii) a potential 15% excise tax.  § 408(e)(2)(B) of the IRC; Treasury Regulation ¶ 1.408-1(c)(2)(i).

2. **Liquidation of investments and reinvestment into other assets within an APS client's IRA, i.e. liquidation of real estate and reinvestment in stocks.**

The Receiver requests authority subject to paragraph 13 above to permit APS clients to direct APS to sell one type of non-cash asset (such as a stock) and re-invest it in another type of non-cash asset (a different stock or real estate).  APS clients will be harmed if forced to retain an asset indefinitely, and may be subject to litigation if an asset held by an APS client substantially drops in value and he or she is not permitted to liquidate such asset prior to the drop in value.  As such, the Receiver seeks authorization from the Court permitting her to complete such transactions on a case-by-case basis going forward.

3. **Investment of existing cash into other investments within APS i.e. investments of existing cash into real property.**

The Receiver requests authorization subject to paragraph 14 above to permit APS clients to direct APS to take cash they have allocated and deposited in their APS client accounts and invest it in a tangible asset such as real property and/or recognized securities.  The transfer of cash into a tangible asset which is not a liquid asset may cause complications at the time a Plan

of Liquidation is determined. For example, if an APS client transfers all of their cash into a piece of real property, and it is determined that all APS clients must take a percentage loss on their APS client account, that client would then be responsible for either making a cash contribution equivalent to the percentage allocation, or it would have to sell or encumber its real property in order to fund the allocation of the loss. Prior to the Receivership, the APS business model specialized in allowing APS clients to self-direct investments into any asset not specifically prohibited by the IRC, and APS clients chose APS for that reason.[3] Accordingly, the Receiver seeks guidance regarding whether this type of transaction may be permitted with the safeguards proposed in paragraph 14 above.

### 4. Investment of existing cash into closely held LLCs, partnerships or corporations with identifiable hard assets such as real estate.

As with scenario 3 above, it is common for an individual IRA to hold unique assets via an LLC or other organization, especially when the individual may own a portion of a given real property (e.g. a 25% share of a real estate property) rather than the entire property. In this example, the APS clients' IRA would purchase a 25% share in an LLC (or other partnership corporate entity), in which various LLC owners would collectively own real property.

The IRC does not prohibit investment in an entity such as an LLC, partnership, or corporation, as long as the action does not constitute a "Prohibited Transaction" under § 4975 of

---

[3] Those restrictions include (i) prohibited investment in life insurance contracts under § 408(a)(4) of the IRC; (ii) prohibiting the commingling assets with other property, except in connection with a common trust fund or common investment fund (such as the APS Master Trust Account) under § 408(a)(5) of the IRC; (iii) prohibited investment in "collectibles" under § 408(m) of the IRC; and (iv) not committing a "Prohibition Transaction" as defined in § 4795 of the IRC (section 408(e)(2)(A) of the IRC. A Prohibited Transaction entails a transaction between the IRA and a "Disqualified Person" (as defined in § 4975(c)(1) of the IRC) and generally prohibits self-dealing between an account holder (or other fiduciary) and the IRA, such as an account holder borrowing or lending assets to an IRA, buying or selling property to the IRA or receiving compensation for services provided to the IRA or its underlying investment(s).

the IRC. Generally, a Prohibited Transaction entails account holder or other disqualified person from selling, exchanging, or leasing property directly to or from an IRA, lending money or extending credit to or from an IRA, furnishing goods, services or facilities to or from an IRA, personal use of monies within the IRA, or receipt of consideration or income as a result of actions taken within the IRA. § 4975 of the IRC. The Receiver proposes creating an attestation form, in which an individual will attest that the transaction he or she is directing APS to undertake will not constitute a Prohibited Transaction and will not otherwise be restricted or prohibited under the IRC subject to paragraph 14 above. The Receiver asks the Court to allow the Receiver to authorize these transactions on a case-by-case basis.

