Mark R. Gaylord (#5073)
Melanie J. Vartabedian (#10148)
Tesia N. Stanley, Esq. (#13367)
Scott S. Humphreys (*admitted pro hac vice*)
BALLARD SPAHR LLP
One Utah Center, Suite 800
201 South Main Street
Salt Lake City, Utah 84111-2221
Telephone:  (801) 531-3000
Facsimile:  (801) 531-3001
gaylord@ballardspahr.com
vartabedianm@ballardspahr.com
stanleyt@ballardspahr.com
humphreys@ballardspahr.com

Attorneys for Court-Appointed Receiver,
Diane A. Thompson

## IN THE UNITED STATES DISTRICT COURT
## DISTRICT OF UTAH, CENTRAL DIVISION

| | |
|---|---|
| **SECURITIES AND EXCHANGE COMMISSION,**<br><br>Plaintiff,<br><br>v.<br><br>**AMERICAN PENSION SERVICES, INC.,** a Utah Corporation and **CURTIS L. DeYOUNG,** an individual,<br><br>Defendants. | **SUMMARY OF RESPONSES TO RECEIVER'S PROPOSED PLAN OF LIQUIDATION**<br><br>Case No.:  2:14-CV-00309-RJS-DBP<br><br>Judge Robert J. Shelby<br>Magistrate Judge Dustin B. Pead |

Diane Thompson, as Receiver for American Pension Services, Inc., by and through her counsel of record Ballard Spahr LLP, hereby submits this Summary of Responses to Receiver's Proposed Plan of Liquidation in accordance with the Court's order.

**SUMMARY OF RESPONSES**

In accordance with the Order Setting Deadlines Pertaining to Receiver's Proposed Plan of Liquidation, dated September 18, 2014 (the "Scheduling Order"), clients and creditors of APS and any other interested parties had until October 20, 2014 to submit written responses and/or objections to the Receiver's proposed Plan of Liquidation of American Pension Services, Inc. (the "Plan").  On or before October 20, 2014, the Receiver received 835 written responses and/or objections to the Plan (the "Responses").[1]

Pursuant to the Scheduling Order, the Receiver has collected and reviewed all 835 Responses and hereby submits *in camera* in electronic format the Responses for the Court's review.  In doing so, the Receiver has categorized the Responses into one of ten main categories with additional sub-categories.  To simplify the Court's review of the Responses, the Receiver prepared and also submits a category designation spreadsheet of client responses ("Spreadsheet") which summarizes all 835 Responses into a single document containing the following information:  (a) the name of each person who submitted a response; (b) if the person is an APS client, (i) the client's account number with APS, (ii) the total account balance reflected by APS as of April 25, 2014, and (iii) the cash balance, if any, reflected by APS as of April 25, 2014; and (c) the category or categories to which the Receiver designated to the response and/or objection.

---

[1] Actually, the Receiver continued to receive responses and/or objections after October 20, 2014, which are included in the *in camera* submission to the Court and Spreadsheet.  Some Responses and/or objections received late have not been categorized or included on the Spreadsheet and are submitted on a separate disk, which is also being submitted to the Court *in camera.*

In establishing the categories, the Receiver attempted to capture the sum and substance of the responses and objections being voiced by clients and creditors alike. As expected, the Responses were varied and often were personal to each APS client's specific situation making the task of placing individual responses into a single category difficult. In addition, many Responses raised a number of objections and/or concerns, resulting in the response being placed in more than one category. The spreadsheet provides the Court with a snapshot of each individual response so that it may discern the response in the context of the overall Responses received.

The categories and subcategories identified by the Receiver are described as follows:[2]

1. **Supportive of Plan/No objection**. This category identifies those who support and/or had no comment to the Plan. Although the Responses support the Plan, some provide suggestions on how the Receiver may want to revise the Plan to improve it and/or includes a comment to a specific aspect of the Plan. A total of 150 out of the 835 Responses fall within this category.