5. **New incoming cash deposited to APS and invested in other investments i.e. new account holder or investment of additional funds to client accounts and directed to be invested.**

Some individuals (both existing APS customers and new APS customers) wish to deposit cash with APS and invest it into a non-cash asset. The Receiver does not anticipate problems with this as the deposit of cash on a going forward basis is easily traceable and not hindered by the misappropriated monies that exist pre-receivership. The Receiver requests the Court to authorize these transactions.

6. **Regularly scheduled monthly, quarterly or semi-annual distributions to clients.**

The Receiver asks the Court to allow her to honor existing elected distributions. It is the Receiver's understanding that APS clients depend on such distributions to live. The Receiver is not currently considering making any new distributions, except for distributions under Paragraph 7 below not already set up before the Receivership Order.

Individuals who are under 59 ½ who receive a distribution from his or her IRA are subject to an additional 10% premature distribution tax, unless an exception applies. § 72(t) of the IRC. The Receiver asks the Court to authorize payment of these expenses or distributions on behalf of APS clients per their requests to avoid these negative tax consequences.

7. **Required minimum distributions to clients over 70.5 years of age to comply with IRS guidelines.**

Section 401(a)(9) of the IRC requires certain minimum distributions for individuals over the age of 70.5 and for individuals who inherit IRA accounts as a non-spouse beneficiary, based on the life expectancy of the individual.[4] In order to comply with the § 401(a)(9) requirements, the Receiver requests authorization to make IRA distributions at the appropriate time, subject to available cash within the APS clients' accounts equal to at least half of the clients' cash account. A 50% excise tax applies on the amount of a minimum distribution if an individual does not receive the minimum distribution on a timely basis. § 4974 of the IRC; Treasury Regulation § 54.4974-2, Q&A # 1.

As noted, the Receiver's main goal in carrying out APS's business operations is to preserve APS clients' assets and to minimize the harm to APS clients. Although the Receivership Order gives the Receiver broad discretion in carrying out her duties, APS clients and related third parties, including brokerage firms, title companies and banks are unwilling to complete transactions without an order of the Court. The title companies' unwillingness to close pending real estate transactions without a specific order may cause harm to APS clients with irreconcilable tax implications. Accordingly, the Receiver respectfully requests that the Court

---

[4] The text of § 401(a)(9) of the IRC applies the minimum distribution requirements only to qualified retirement plans such as 401(k) plans, but § 408(a)(6) of the IRC and Treasury Regulations § 1.408-8 Q&A 1 extends the application of the required minimum distribution rules of § 401(a)(9) to IRAs.

enter an order authorizing the Receiver to perform the types of transactions articulated above in paragraphs 1-7 and to clarify that title companies do not need an additional order with respect to each individual transaction.

## CONCLUSION

For the foregoing reasons, the Receiver hereby requests that the Court enter an Order Clarifying the Receivership Order. A proposed Order is attached hereto as Exhibit 2.

DATED this 15th day of May, 2014.

/s/ Mark R. Gaylord
Mark R. Gaylord, Esq.
Melanie J. Vartabedian, Esq.
BALLARD SPAHR LLP
Attorneys for Court-appointed Receiver

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct of copy of the foregoing **MOTION AND MEMORANDUM SUPPORTING CLARIFICATION REGARDING ORDER APPOINTING RECEIVER, FREEZING ASSETS, AND OTHER RELIEF** was served to the following this 15th day of May 2014, in the manner set forth below:

[ X ] Through the CM/ECF System for the U.S. District Court

[  ] Hand Delivery

[  ] U.S. Mail, postage prepaid

[ X ] E-mail:    wadleyd@sec.gov; meltont@sec.gov; moric@sec.gov; feindtp@sec.gov; pmoxley@djplaw.com

        Daniel J. Wadley, Esq.
        Thomas M. Melton, Esq.
        Cheryl M. Mori, Esq.
        Paul N. Feindt, Esq.
        SECURITIES & EXCHANGE COMMISSION
        15 West South Temple Street, Suite 1800
        Salt Lake City, UT 84101

        Paul T. Moxley, Esq.
        Durham Jones & Pinegar
        111 East Broadway, Suite 900
        Salt Lake City Utah 84111
        Attorney, Special Appearance for Defendants

        /s/ Mark R. Gaylord