2. **Account exempt from fraud/allocation of Loss**. This category identifies those who believe their IRA account should be exempt from the Receiver's proposed loss allocation of ten percent. The reasons expressed for exempting their accounts are varied. Thus, the Receiver developed a group of sub-categories in an effort to further assist the Court, which are set forth as follows:

---

[2] The Receiver attaches hereto as Exhibit 1 a Category Key for Responses to Plan of Liquidation.

a. <u>Account opened after fraud occurred</u>.  This sub-category identifies those whose IRA accounts were not opened until after 2009 (or a specified date) wherein the client believes his/her account was unaffected by DeYoung's misappropriation or fraud, which they assert occurred before they became an APS client.  A total of 39 out of the 835 Responses fall within this sub-category.

b. <u>Account opened shortly before receivership</u>.  This sub-category identifies those whose accounts were opened prior to the appointment of the Receiver, but whose accounts had zero cash until after the Receiver was appointed, like APS client James Stava.  These individuals assert their accounts should not be subject to the Receivership and Asset Freeze Order.  A total of 27 out of the 835 Responses fall within this sub-category.

c. <u>Money only in commingled account for very short period of time</u>.  This sub-category identifies those whose cash was in the commingled Master Trust Account for a short period of time (a day, week, month, etc.) before it was deployed elsewhere.  These clients assert their cash was not part of the fraud due to the very short amount of time their cash sat in the commingled account.  A total of 37 out of the 835 Responses fall within this sub-category.

d. <u>Cash went to specified investment</u>.  This sub-category identifies those whose funds were invested in a specific investment, most commonly a piece of real property, limited liability company, or other tangible asset.  Because these clients assert they always had control over their account/asset and never allowed DeYoung to invest their money in any of the bad/tainted investments, their money was not stolen and they should not have to bear any loss.  A total of 141 out of the 835 Responses fall within this sub-category.

e. <u>Request tracing approach.  Did not invest in a nefarious/tainted investment</u>. This sub-category identifies those who object to the pro rata approach and prefer that the Receiver trace their investment, which they assert will reveal that their money was not stolen by DeYoung, nor was it invested in any of the bad/tainted investments that lost money and/or were subject to fraud.  A total of 27 out of the 835 Responses fall within this sub-category.

f. <u>Funded in kind</u>.  This sub-category identifies those who rolled over an investment/asset "in kind" to APS (i.e. a client owned real estate prior to signing up with APS; client signed up for APS and rolled the real estate directly into their account at APS), and never had any cash in the commingled Master Trust account.  A total of 7 out of the 835 Responses fall within this sub-category.

g. <u>401k plan never in comingled account</u>.  This sub-category identifies those who assert they are APS 401k clients whose deposits were never commingled in the Master Trust Account.   A total of 22 out of the 835 Responses fall within this sub-category.

h. <u>Other</u>.  Other reasons individuals do not believe they should have to bear any loss not fitting into any of the categories above.  A total of 2 out of the 835 Responses fall within this sub-category.

3. **Objection to Allocation of Loss.**

a. <u>Object to the 10% allocation of loss</u>.  This sub-category identifies those who believe the allocation of loss should be less than 10% (some asserting it should be 6.8% or 7%) and there should be no provision for valuation adjustments or other unforeseen impacts included in the loss allocation.  A total of 116 out of the 835 Responses fall within this sub-category.

   b. <u>Former clients should share in loss</u>.  This sub-category identifies those who believe loss should be allocated to former APS clients (either all former clients or those that took out large cash distributions).  A total of 39 out of the 835 Responses fall within this sub-category.

   c. <u>Loss should only be allocated to clients with cash.</u>  This sub-category identifies those who believe loss should only be allocated to APS clients with cash balances in their accounts as of April 25, 2014 and not to those with non-cash assets.  A total of 26 out of the 835 Responses fall within this sub-category.

   d. <u>Amend formula and consider time with APS and account size</u>.  This sub-category identifies those who believe the Receiver should revise the pro rata 10% allocation of loss proposal and implement an allocation formula that takes into account how long the client was a client of APS and the size of the account balance.  A total of 13 out of the 835 Responses fall within this sub-category.

   e. <u>Refuses to sell property to meet allocation requirement</u>.  This sub-category identifies those who refuse to or state they cannot sell property to facilitate account adjustment for the loss.  Reasons include not wanting to sell property in a down market, needing adequate time to sell property, relying on monthly rental income generated by property to pay for living expenses, incurring brokerage fees and other losses that will be sustained in order to sell property.  Some clients believe their allocation of loss should be reduced commensurate with the amount of cost they will incur from having to sell property.  A total of 21 out of the 835 Responses fall within this sub-category.

f. <u>Other</u>.  Other reasons individuals object to the allocation of loss not fitting into the categories above.  A total of 15 out of the 835 Responses fall within this sub-category.

4. **Valuation Incorrect**.  This category identifies those who object to valuing APS client accounts as of April 25, 2014 for a variety of reasons, including:

a. <u>Non-recourse.</u>  This sub-category identifies those whose account includes encumbered real estate who assert the value should be reduced by the amount of the encumbrance.  A total of 12 out of the 835 Responses fall within this sub-category.

b. <u>Write down request (past) refused by APS.</u>  This sub-category identifies those who requested prior to the Receivership that APS write down/re-value an asset in their account, but APS rebuffed/refused.  Also includes clients who requested APS close their account, but APS refused.  A total of 53 out of the 835 Responses fall within this sub-category.

c. <u>Write down request (current) due to worthless or lower value than listed</u>.  This sub-category identifies those who disagree with their account value as of April 25, 2014 and contend post-Receivership that their account value should be written down/re-valued because it is not worth what is reflected on APS' system or is not worth anything at all.  Examples of assets clients want written down/re-valued include promissory notes that have not been paid back in years and which the clients believe will never be paid back or real estate that has been incorrectly valued at an inflated level by APS so that more fees could be charged.  A total of 98 out of the 835 Responses fall within this sub-category.

d. <u>Foreign Currency—method of valuation.</u> This sub-category identifies those who want to re-value their foreign currency, which values fluctuate frequently.  Some suggest the Receiver should contact the currency exchange (Sterling) from where the foreign currency

was purchased for a more accurate valuation assessment.  A total of 12 out of the 835 Responses fall within this sub-category.

   e. <u>Other</u>.  Other reasons individuals object to valuing APS accounts as of April 25, 2014.  A total of 23 out of the 835 Responses fall within this sub-category.

 5. **<u>IRS treatment of loss allocation</u>**.  This category identifies those with questions regarding whether and how contributions made from outside their IRA accounts to cover the allocation of loss will be treated by the IRS.  Includes questions about what other options clients will have available to pay the allocation of loss, including whether clients may take a loan against an investment/asset.  Also includes clients who want an answer from the IRS before a decision is made on the Proposed Plan of Liquidation.  A total of 50 out of the 835 Responses fall within this category.

 6. **<u>Objects to fees.</u>**  This category identifies those who object to paying fees while in Receivership, including the below.

   a. <u>Management Fees.</u>  This sub-category identifies those who believe they should not be assessed a management fee from APS, or the fee should be reduced, because their accounts are frozen and they cannot invest their money as they desire.  A total of 48 out of the 835 Responses fall within this sub-category.

   b. <u>Administrative fees (Receiver)</u>.  This sub-category identifies those who object to paying an administrative fee for the Receiver, or who believe the Receiver's fee is too high.  Includes clients who agree to pay administrative fees, but believe the fees should be spread evenly among the clients and not included into the allocation of loss 3% cushion.  A total of 14 out of the 835 Responses fall within this sub-category.

7. **Comments/questions re new administrator and purchase agreement.**  This category identifies those who are supportive of selling the management of APS accounts to a new administrator and are willing to move to new administrator selected by the Court/Receiver; clients who want to do this as soon as possible; clients who want to choose their own new administrator, not one selected by the Court/Receiver; clients who have questions about how the new administrator is being selected; clients who agree with the Court/Receiver selecting a new administrator, but would like a choice between two or more; clients who want to know who the names of the potential new administrators being considered.  A total of 46 out of the 835 Responses fall within this category.

8. **Other avenues for recovery**.  This category identifies those who would like the Receiver to pursue other avenues of recovery, including the below.

a. Bank.  This sub-category identifies those who would like Receiver to pursue claims against First Utah Bank and believe the Bank is liable for the losses as the custodian of the accounts; clients with questions regarding what is being done about First Utah Bank.  A total of 27 out of the 835 Responses fall within this sub-category.

b. Insurance.  This sub-category identifies those who would like the Receiver to pursue any and all insurance claims, including insurance held by First Utah Bank.  A total of 14 out of the 835 Responses fall within this sub-category.

c. Other.  This sub-category identifies those who believe others are culpable for the loss and that the Receiver should pursue them, including the Memmotts.  A total of 11 out of the 835 Responses fall within this sub-category.

9. **Other/Misc**.  This is a category for comments that do not fit any of the categories above.  Comments include clients who request a distribution of their full account value; clients who want their money now; clients who want the Receivership wrapped up quickly; clients who want to close their accounts; clients who wish to pay their 10% allocation of loss now and move on to a new administrator; clients who want to get their foreign currency out and are concerned the currency will increase in value and they won't be able to get it out at the opportune time.  A total of 137 out of the 835 Responses fall into this category.

    a. SEC liable for recent losses.  This sub-category identifies those who believe the SEC should have warned the public that APS was under investigation and that the SEC is liable for losses sustained from the time the investigation was commenced.  A total of 6 out of the 835 Responses fall into this sub-category.

    b. Requests additional information.  This sub-category identifies those who request additional information from the Receiver, most commonly questions about how their account specifically will be affected by the Proposed Plan.  A total of 12 out of the 835 Responses fall into this sub-category.

10. **Curtis DeYoung**.  This category identifies those who are angry at Curtis DeYoung and believe he should be criminally prosecuted and spend a long time in jail.  A total of 53 out of the 835 Responses fall into this category.

DATED this 4th day of November 2014.

        /s/ Melanie J. Vartabedian
        Mark R. Gaylord, Esq.
        Melanie J. Vartabedian, Esq.
        Tesia N. Stanley, Esq.
        Scott S. Humphreys, Esq. (*admitted pro hac vice*)
        BALLARD SPAHR LLP
        Attorneys for Court-Appointed Receiver, Diane A. Thompson

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct of copy of the foregoing **SUMMARY OF RESPONSES TO RECEIVER'S PROPOSED PLAN OF LIQUIDATION** was served to the following this 4th day of November 2014, in the manner set forth below:

[ X ] Through the CM/ECF System for the U.S. District Court

[ ] Hand Delivery

[ ] U.S. Mail, postage prepaid

[ ] E-mail: wadleyd@sec.gov; moric@sec.gov; feindtp@sec.gov; pmoxley@djplaw.com; tburns@djplaw.com; rpahnke@djplaw.com; jchandler@djplaw.com; judsonpitts@hotmail.com; judson@wimmerpitts.com; gbh@pkhlawyers.com; dleta@swlaw.com; ahardenbrook@swlaw.com; john@johnbagleylaw.com; krw@scmlaw.com; markjgregersen@hotmail.com

    Daniel J. Wadley, Esq.
    Cheryl M. Mori, Esq.
    Paul N. Feindt, Esq.
    SECURITIES & EXCHANGE COMMISSION
    351 S. West Temple, Suite 6.100
    Salt Lake City, UT 84101

    Paul T. Moxley, Esq.
    Thomas J. Burns, Esq.
    Z. Ryan Pahnke, Esq.
    Joshua D. Chandler, Esq.
    DURHAM JONES & PINEGAR
    111 East Broadway, Suite 900
    Salt Lake City, UT 84111

    Judson T. Pitts, Esq.
    WIMMER & PITTS, P.C.
    11651 S. Harvest Rain Ave.
    South Jordan, UT 84095

    George B. Hofmann, IV, Esq.
    PARSONS KINGHORN HARRIS
    111 E. Broadway 11th Fl.
    Salt Lake City, UT 84111

David E. Leta, Esq.
Andrew V. Hardenbrook, Esq.
SNELL & WILMER L.L.P.
15 West South Temple, Suite 1200
Salt Lake City, UT 84101

John P. Bagley, Esq.
BAGLEY LAW, PC
308 East 4500 South, Suite 175
Salt Lake City, UT 84107

Kim R. Wilson, Esq.
SNOW, CHRISTENSEN & MARTINEAU
10 Exchange Place, Eleventh Floor
Post Office Box 45000
Salt Lake City, UT 84145-5000

Mark J. Gregersen, pro se
10 West Broadway, Suite 505
Salt Lake City, UT 84101


                          /s/ Lori D. Brown