Mark R. Gaylord (#5073)
Melanie J. Vartabedian (#10148)
Tesia N. Stanley, Esq. (#13367)
Scott S. Humphreys (*admitted pro hac vice*)
BALLARD SPAHR LLP
One Utah Center, Suite 800
201 South Main Street
Salt Lake City, Utah 84111-2221
Telephone:  (801) 531-3000
Facsimile:  (801) 531-3001
gaylord@ballardspahr.com
vartabedianm@ballardspahr.com
stanleyt@ballardspahr.com
humphreys@ballardspahr.com

*Attorneys for Court-Appointed Receiver,*
*Diane A. Thompson*

# IN THE UNITED STATES DISTRICT COURT
## DISTRICT OF UTAH, CENTRAL DIVISION

| | |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION, <br><br> **Plaintiff,** <br><br> v. <br><br> **AMERICAN PENSION SERVICES, INC., a Utah Corporation and CURTIS L. DeYOUNG, an individual,** <br><br> **Defendants.** | **RECEIVER'S MEMORANDUM IN RESPONSE TO APS CLIENT RESPONSES AND OBJECTIONS TO PROPOSED PLAN OF LIQUIDATION** <br><br> **Case No.:  2:14-CV-00309-RJS-DBP** <br><br> **Judge Robert J. Shelby** <br> **Magistrate Judge Dustin B. Pead** |

## <u>TABLE OF CONTENTS</u>

INTRODUCTION ........................................................................................................... 1

I.     THE RECEIVER'S PROPOSED LIQUIDATION PLAN.................................. 3

II.    THE RECEIVER'S RESPONSE TO APS CLIENT CONCERNS REGARDING THE PROPOSED PLAN OF LIQUIDATION.................................................. 7

    1.     Category No. 1 – Supportive of Proposed Plan. ...................................... 7

    2.     Category No. 2 – Account Exempt from Loss Allocation..................................... 9

         a.     Category 2(a) - Requesting Exemption Because Assert that Account Opened After Fraud Occurred. (Recommend No Change.)......... 9

         b.     Category 2(b) - Account Funded After Receivership or Shortly Before Receivership. (Recommend Change in Plan per Order issued October 21, 2014 [Dkt. 255].)......................................... 12

         c.     Category 2(c) - Requesting Exemption Due to Short Term Cash. (Recommend No Change.).......................................................... 14

         d.     Category 2(d) – Cash Deposited in Master Trust Account, but Directed to Specified Investment. (Recommend No Change.)................. 15

         e.     Category 2(e) - Tracing Request.  (Recommend No Change.)................. 21

         f.     Category 2(f) - Account Exempt Because Funded in Kind – Never Any Cash in Master Trust Account. (Recommend Change in Plan). ....... 26

         g.     Category 2(g) – American Pension 401(k) Services, Inc. Accounts. (Recommend Change in Plan.) .............................................. 29

         h.     Category 2(h) – Other Objections.......................................... 31

    3.     Category No. 3 – Loss Allocation........................................................ 31

         a.     Category 3 (a) - Objections to Loss Allocation of 10%. (Recommend No Change.).......................................................... 32

         b.     Category 3(b) - Exclusion of Former Clients or Those Current Clients who Took Distributions.  (Recommend No Change.)................. 38

     c.       Category 3(c) - Allocate Only to Clients with Cash at Time Receivership Commenced.  (Recommend No Change.) ......................... 40

     d.       Category 3(d) - Amend Loss Allocation to Consider Time and Account Size. (Recommend No Change.) ................................. 41

     e.       Category 3(e) - Refusal or Requesting Alternatives to Requirement to Liquidate Assets to Pay Loss Allocation.  (Recommend No Change.) ............................................................................... 42

     f.       Category 3(f) -- Other. ............................................................... 45

4.     Category 4 - Valuation. (Recommend Some Changes.) ....................................... 46

     a.       Category 4(a) – Non-recourse (i.e. Loans Collateralized by Property) (Recommend Change.) ............................................. 46

     b.       Category 4(b) – Write Down Request Refused by APS. (Recommend No Change.) .................................................... 47

     c.       Category 4(c) – Write Down Due to Worthless or Lower Value of Asset. (Recommend No Change.) ............................................. 49

     d.       Category 4(d) -- Foreign Currency. (Recommend No Change.) .............. 51

     e.       Category No. 4(e) -- Other. ........................................................ 52

5.     Category 5 - IRS Treatment of Loss Allocation. .................................................. 55

6.     Category 6 – Objection to Fees. ........................................................................ 57

     a.       Category 6(a) – Management Fees. ........................................... 57

     b.       Category 6(b) - Administrative Fees (Receiver). ...................................... 59

7.     Category 7 - Transition to new Custodian/Administrator. (Proceed with Plan.) ....................................................................................................... 61

8.     Category 8 - Other sources of recovery and timing of pursuit relative to plan approval. .................................................................................................... 68

     a.       Category 8(a) – Bank. ............................................................... 68

     b.       Category 8(b) – Insurance. ........................................................ 69

     c.       Category 8(c) – Other. .............................................................. 69

9.       Category 9 – Other/Miscellaneous.........................................................70

         a.      Category 9(a) – SEC Liable for Recent Losses. .......................71

         b.      Category 9(b) -- Requests for Additional Information. ............71

         c.      New Category 9(c) – Release of Claims....................................72

         d.      New Category 9(d) – Committee................................................73

         e.      New Category 9(e) – Recoveries/Expenses...............................75

10.     Category 10 - Comments Regarding DeYoung. ....................................77

11.     Category 11 – [NEW] Responses of Counsel on Behalf of Clients. ...................78

12.     Category 12 – [NEW] Responses of Creditors and Other Interested Parties.................................................................................................86

a.      First Utah Bank. .....................................................................................87

b.      Receiver of National Note of Utah, Inc. ...............................................90

c.      Judgment Creditors. ..............................................................................90

AMENDED LIQUIDATION PLAN .......................................................................91

INDEX .....................................................................................................................96

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**FEDERAL CASES**

*Commodity Futures Trading Comm'n v. Eustace*,
  2008 WL 471574 (E.D. Pa. Feb. 19, 2008) ...........................................................................23

*Commodity Futures Trading Comm'n v. Wilson*,
  2013 WL 3776902 (S.D. Cal. July 17, 2013) .........................................................................23

*Corp. of the Presiding Bishop v. Hodel*,
  830 F.2d 375 (D.C. Cir. 1987).................................................................................................27

*Cunningham v. Brown*,
  265 U.S. 1 (1924)...................................................................................................14, 21, 24

*In re Big v. Holding Corp.*,
  267 B.R. 71 (Bankr. D. Del.2001).......................................................................................18, 20

*In re Foxmeyer Corp.*,
  286 B.R. 573 (Bankr. D.Del. 2002) ........................................................................................18

*In re Geneva Steel Co.*,
  281 F.3d 1173 (10th Cir. 2002) ..............................................................................................90

*In re M&L Business Mach. Co., Inc.*,
  59 F.3d 1078 (10th Cir. 1995) ................................................................................................14

*Mosier v. Callister, Nebeker 7 McCullough, P.C.*,
  546 F.3d 1271 (10th Cir. 2008.) .............................................................................................80

*Rosenberg v. Collins*,
  624 F.2d 659 (5th Cir. 1980) ..............................................................................................21, 24

*SEC v. Credit Bancorp, Ltd.*,
  290 F.3d 80 (2d Cir. 2002)......................................................................................................23

*United States v. Bailey*,
  926 F. Supp. 2d 739 (W.D.N.C. 2013) ................................................................................35, 22

*United States v. Durham*,
  86 F.3d 70 (5th Cir. 1996) ......................................................................................................23

*Voest-Alpine Trading USA, Corp. v. Vantage Steel Corp.*,
  919 F.2d 206 (3d Cir. 1990).....................................................................................................20

**OTHER CASES**

*Meadows v. Bierschwale,*
    516 S.W.2d 125 (Tex. 1974)............................................................................................21, 22

**FEDERAL STATUTES**

18 U.S.C. § 981....................................................................................................................35

**RULES**

Federal Rules of Civil Procedure, Rule 23 ..................................................................81

Diane Thompson, as Receiver for American Pension Services, Inc., as well as any related entities owned, controlled, and/or under common control by or through American Pension Services, Inc., including but not limited to American Pension 401(k) Services, Inc. ("APS 401(k)"), LJP, LLC, Interim Funding LLC, First Silverado Properties, LLC, LIC Environmental, LLC and Quicksilver Management, LLC (collectively "APS"), and all assets of Curtis DeYoung ("DeYoung") (APS and DeYoung shall collectively be referred to as "Receivership Defendants"), by and through her counsel of record Ballard Spahr LLP, hereby submits her Memorandum in Response to APS Client Responses and Objections to Proposed Plan of Liquidation ("Receiver Memo.").

## INTRODUCTION

Pursuant to this Court's direction, the Receiver provided notice to all current APS clients of the proposed Plan of Liquidation (the "Liquidation Plan") that she filed with the Court on August 22, 2014.  On or before October 20, 2014 a total of 835 separate responses and/or objections to the Liquidation Plan were submitted to the Receiver (collectively the "Client Responses").  The 835 Client Responses represent approximately fourteen percent (14%) of all current clients who established individual retirement and 401(k) accounts with First Utah Bank (the "Bank") as custodian and APS as the third-party administrator.  Earlier this month, on November 4, 2014, the Receiver submitted to the Court (*in camera*) unredacted and unaltered copies of all Client Responses.[1]  Accompanying the submission, the Receiver provided: (a) a key

---

[1] Attached hereto as Exhibit 1 is a list of the Client Responses submitted to the Court for review and consideration organized by: (a) Response Number; (b) Account Number(s); and (c) the

to the ten (10) categories and sub-categories the Receiver used in synthesizing the Responses;

(b) an excel spreadsheet listing each individual response and the category or categories the

response fell into; and (c) a Summary of Responses and Objections to Proposed Plan of

Liquidation (the "Summary") which described the Receiver's efforts to review the Responses

and categorize them.  The Receiver did not respond to the Client Responses identified in the

Summary.  That is the purpose of this memorandum.

In addressing the Client Responses, the Receiver does not intend to comment on each

submission.  To do so would not only be time consuming, but unnecessary as there is

considerable overlap and duplication although each client provided their own unique perspective

to the receivership and the proposed Liquidation Plan.  Instead, the Receiver will address the

Client Responses on a more global level with the hope of capturing the essence of all responses.

What is clear from the Client Responses is that no matter what the Receiver proposes, there will

be those in support of, and opposition to, the Liquidation Plan.  More importantly, it should not

be overlooked that approximately 4,900 clients **did not** provide any responses and/or objections

to the Liquidation Plan.  By their silence, they have in essence left in the Court's hands the

approval of the Liquidation Plan.  Hence, the Receiver's endeavor herein is to address the

---

Category or Categories assigned to each response.  The Court, however, was previously
provided *in camera* additional information relating to each account including the asset value of
the account as of April 24, 2014 and the cash balance each had in the Master Trust Account
based on the records of APS.  To protect the confidentiality of each individual account holder, to
the extent the Receiver makes reference to a specific individual response by the "Response No."
assigned by the Receiver.

concerns of those who elected to respond and indicate her views on why the proposed

Liquidation Plan, subject to some modifications, should be adopted by the Court.

In that vein, the Receiver's goal remains unchanged– balancing cost effectiveness,

expediency and compliance/cooperation– that is to move this case beyond the control of the

Receivership Order so that APS clients may direct their investments without further Court

intervention.

## I. THE RECEIVER'S PROPOSED LIQUIDATION PLAN.

Before addressing the Client Responses directly, it may be helpful to recount the general

terms of the proposed Liquidation Plan.  Due to the misappropriation of the approximately $25

million of client funds from the Master Trust Account held at First Utah Bank, the Receiver is

faced with a cash shortfall of the same amount.  If the Master Trust Account is left unchanged,

when the APS clients are given the ability to move their accounts, the Receiver will not have

sufficient cash to disburse.  There will be an approximately 50% shortfall of cash that, if not

corrected, will result in those whose accounts were held in cash shouldering one hundred percent

(100%) of the loss.  As discussed in greater detail in the Liquidation Plan, the Receiver does not

believe this is a fair or equitable allocation of loss.  Rather, she proposed that the loss be

allocated proportionately across all current IRA client accounts.  The difficulty with this

approach is that it leaves approximately 1,700 APS clients (who have no cash in the Master Trust

Account) and approximately 1,342 APS clients (who have less than 10% of their asset value in

cash) without sufficient cash to free them of the Receivership Order.

3

In order to allow all clients to move ninety percent (90%) of their asset value to the new administrator, the Receiver needs approximately $51 million in the Master Trust Account[2] because there will be a negative draw on the Master Trust Account unless there is a cash infusion from IRA account owners who hold illiquid assets.  With this infusion of cash, all APS account owners will endure the same 10% loss.  For the cash-only account owner, he/she is only taking 90% of his/her asset value to the new administrator/custodian (plus a 10% receivable).  Likewise, the illiquid account owner will take 90% of the asset value (plus a 10% receivable) if he/she covers the  Loss Allocation with a 10% contribution to the IRA account.  In advancing this proposed Loss Allocation, the Receiver is not seeking to harm clients whose IRAs only hold illiquid assets.  Nor is she intending to require clients to shoulder the financial burden of the loss.  Rather, her Liquidation Plan simply seeks to balance the ledger necessary for all current APS clients to move their accounts on an equal basis – that is to allow all clients to transfer 90% of their assets immediately to a new custodian/administrator and carry forward a 10% receivable.

A hurdle many clients face is that the Loss Allocation exceeds the maximum contributions that can be made in any given year under IRS Regulations.  An IRA account owner whose assets exceed $55,000 would be precluded from making an annual contribution equal to the Loss Allocation.  However, if clients are eligible to do so and would like to provide additional liquidity to their accounts, they are free to make a contribution by December 31, 2014

---

[2] As of April 25, 2014, the APS Master Trust Account had a cash balance of only $26,067,278.61, while APS records reveal the balance should have been $50,653,871.85 (Declaration of M. Hashimoto, dated May 6, 2014 [Dkt. 38, Exh. E]).

to potentially cover their Loss Allocation.  Such contributions would not be subject to the

Receivership Order freezing the assets, but could be used to assure their illiquid assets could be

moved to the new administrator/custodian.  For a client whose account value is less than

$100,000, they could make a contribution by December 31st and a second contribution in early

2015.  With sufficient cash now in their account, the client and any similarly situated would be

able to move their account to the new administrator/custodian.  The uncertainty lies with those

clients' accounts whose values exceed $100,000.00 with insufficient cash deposits in their IRA

account.

      To assist with this dilemma, the Receiver has filed a request for private letter ruling

("PLR") with the Internal Revenue Service with the intention of seeking relief from the strict

interpretation of the Internal Revenue Code via a ruling allowing for restoration payments rather

than regulated contributions.  Although the Receiver is in communications with the IRS to

expedite the response to the PLR, she does not expect to receive a response before the end of the

year.  This could delay the implementation of the Liquidation Plan, as a key component of the

plan is to allow APS clients' to contribute cash rather than liquidate assets to account for the

Loss Allocation. It should also be noted that even if the PLR is rejected by the IRS, APS clients

may consider obtaining third-party loans within their retirement plans secured by the plan assets

or on an unsecured basis to pay the Loss Allocation.

      Another difficult aspect of the Liquidation Plan is that many APS clients state their assets

have depreciated in value and/or need to be revalued.  Although the Receiver is sympathetic to

this issue, she is of the view that the Court should only allow revaluations of accounts in very

limited circumstances.  Otherwise, the Liquidation Plan is doomed to fail from the very beginning because hundreds of clients will attempt to revalue their accounts to avoid having to make cash contributions (or as much of a cash contribution)  to the Receivership Estate.

The initial Loss Allocation (10%) was determined by dividing the misappropriated amount ($25 million) into the value of all APS client assets plus a cushion to account for various uncertainties which may be experienced in implementing the Plan.  A change in the denominator (total account value) will affect the actual Loss Allocation.  Due to the complexities inherent in revaluing assets, the Receiver believes there is only one opportunity to determine the Loss Allocation, transition the accounts to a new administrator/custodian and, upon recovery, make a distribution (based on the proportionate share each client's loss) upon the sale of Receivership Assets, recovery of insurance proceeds, or recoveries from third-parties.

With the ultimate goal of allocating the loss equally among current clients, regardless of the type of asset held by an individual IRA account owner, the Receiver recognizes that clients believe the Receiver is contributing and/or furthering their loss.  This belief is not only misplaced, but overlooks the dilemma the Receiver found the Receivership Estate in when she was appointed by the Court.  As discussed further below, the Loss Allocation arises because of DeYoung's actions, not from anything the Receiver has done.  The Liquidation Plan proposed by the Receiver attempts to address these concerns while opening the door for all clients to move their accounts to the new custodian/third-party administrator.

## II.   **THE RECEIVER'S RESPONSE TO APS CLIENT CONCERNS REGARDING THE PROPOSED PLAN OF LIQUIDATION.**

With the foregoing as a starting point, the balance of the Receiver Memo will address the Client Responses and provide the Receiver's view on whether the Liquidation Plan should be modified to address these concerns, and if so, in what way.  For ease of reference, the Receiver's Memo is organized by the same categories utilized in the Summary filed with the Court on November 4, 2014.  [Dkt. 316.]

The Liquidation Plan, even amended, will not satisfy all of the concerns of all interested and affected parties.  Of the 835 responses, there were those who expressed their approval for the Liquidation Plan and desire to move forward with expediency.  There were those who reluctantly expressed approval for the Liquidation Plan, chastising DeYoung and the process being used by the Court, SEC and Receiver.  Many of the responses were understandable expressions of anger and frustration with the situation.  Still, others disagree with how the Receiver determined the Loss Allocation, the unfairness of having to advance funds to cover the cash shortfall, and how this unfairly prejudices those who made wise investment decisions.  As noted above, this memorandum is intended to synthesize the Client Responses and provide commentary to the concerns in a manner that hopefully allows the Court, the clients and the Receiver to move this case to conclusion.

### 1.   **Category No. 1 – Supportive of Proposed Plan.**

This category identified those clients who support and/or had no comment to the Liquidation Plan.  A total of 150 out of the 835 (18%) Client Responses fall within this category

7

and were identified to the Court as Response Nos. 2, 6, 7, 11, 14, 15, 22, 25-28, 30, 36, 38, 43,

46, 48-49, 59, 60,68-69, 73-75, 82, 85, 86, 87-90, 96, 102, 104-107, 109-111, 114-115, 118-121,

123, 129, 133-35, 141, 143, 145, 155, 159-161, 163, 165-66, 169, 172, 179, 187, 190, 195, 197,

199, 202, 211, 212, 213, 216, 221-22, 227, 239, 251-54, 263, 268, 272, 277  291-93, 313, 316-

17, 331, 336-340, 348, 357, 360, 364-65, 375-76, 379-81, 383, 390, 392, 400, 413, 417, 420,

428-30, 434, 442, 475, 532, 542, 550, 560, 575, 582, 595-96, 615-16, 629, 631, 636, 639, 650,

661, 694, 711-12, 721, 741, 750, 752, 764, 780, 788, 805, 819, 825, and 830.  (*See* Chart noting

all responses received by Response number and Client number, attached hereto as Exhibit 1.)

 Although those above expressed support for the Liquidation Plan, it was not without

some trepidation and disagreement.  For example, in Response No. 6, the respondent disagreed

that "all account loss should be shared equally."  In doing so, the respondent thought those who

followed an "advisors advice" should bear a greater burden of the risk.  Yet, in the end, the

respondent wants to move his account to the new administrator/custodian.  In a different vein, in

Response No. 30, the respondent expressed support for the Liquidation Plan, but voiced concern

about the impact on having to sell his holdings in land which won't be easy.  He further

suggested applying a longer term for payment to account for the liquidity problem.  Another

view is addressed in Response No. 161, where the respondent inquired regarding what action the

Receiver was taking against "DeYoung + friends [who] have shown no remorse or cooperation

with authorities."  In the end, however, respondents within this category want to move forward

with the Liquidation Plan as quickly and efficiently as possible.

8

2.     **Category No. 2 – Account Exempt from Loss Allocation.**

This category includes those who believe their IRA account should be exempt from the Receiver's proposed Loss Allocation entirely.  The Receiver developed a group of sub-categories in an effort to assist the Court and better respond to the comments and/or objections.  The Receiver's response to each category is set forth herein.

a.     **Category 2(a) - Requesting Exemption Because Assert that Account Opened After Fraud Occurred.** (Recommend No Change.)

This sub-category identified respondents who claim that their IRA accounts were not opened until after 2009 and/or contend that their account was unaffected by DeYoung's misappropriation or fraud, which they assert occurred before they became an APS client. (Response Nos. 20, 33, 44, 132, 248, 299, 314, 319, 360, 446, 516, 625.)

Included in this sub-category are those who argue that their cash was not commingled and/or is traceable.  (Response Nos. 314, 319, 516, 808.)  Respondents commented that they were not clients of APS or did not have commingled funds during the period of time when "the fraud" occurred and thus their account should be exempt.  (Response Nos. 33, 44, 248, 299.) Some who raise this objection do so in a general fashion without any explanation, (*See* Response Nos. 247, 538, 622, 673, 693, 744), while others claimed the "fraud" was not traceable to a single act or act of theft from the Master Trust Account on a particular date when the balance in the account and the cash balances of each client who was in the account on that day could be determined and/or matched.  (Response Nos. 299, 333, 335, 437, 516, 649, 679.)  The facts are that multiple acts of theft or unapproved use of funds traveled through the Master Trust Account

on multiple occasions over approximately fourteen years.  Each day, even within the day, clients

with funds in the account fluctuated due to transactions converting cash from investments (and

vice-versa) and new clients being added or transferred.  The acts of theft were coupled and

compounded by daily deliberate misreporting of the balances of accounts to cover up the

continual shortfall of funds.  (*Id*.)  A similar complaint focused on DeYoung's criminal acts,

questioning why they are being asked to cover for his conduct.  (Response Nos. 319, 333.)

Another group of respondents objected to being compelled to liquidate their investments

to allow for the Loss Allocation.  (Response Nos. 314, 425, 446, 494.)  For example, in Response

No. 314, the respondent has Iraqi Dinar, which she does not want to liquidate.

Some clients asserted they could not be included in the Loss Allocation because they did not

have an investment account with APS, but a self-directed IRA as a custodial account.

**RESPONSE:**

A central argument of the above respondents lies in the theory that they all transferred

funds into the Master Trust Account **after 2009**.  Their theory being that since the

misappropriation occurred before they signed on with APS, they should not have to share in the

Loss Allocation.  This position reflects a general misunderstanding of the means and methods

upon which DeYoung hid his fraudulent activity; therefore the Receiver does not propose

modifications here.

To be clear, the cash associated with virtually all the custodial accounts (IRAs, SEPs,

etc.) was held in the commingled Master Trust Account held at First Utah Bank if only, in many

cases, for a few days or a few hours.  There is perhaps a misunderstanding that clients allowed

10

APS to invest or direct investments and thus funds were lost.  This is incorrect.  The funds were stolen from commingled <u>custodial</u> funds.

Once those funds were deposited into the commingled Master Trust Account, the funds lost their identity and became untraceable and part of DeYoung's fraudulent scheme. (Declaration of Mark Hashimoto, 12/3/14, at ¶ 4, attached hereto as Exhibit 2.)  Although the Receiver believes **<u>all</u>** accounts with funds that were placed in the commingled Master Trust Account between the "Loss Period" of 2000-April 25, 2014, should participate in the allocation of loss, as discussed further below, the Receiver is constrained from pursuing and/or compelling both former and current clients to share in the loss.  (Hashimoto Declaration ¶¶ 3, 5.)

Many clients happened to also make poor investments and lost custodial funds due to their self-directed choices.  The Receiver is <u>not</u> suggesting these losses are included in the $25 million cash shortfall created by DeYoung's theft.  Following the theft, DeYoung either spent the money, lent it to nonpaying friends and businesses, or lost it in bad investments he made with the stolen funds.  DeYoung's misappropriation began in approximately 2000.  Although he made a book entry in 2009 to attempt to conceal the increasing loss, "the fraud" continued until the Receiver took control of APS and froze activity on April 25, 2014.  In fact, although recent clients assert they came to APS years after "the fraud" occurred, they came at perhaps the most critical time, when new funds became an integral part of DeYoung's ability to continue "the fraud."  By enticing and persuading individuals to open new IRA accounts, liquidate their securities and rollover their cash into the Master Trust Account, DeYoung was able to use the cash proceeds to honor other APS client investment directions and maintain APS as a going

11

concern.  The use of cash assets from new and  existing accounts, coupled with the fact that most

IRA/401(k) clients do not take cash distributions regularly from their accounts, permitted "the

fraud" to compound and continue undiscovered for years.  Thus, even if an APS client became a

client after 2009, every client from 2000 to 2014, with limited exceptions discussed below, was

affected by "the fraud."

> **b.**   **Category 2(b) - Account Funded After Receivership or Shortly Before Receivership.** (Recommend Change in Plan per Order issued October 21, 2014 [Dkt. 255].)

This sub-category identified those whose accounts were opened prior to the appointment

of the Receiver, but whose accounts had zero cash until after the Receiver was appointed.  These

individuals assert their accounts should not be subject to the Receivership Order.

**RESPONSE:**

At least one APS client (Response No. 685) opened an IRA account <u>before</u> the

Receivership, but did not fund the IRA until <u>after</u> the Receiver took control and petitioned the

Court seeking to have his funds released from the Court's Receivership Order.  (*See also*

Response Nos. 414 (April 29, 2014), 630 (April 25, 2014), 656 (April 24, 2014), and 714 (April

29, 2014).)  The Court granted the client's requested relief while barring him from intervening in

the case.  [Dkt. 255.]  A total of 27 other similarly situated clients have objected on the same

grounds or similar grounds.  However, several respondents actually had funds deposited in the

Master Trust Account **before** the Receivership Order was entered, while others simply opened

the IRA account but did not deposit funds with APS until **after** the Receivership Order was

entered.

12

With regard to the latter group of clients, based on the Court's Order [Dkt. 255], clients whose cash deposits came in after the appointment of the Receiver, have been notified that their accounts will be excluded from the Loss Allocation and freeze order and may direct the Receiver regarding disposition of their account.  The impact of this action is that it may have a corresponding reduction in the total value of all assets, albeit minor.

However, there are a number of respondents who seek to be included in this sub-category on the grounds they came to APS late in the game, primarily a month or so before the Receivership Order was entered.  (Response Nos. 92, 224, 226, 264, 310, 312, 328, 355, 384, 385, 511, 625, 653 and 777.)  In these instances, the Receiver considered, but ultimately declines to propose an exception to those clients.  In such instances, as soon as the funds were deposited in the Master Trust Account, the funds lost their identity and became untraceable and part of DeYoung's fraudulent scheme.  (*See* Response to Category 2(a) above.)

There are still others in this sub-category who deposited funds with APS in 2012 or 2013– at least several months before the Receivership Order (Response Nos. 132, 157, 207, 329, 333, 360, 368, 392, 434, 583, 625, and 744.)  The Receiver does not believe these clients should be excluded from the "Loss Allocation" even though they only recently engaged the services of APS, and immediately directed the cash deposits to be reinvested.  In such instances, the short-term client is no different than the client who signed up with APS in 2006 or 2007 and immediately directed APS to reinvest the cash deposit.  The Receiver proposes an approach that provides consistency and does not favor one client over the other.  That approach is founded on

13

whether the funds were deposited into the Master Trust Account during the Loss Period (2000-April 25, 2014).

The legal rationale for this approach stems, in part, from the United States Supreme Court decision involving Charles Ponzi, the man who perpetrated the eponymous scheme. In *Cunningham v. Brown*, 265 U.S. 1 (1924), the Supreme Court held that the money in the commingled account belonged to all of the victims, and that the use of tracing would harm some of the victims' rights. *Id*. at 13. Accordingly, because of the similarly situated position of the victims, the Court ruled that equity would not permit them a preference. *Id*. This approach has been upheld over the years by all Circuits including the Tenth Circuit. *In re M&L Business Mach. Co., Inc.*, 59 F.3d 1078, 1081 (10th Cir. 1995).

Here, the Receiver is faced with an even more daunting problem because the funds come from virtually all IRA account holders were commingled. Once funds were deposited into the Master Trust Account, the funds lost their identity, became untraceable, and became part of DeYoung's fraudulent scheme. Equity calls for treating all clients on equal footing in terms of loss allocation.

c.  **Category 2(c) - Requesting Exemption Due to Short Term Cash.**
(Recommend No Change.)

This sub-category sought to identify respondents whose cash was in the commingled Master Trust Account for a short period of time (a day, week, month, etc.) when it was "immediately" invested at the direction of the client. (Response Nos. 3, 44, 218, 220, 232, 238, 264, 294, 319, 328, 363, 416, 473-74, 478-82, 511, and 777.) Some respondents suggest that the

14

Court determine the Loss Allocation based on the value when the funds were withdrawn from the commingled account. (Response No. 416.) The argument lies in the belief that the Receiver is seeking to take a "portion of the growth" that the client generated in the account. (*Id.*) These clients assert their cash was not part of the fraud due to the very short amount of time their cash sat in the commingled account. Many clients indicated they funded their APS accounts shortly before the Receivership. They reflected frustration and dismay that the SEC did not warn them and they could have avoided the Receivership and loss allocation. They question the fairness of the allocation due to their limited time in the commingled Master Trust Account.

**RESPONSE:**

This group of respondents highlights the difficult task of the Receiver, who has struggled to address the allegations of the unfair and inequitable nature of allocations of loss for individuals who believe their prudent actions to quickly invest are subsidizing those who remained in cash**.** Ultimately, because respondents within this category had funds (no matter how briefly) that were deposited in the commingled Master Trust Account, their funds lost their identity, became untraceable, and became part of the fraudulent enterprise. Thus, the Receiver believes they should participate in the Loss Allocation. (*See also* Responses to Category 2(a), above and Category 2(d), below).

      d.     <u>**Category 2(d) – Cash Deposited in Master Trust Account, but Directed to Specified Investment.**</u> (Recommend No Change.)

This sub-category is one of the largest and identifies those respondents who claim they should be excluded from the Loss Allocation because they invested in a specific investment,

most commonly a piece of real property, limited liability company, stocks or other tangible asset. Because these clients believe they always controlled their account and investments, they assert they never allowed DeYoung to misappropriate their money from the Master Trust Account. Accordingly, they assert their money was not stolen and they should not have to bear any of the loss.  A total of 141 out of the 835 Responses fall within this sub-category.

     The overall theme of this category of respondents can be summed up in the following ways:

> "APS has never managed funds for me.  I utilized APS because I was able to create a self-directed IRA account to channel funds to a particular investment. APS was only used to channel the funds.  The funds were in the APS for one day and move out to my selected investment, … ."  (Response No. 98.)

> "My account was funded and immediately transferred into a third-party managed stock account with TD Ameritrade where I have had administrative control to buy and sell with my funds in the account."  (Response No. 191.)

> "We did not entrust APS to hold and manage our money.  We simply entrusted APS to transfer our money from our IRA rollovers to our own investments.  APS was holding our money for a few brief hours in trust for that purpose."  (Response No. 238.)

> "My husband and I have used many custodians for our IRAs and chose American Pension so that we could hold a real estate interest in our IRA and a currency investment.  We did not consult with Mr. DeYoung or follow his advice or give him permission to use any of our funds."  (Response No. 410.)

> "The owners of APS had no opportunity to defraud me of money, as no money was given them to invest, or take.  I should not be part of this action to recover damages caused by their fraudulent activities."  (Response No. 512.)

> "I don't agree with the Receiver's argument that the instant I deposited cash into my account, even though it almost immediately went to purchase non-cash assets, I somehow 'commingled' my cash with other cash assets in APS and should be deemed to have allowed my money to be part of the DeYoung fraud."  (Response No. 561.)

16

"I self manage my IRA account.  My money is in my own checking account and not in APS Possession.  That money was used to purchase a rental property in 2011 along with taking out a loan … ."  (Response No. 613.)

"I do not understand why I am being charged this 10% loss charge as I did not have hardly any liquid asset in APS; nearly all of my pension funds had been moved into non-liquid real estate."  (Response No. 676.)

"I transferred my funds to an outside account in the name of my LLC and the money has always moved in and out of that account, not in and out of APS." (Response No. 733.)

"My money went in as cash and was taken out as cash and put into an account here in Illinios except for the minimum balance APS suggested to cover yearly administrator fee."  (Response No. 808.)

Response No. 275 reaffirms and acknowledges that the Court has wide discretion in determining the relief in a receivership.  (Response No. 275, at 3.)[3]  The respondent goes on to affirm the Receiver's position of treating all similarly situated clients fairly and reasonably.

> [T]he Court must ensure that any proposed plan of liquidation and distribution is "fair and reasonable. " *S/~C v. Wealth Mgrnt. LLC,* 628 F.3d 323, 332 (7th Cir. 2010). The plan should be equitable, "with similarly-situated investors treated alike." *United States v. Petters,* 2011 WL 281031, *7 (D. Minn. Jan. 25, 2011); *accord ln re Receiver,* 2011 WL 2601849, *2 (D.S.C. July 1,2011); *see also SEC v. Vescor Capital Corp.,* 599 F.3d 1189, 1194 (10th Cir. 2010) ("When a district court creates a receivership, its focus is...to assist the district court in achieving a final equitable distribution of the assets if necessary." (Internal quotation marks and citation omitted.)); *Wealth Mgmt. LLC,* 628 F.3d at 334 ("The goal in both securities-fraud receiverships and liquidation bankruptcy is identical - the fair distribution of the liquidated assets."); *SEC v. Sunwest Mgmt.,* 2009 WL 3245879, *9 (D. Or. Oct. 2, 2009) ("In approving a plan of distribution..., the court must determine the most equitable distribution result for all claimants, including investors.").

(*Id*.)  Despite this acknowledgment, however, the respondent relies on the "integrated transaction" or "step transaction" doctrine to argue his transaction (and arguably those similarly

---

[3] *See also* Response No. 703, which is filed by another pro se attorney who incorporates the arguments of Response No. 275.

17

situated) is not fair and equitable and should not bear any of the loss.  (*Id.*)  Relying on the

bankruptcy case *In re Foxmeyer Corp.*, 286 B.R. 573 (Bankr. D.Del. 2002), the respondent

describes the "integrated transaction" doctrine "to collapse the individual steps of a complex

transaction into a single integrated transaction" as follows:

> (1) the "end result" test, (2) the "interdependence" test, and (3) the "binding commitment" test. *Id.*

> The end result test combines into a single transaction separate events which appear to be component parts of something undertaken to reach a particular result.  If a series of closely related steps in a transaction are merely the means to reach a particular result, the court will not separate those steps, but instead treat them as a single transaction.

> Under the interdependence test, the court disregards the effects of individual transactional steps if it is unlikely that any one step would have been undertaken except in contemplation of the other integrating acts.... [This test focuses on] whether under a reasonably objective view the steps were so interdependent that the legal relations created by one of the transactions seem fruitless without completion of the series.

> ... [With respect to the binding commitment test,] a series of transactions may be integrated if, at the time the first step is entered into, there is a binding legal commitment to undertake the later step or steps.

*In re Big v. Holding Corp.,* 267 B.R. 71, 92-93 (Bankr. D. Del.2001) (internal quotation marks

and citations omitted; alterations in original).

In other words, the respondent argues that his decision to rollover his account and

immediately invest in a real estate transaction should be viewed as a single integrated

transaction that should be excluded from the Loss Allocation.  (*Id.*)[4]

---

[4] *See also* Response Nos. 625, 756, 774, 775, filed by counsel on behalf of a client (or his or herself)  suggesting they are "not similarly situated to all other APS customers" and that the Liquidation Plan would be "inequitable to treat him similarly to all others because [his] client opened his account almost five years after the deficit occurred." (Response No. 625.)

**RESPONSE:**

The Receiver appreciates the insight of Response No. 275.  A large number of responses focus on a similar notion that they can properly trace their investment to a single integrated transaction.  As noted, many object to the proposed Liquidation Plan on the basis that their rollover was immediately or shortly followed by directing the funds be invested in a particular asset.  The Receiver has fully considered whether an exception should be made based on the integrated transaction doctrine, but she has ultimately determined the doctrine does not apply in this context.

A step transaction is typically used to show that a business transaction, although executed on multiple dates, was an integrated event and should be treated as one (i.e. the client's money was never really deposited in the commingled Master Trust Account, so it could not have been stolen by DeYoung.)  However, the fact of the matter is that the money was deposited in the commingled Master Trust Account (however briefly) and DeYoung's misappropriation from the Master Trust Account was occurring continuously during the Loss Period, from 2000 to April 25, 2014.  Once the funds came into the commingled Master Trust Account, they lost their identity, became impossible to trace and part of DeYoung's fraudulent scheme.  Therefore, the two distinct "steps" of the APS client transactions (deposit into Master Trust Account and subsequent investment into asset of client's choice) cannot be collapsed into one step.  This is very different than those who came to APS with purely "in-kind" assets and never had funds in the Master Trust Account.  (*See* Category 2(f) below.)

Additionally, the doctrine does not apply because it "has traditionally been applied in the tax context." *Big V. Holding*, 267 B.R. at 92. This is not such a situation. The clients are not seeking to avoid having the creation of the IRA account result in a non-taxable event. Although the doctrine has also been involved in cases of "corporate governance, contract interpretation and fraudulent conveyances," it has not been applied in circumstances like the Court (and Receiver) find itself here –the winding up of a business established to provide administrative services to IRA and 401(k) accounts.[5]

In this case, we have a commingled Master Trust Account in which all client funds were deposited. The mere commingling of assets takes this case out of the realm of applying such a doctrine because this matter involves not a single transaction, but tens of thousands of transactions that occurred over a fourteen year period. The cases applying the integrated transaction doctrine do not involve a situation where the missing funds are due to the misappropriation of funds from a Master Trust Account. Although many APS clients had specific investments in mind, the facts of this case do not create a circumstance that suggests the same outcome. Finally, and most importantly, were the Court to apply this doctrine, it would require the Receiver to independently evaluate each and every transaction to determine if the facts warrant the exception. Like the difficulties arising from revaluing the assets based on a multitude of factors, the Receiver is seeking to minimize the management and administrative

---

[5] The use of this doctrine is primarily to prohibit parties from avoiding or through subterfuge a transaction that was a fraudulent transfer, or disputes between competing corporate interests. *Id*.; *see also Voest-Alpine Trading USA, Corp. v. Vantage Steel Corp*., 919 F.2d 206, 211-213 (3d Cir. 1990).

costs of this receivership, not escalate them. Applying this doctrine will create an environment that will only escalate costs.

        e.    **Category 2(e) - Tracing Request.**  (Recommend No Change.)

This sub-category identifies those who object to the pro rata approach and prefer that the Receiver apply a tracing approach to determine the Loss Allocation. The argument for tracing follow a similar theme–there is a patent unfairness to impose a pro-rata allocation on all current clients rather than to apply the loss more equally among all 14,000 former and current clients. Respondents who raised this argument include Response Nos. 66, 220, 223, 238, 240, 299, 323, 416, 418, 431, 496, 637, 649, 679, 682, 707, 740, 746, 748, 759, 774, 799, and 800. Some of the most vocal responses came from counsel on behalf of clients.

For example, in a lengthy objection (Response No. 431), the respondent argues that it would be easy for the Receiver to subpoena bank records, credit card records and other records to trace and/or clawback allocated losses from all account holders from 2000 to 2014. Relying on certain case law, the respondent suggests that the court should establish a "constructive trust" because she and other "Similarly Situated Investors" can be distinguished from other victims. (*Id*. at 13.) In advancing this argument, however, the client misapplies the law. Both *Cunningham v. Brown*, 265 U.S. 1 (1924) and the *Rosenberg v. Collins*, 624 F.2d 659 (5th Cir. 1980) cases place the obligation to trace on the customer, not the Receiver. As the *Rosenberg* case held a "constructive trust, …, can only attach to some identifiable property which can be traced back to the original property acquired by fraud. *Rosenberg,* 624 F.2d at 16; *see also Meadows v. Bierschwale*, 516 S.W.2d 125 (Tex. 1974). In the *Rosenberg* case, like this one, the

21

court recognized the difficulty of such tracing because "none of the customers of the bankrupt could successfully trace his or her funds … because all of the funds from the 900 customers of the bankrupt were commingled in a single back [sic] account, which was used for personal and business purposes of the bankrupt, …." *Id.* Here, the situation is even more difficult because APS had over 14,000 individual accounts of which 5,500 remain wherein the clients' funds were commingled into a single bank account, the Master Trust Account. To trace each and every transaction from each IRA account would be economically and logistically impossible. (Hashimoto Decl. at ¶¶ 6-7.)

Applying a slightly different take on the tracing issue, several respondents claim that the Loss Allocation is actually a "civil forfeiture" which is an "additional punishment" to clients and that the Receiver has failed to make a "showing sufficient to satisfy the requirements for such a forfeiture." (Response Nos. 679, 680.) Respondent misapplies the civil forfeiture argument for the simple reason that this case **does not** have a situation in which "APS properly performed its role with respect to the Claimants." (*Id*.) The reason is quite simple. Unlike the *Bailey* case, DeYoung actually stole money out of the commingled Master Trust Account, which was not a "proper" use of the funds on deposit. More importantly, this is not a forfeiture as the respondents claim; the Receiver's proposed Liquidation Plan simply seeks to establish the means and manner of allocating the loss across all asset lines. The APS clients are not forfeiting anything. There is a determined loss of at least 6.8% of the total assets which, once the Loss Allocation is completed, may be as high as 10%.

Others suggested that they could not believe DeYoung "pilfered money from the general Master Account" because that would "have been too easy to trace."  (Response No. 240.)  As such, they argue the Receiver should be directed to "trace each account and determine exactly where and when the embezzlement occurred."  (*Id*.)  This theme carried a similar tone when respondents suggested that the Receiver has failed to find any clear evidence of "traceable funds which would evidence commingling between accounts."  (Response No. 746, 748.)  In these responses, the respondents attempt to qualify the cases cited in the Receiver's proposed Liquidation Plan by suggesting the facts differed in terms of illiquid assets, which requires the Court to take a different approach to liquidation since the real estate assets are not readily fungible or marketable.  (*Id*.)  Accordingly, these respondents argue that it is "imperative … that the Receiver first establishes a clear and traceable pattern of commingling of the assets of the affected accounts with the assets of the non-affected accounts in order for her Plan to be supported."  (*Id*.)

**RESPONSE:**

As the Receiver noted in her proposed Liquidation Plan, because the receivership proceeding is in equity, a federal court is not required to apply principles of tracing, such as the lowest intermediate balance rule or the first in first out rule. *See, e.g., United States v. Durham*, 86 F.3d 70 (5th Cir. 1996); *Commodity Futures Trading Comm'n v. Eustace*, 2008 WL 471574 (E.D. Pa. Feb. 19, 2008).  Instead, courts typically favor a pro rata distribution scheme in federal receiverships on the basis that equally injured investors should be treated alike. *See, e.g., Trade Partners*, 572 F.3d at 298; *SEC v. Credit Bancorp, Ltd*., 290 F.3d 80 (2d Cir. 2002); *Commodity*

23

*Futures Trading Comm'n v. Wilson*, 2013 WL 3776902 (S.D. Cal. July 17, 2013).  Although the Receiver appreciates the differing points of view and the notion that modern technology should make tracing a viable option, the task is not so simple.

First, as discussed in *Cunningham* and *Rosenberg*, the duty to trace actually lies with the client and not the Receiver.  *Cunningham*, 265 U.S. 1; *Rosenberg*, 624 F.2d 659.  Between 2000 and 2014, APS serviced over 14,000 separate IRA and 401(k) accounts.  A total of more than $900 million was transferred in and out of the Master Trust Account.  There were over 80,000 separate deposits and withdrawals.  The majority of these transactions were made at the direction of the APS clients.  APS did not employ modern technology and did not track the thousands of self-directed transactions on a real time basis, but used an antiquated DOS based computer system and hard copies to record the transactions.  The Receiver cannot be expected to undertake the task of tracing all 80,000 transactions to determine whose money was actually misappropriated.  Even if she did, there is no way she could affirm with any certainty that a dollar deposited by "Client A" is the same dollar used by Client A when that Client directed APS to make an investment.

Second, tracing would be even more difficult because monies were deposited and withdrawn on a regular basis by IRA account holders.  The Receiver cannot be expected to delineate between whether a deposit was a contribution or a profit from an investment.  The duty to properly account for cash in and cash out rested squarely on the shoulders of each client.  Thus, the commingling of the Master Trust Account makes tracing impossible.  In an effort to provide facts to the Court concerning the time and cost of attempting to trace all 14,000

24

accounts, or even the 5,500 current accounts, the Receiver's forensic accountant provided an estimate of the costs to recover this information with the kind of certainty that would be required. According to Mr. Hashimoto, he estimates that it would take himself and five associates approximately six to nine months of full time work to complete such an analysis *assuming* that all necessary documents and records exist to perform such an analysis.  (Hashimoto Decl. ¶ 6.) The accounting fees associated with such an analysis would be approximately $1 million to $1.5 million. (*Id*. ¶ 7.)  In the end, there is no benefit conferred on the Receivership Estate.  When the Receiver weighs this cost against the total loss associated with DeYoung's wrongful misappropriation, it is her view that the costs do not outweigh the benefit.

Even if the Receiver's accountants could pinpoint each act of theft and correlate it to the clients in the Master Trust Account on each day and time, the clients who had funds stolen from them that day, and the proportion of cash that was attributable could be different within the same day or the next day.  The Receiver continues to believe the only feasible approach is that previously presented in the Proposed Plan.  Simply stated, tracing is not a feasible approach in the context of any client who had cash in the commingled Master Trust Account.  "The fraud" cannot be pinpointed or correlated to a specific date or amount traceable to any particular client funds resident in the Master Trust Account from 2000 to the present.  The cash that was misappropriated could have been anyone's cash at any moment in time and to have the Receiver take on that task when the economic benefit to the Receivership Estate is minimal is simply contrary to good business judgment.

  **f.**   **Category 2(f) - Account Exempt Because Funded in Kind – Never Any Cash in Master Trust Account.** (Recommend Change in Plan).

  This sub-category of responses raises an interesting and compelling objection to the proposed Liquidation Plan because if a client did not liquidate their assets and only transferred assets to APS in-kind, that client may have never made any deposits or withdrawals from the commingled Master Trust Account (assuming the client did not later liquidate any assets to reinvest or take a distribution). This category sought to identify those who claim that this is the case. Respondents who raised this argument were Response Nos. 23, 24, 203, 341, 646, 679 and 707. Several of these respondents raise a number of other arguments that cause the Receiver to question the veracity of their claim. (*See* Response Nos. 341 and 679.)

  A respondent, by and through his counsel, approached the in-kind argument from a slightly different angle based on the claim that when the IRA was established in 2012 the client transferred "in-kind" all assets to the custodian. (Response No. 707.) This transfer took place "long after much of the fraudulent conduct … had already occurred." (Id. at 1-2.) The respondent then provides a detailed discussion of the scope of the Receivership Estate, asserting that the (a) IRAs did not invest in APS, own an interest in APS, nor participate in the profits or losses of APS; (b) IRAs did not retain APS as the custodian of their assets; (c) the IRAs hired APS as an administrator and record keeper; and (d) APS did not own, possess, have a beneficial interest in, or control directly or indirectly any IRA asset. Rather, he contends the IRA assets were held by the custodian. In advancing these points the respondent emphasized that the IRAs were not investors or equity owners of APS.

The respondent then argues the Liquidation Plan is an unconstitutional taking of private property by the government relying on *Corp. of the Presiding Bishop v. Hodel*, 830 F.2d 375 (D.C. Cir. 1987). As such, the respondent claims that because the IRAs did not transfer their assets to APS, and because the Bank was the IRAs custodian, the IRAs took no action that would permit the Court to include their assets in the pro rata distribution. (Id. at 3.) The respondent then addresses the commingled Master Trust Account and asserts that when the IRA account was opened, unlike other clients, the respondent did not liquidate any assets or transfer any cash to the custodian. (Id. at 4.) Despite recognizing the "broad discretion [a court has] when crafting relief in a receivership because … [of their] equitable … nature," the respondent contends the Court should distinguish between classes of APS clients. (Id. at 5-6.) The respondent claims that he he is one of the "1,711 APS clients whose investments are solely non-cash assets" and argues that these "non-cash investments were never invested with APS, were never transferred to APS and were never even under the constructive control of APS through the … Master Trust Account." (Id.) Finally, and most importantly, he states that "[t]he mere fact that some cash for redemptions or distributions may have passed through the so-called Master Trust Account, does not justify dragging non-cash IRA investments into the Liquidation Estate, and certainly makes them dissimilar from an equitable perspective." (Id.) Because the "non-cash assets are held by the custodian of each IRA," the respondent claims they were not commingled assets and should not be subject to the Loss Allocation or Liquidation Plan. Rather, the "most equitable solution is that APS clients who had cash deposits as of April 25, 2014 shoulder the loss." (Id.) In advancing this argument, the respondent suggests that the Custodian Services Agreement

27

required that certain insurance policies were to be secured which should cover the losses.  (Id. at 7-8.)

**RESPONSE:**

Regardless of whether an APS client's response was limited solely to this issue or raised other arguments in opposition to the Liquidation Plan, the Receiver agrees that to the extent an APS client can show (i) respondent's assets were transferred "in-kind" to APS, **and** (ii) that at no time since establishing his/her IRA account, respondent either deposited or withdrew monies from the Master Trust Account, (in other words the IRA account remained in that specific asset over the life of the account), then the IRA account should be excluded from the Loss Allocation and the APS client could move one hundred percent of their assets to the new administrator. This would include any clients who deposited foreign currency into the IRA accounts, and the deposited currency was always held in the First Utah Bank safe deposit boxes.  In these cases, to the extent that no cash ever went into or out of the Master Trust Account, the clients could not have been affected by the misappropriation of funds.  In this instance, however, the Receiver will propose that a flat administrative fee of $500 be paid by these account holders so the Receiver may verify the "in-kind" transfer, enabling the client to complete the transfer of their accounts to the proposed new administrator/custodian.  The Loss Allocation calculation will need to adjusted downward to account for these exemptions.  These exempted accounts will also be excluded from any loss recovery/recoupment payment in the future.

However, accounts where the in-kind assets later generated cash income were partially or fully sold, liquidated, and reinvested or distributed, or where cash contributions were made to

28

maintain or pay expenses related to the in-kind asset should not be excluded for the same reasons discussed above.

g.      **Category 2(g) – American Pension 401(k) Services, Inc. Accounts**.
(Recommend Change in Plan.)

This sub-category identifies those who assert they are American Pension 401(k) Services, Inc. ("APS 401(k)") clients whose deposits were never commingled in the Master Trust Account. In the proposed Liquidation Plan, the Receiver believed that less than twenty (20) 401(k) accounts were commingled into the Master Trust Account.  Upon further analysis, this number has increased to sixty-four (64) accounts.

Under this category, we identified three types of 401(k) account holders.  First, are those who maintained 401(k) accounts before July 2009 when APS 401(k) was established and their 401(k) accounts were then transferred to separate trust accounts.  (Response Nos. 726, 800.) Second, are those who had IRA accounts with APS which were subsequently transferred to 401(k) accounts.  Third, are those who opened 401(k) accounts after July 2009.  Under this later circumstance,  the respondents' cash transfers were not commingled with the Master Trust Account.  Those respondents who fit within this third category objected to having their accounts included in the Plan of Liquidation, or at the very least the Loss Allocation.  (Response Nos. 240, 576, 731, 743, 759.)

**RESPONSE:**

The Receiver has determined that sixty-four (64) 401(k) accounts out of the approximately two hundred sixty (260) APS 401(k) plans were in existence prior to July 12,

2009, when separate trust accounts were opened and funds were segregated and transferred from the Master Trust Account to a separate 401(k) master trust account.  In addition, twenty-four (24) accounts had assets which were originally in an IRA account participating, which were in the Master Trust Account and then transferred to a 401(k) account after 2009.  Due to the commingling of 401(k) accounts with all other IRA accounts prior to July 12, 2009, the Receiver has determined that it is appropriate to include those 401(k) client accounts that were in existence prior to the establishment of separate accounts in the Loss Allocation and the Liquidation Plan– that is July 12, 2009.[6]  Likewise, the twenty-four (24) accounts which had funds in IRA accounts which were transferred to 401(k)s after 2009 should also be included in the Loss Allocation since their funds were originally commingled in the Master Trust Account.

      With regards to any APS 401(k) account that was established **after July 12, 2009**, the Receiver will recommend that these accounts **not be subject to** the Loss Allocation since these funds were not deposited into the commingled Master Trust Account.  The Receiver, however, proposes that these post-2009 401(k) accounts be transferred to the new custodian/ administrator along with all other accounts.  Because the post-2009 401(k) accounts were not involved in the commingled Master Trust Account, the Receiver does not believe they should bear any portion of the Loss Allocation.  The net impact of this recommendation is that the overall value of the

---

[6] To the extent monies were contributed and/or value added after July 12, 2009, such contributions will not be included.  The Receiver will only apply values 401(k) account values as of July 12, 2009 when the accounts were transferred to the new entity.

assets in the denominator of the Loss Allocation will be adjusted downward to reflect the exclusion of the post-2009 401(k) accounts.

h.      **Category 2(h) – Other Objections.**

Among the objections to the Loss Allocation was a respondent who appears to demonstrate that any obligations owing to APS were discharged by his 2009 bankruptcy. (Response No. 175.)  The respondent also brings to light an additional issue that the Receiver recognizes (as discussed below) will be a significant part of the Liquidation Plan– that is APS's refusal to adjust valuations when asked to do so by APS clients.  Response No. 175 appears to be such a case.  (*Id*.)

3.      **Category No. 3 – Loss Allocation.**

This category includes responses and objections to the Receiver's determination of the Loss Allocation due to the misappropriation of the $25 million by DeYoung when charged against the combined value of current APS client assets ($360 million).  The Liquidation Plan proposed to apply the Loss Allocation equally among all current APS clients.  The Receiver recognized the inherent conflict in establishing the Loss Allocation due to the different assets held by account owners: (i) accounts with cash greater than the Loss Allocation (2,268); (ii) clients with no cash in their accounts (1,711).  Because of the different allocation of assets held by clients, a number of respondents objected to the Loss Allocation because they believed: (a) only those with cash should bear the loss; (b) the Receiver should allocate the loss among all 14,000 APS clients; (c) the majority of misappropriations occurred before they created IRA accounts with the Bank and APS; or (d) the losses have not been adequately traced to them.

31

Additionally, the Liquidation Plan identified there was a valuation issue that also needed to be considered and addressed which could impact the actual value of the APS client assets. The ultimate value of the assets held by all 5,500 clients is essential to determining the Loss Allocation as it constitutes the denominator of the percentage on which Liquidation Plan is implemented.  Respondents had a number of objections that focused on value.  For example, in Response No. 725, the respondent[7] raised concern over APS client who invested in National Note of Utah, LLC ("NNU"), asserting investments in NNU should be revalued because the approximately two hundred ninety-three (293) APS clients who invested in NNU will not receive a distribution from the National Note Receiver once that receivership is completed. Response No. 725 is an example of a category of objections making the determination of the Loss Allocation more difficult.

    a.    **Category 3 (a) - Objections to Loss Allocation of 10%**. (Recommend No Change.)

This sub-category sought to identify those claiming the Loss Allocation should be less than 10% as proposed by the Receiver.  It also captured those who asserted there should be no provision for valuation adjustments or other unforeseen impacts included in the Loss Allocation. A total of 116 out of the 835 Responses fall within this sub-category.

---

[7] Although the Receiver has been careful in not identifying the names of respondents, in this case the respondent is the Receiver of National Note of Utah, LLC, who was appointed by the United States District Court, District of Utah as part of a similar SEC case in which the principal of NNU is charged with operating a Ponzi scheme that resulted in substantial losses to investors.

The scope of this sub-category runs the gamut from a simple objection to the Loss Allocation of 10% to their account (*see* Response Nos. 744, 228, 236, 241, 302, 350, 412, 426) to a complex discussion of how any Loss Allocation is unlawful and simply makes them a further victim of the fraud perpetrated on them by DeYoung, First Utah Bank, and other third-parties including the SEC, IRS and Receiver.  (*See* Response Nos. 6, 240, 290, 345, 426, 775, 807.)  Objections range from outright disagreement based on legal contentions to disagreement for being "punished" for DeYoung's wrongdoing.  (Response Nos. 277, 421.)  There are also a variety of views that the Loss Allocation should not be applied to them for various reasons.

For example, there are many who simply object to the 10% allocation when the Receiver had suggested the account owners losses may only be 6.75%.  (Response Nos. 4, 185, 238.)  Others argue the 10% should only be based on the value of the cash account, not the entire account value, (Response No. 17), while there are those who claim that the Loss Allocation should not apply to them since the loss occurred in 2009 and they did not establish an IRA with the Bank or APS until later.  (Response Nos. 33, 238, 240, 264, 299, 368, 427.)  Others note that APS (and/or the Receiver) has already taken the yearly management fee and the account owner should not have to participate in the Loss Allocation.  (Response No. 210.)  Further, there is concern that the Receiver does not properly describe the Loss Allocation and how the contributions by account owners will be distributed.  (Response No. 238.)

Another point of contention with the Loss Allocation comes from those whose assets were lost because of a bad investment (i.e. National Note of Utah) and who are now being asked

to participate in the Loss Allocation when APS had known about National Note for several years. (Response Nos. 344, 345.)

Another view on the Loss Allocation is that the increased value of some client accounts is due to good investment decisions and they should not have to bear the burden of such an increase in value to cover the cash loss in the Master Trust Account.  (Response No. 416.)  Similarly, are those who claim APS refused to write down the value and/or overvalued the assets, which would in turn require them to shoulder a greater burden of the Loss Allocation.  (Response No. 421.)

In Response 800, two account owners object to the 10% Loss Allocation and further suggest they should only be calculated "at the time of transfer out of the commingled bank account."  (Response No. 800.)  In Response 640, the respondent sets forth ten reasons why the loss allocation is unfair (funds were rolled over into self-directed accounts and immediately invested, self-directed IRAs have higher risks, account holders expressly directed funds into "non-cash" investments, those who parked their assets in cash bore a risk just as if they deposited them in mutual funds, etc.) and argues that loss should be only allocated against those clients with cash accounts.

The Receiver also received several submissions by attorneys on behalf of APS clients objecting to the Loss Allocation.  For example, Response No. 678 was filed on behalf of Account Nos. 11724, 11726, 11725,  9484, 19835, 10835, 10837, 10838, 10836, 9359, 9772, among others.  In Response No. 678, the objectors claim the Court is barred from requiring "non-parties to pay monies to the Receivership Estate."  (*Id*.)  They then argue that the application of the "loss allocation theory" only applies to "distribution of receivership assets" not

34

an allocation of losses caused by the defrauding party.  Then, ignoring the language in the

Liquidation Plan, the objectors in Response No. 678 suggest that the "[l]oss allocation doesn't

even apply to APS Clients who have no claim to the receivership cash," especially since they

will not "receive any monies from the receivership estate to mitigate their losses." (*Id*.)  The

Response goes on to raise further objections involving due process and that proposing to issue a

1099 IRS tax notice for non-compliers and/or impose liens on client accounts is not permissible

(although they fail to cite any supporting law).  Further, Response No. 678 argues the Plan is not

equitable or reasonable because it fails to address the tax implications if the account owner's

assets are non-liquid as well as costs they would be forced to incur to liquidate their assets.

Finally, Response No. 678 argues the loss should be allocated among all 14,000 clients, as

opposed to the current clients.  (*See also* Response Nos. 559, 680, 775.)

     In Response Nos. 679 and 680, the respondents rely on 18 U.S.C. § 981 to argue the

Receiver is duty bound to prove the "funds deposited by Claimant were actually commingled,

were wrongfully converted by APS, or that the separate assets owned by Claimant were

purchased with funds other than those specifically deposited by Claimant … ."  (Response No.

680.)  Relying on a forfeiture case out of the Western District of North Carolina, *United States v.

Bailey*, 926 F. Supp. 2d 739 (W.D.N.C. 2013), the respondents argue the Receiver has failed to

carry her burden to prove the IRA assets were part of the fraudulent activity.  (Response Nos.

679 and 680.)

     In a lengthy response, Response No. 431 (which appears to have been written by an

attorney with considerable knowledge of Ponzi schemes and the law relating to Madoff case) ,

35

goes to great lengths to advance virtually every argument imaginable against the Liquidation

Plan.  Specifically, the Respondent argues that: (a) the Loss Allocation should be borne by "All

APS investors who had assets with the scheme from 2000-2014 and not solely among those who

had account[s] … with APS as of April 25, 2014;" (b) the Receiver used a "flawed"

methodology and should only share in the loss during the years in which they maintained

accounts at APS; (c) the Receiver is only allowed to recover the difference between what a client

invested and what a client ultimately withdrew in "excess of what investor put into the fraudulent

scheme" (i.e. clawback claims); (d) the Receiver has failed to show by a preponderance of the

evidence the existence of a Ponzi scheme, and that due to the Receiver's failure to do so cannot

"clawback any portion of the principal" of APS clients; (e) the Receiver has not proven the

wrongful conduct continued during 2013 and 2014 when she was involved with APS; (f) the

Receiver should pursue any and all opportunities to "mitigate losses of Mr. & Mrs. DeYoung" by

pursuing third-parties, insurance policies, clients benefited or involved in  Mr. DeYoung's

fraudulent conduct; (g) the last statement method applied is unfair and rarely used and unjustly

enriches former APS clients; (h) the date chosen (April 25, 2014) is arbitrary and unfair and

ignores the 12-14 years of theft by Mr. DeYoung; (i) tracing should be used; and (j) the Loss

Allocation of 6.8%-10% is unreasonable in light of third-party actions and on-going business.

Another detailed response raised a myriad of questions, suggestions, and objections to the

proposed Liquidation Plan, including an objection to the Loss Allocation of 10%.  (Response No.

496.)  In objecting to the Loss Allocation, the respondent argues that the Plan proposes to use the

cash generated by a "Surcharge" to cover estate losses resulting from: (a) appropriate re-

evaluations of Client assets; (b) uncollectible payments from account holders who owe

administrative fees; (c) the cash shortfall caused by DeYoung's misappropriation; and (d)

expenses relating to the Receivership, including unpaid administrative expenses.  (*Id.*)

    **RESPONSE:**

    Many of these Responses misunderstand and misinterpret the facts and proposed

Liquidation Plan.  For example, there are two purposes for the Loss Allocation.  First, it is to

apply the loss equally to existing IRA account owners regardless of the nature of the assets held

in each IRA account.  Second, the alleged "forfeiture" is not a forfeiture because the Loss

Allocation is the actual loss due to DeYoung's fraudulent conduct.  The Receiver is simply

applying the loss equally to all current clients, regardless of the form of the asset.  If and when

the Receiver liquidates assets and/or recovers from third-parties who contributed to the loss, the

Receiver will use the same analysis to distribute monies back to all clients.  Compelling only

IRA account owners who had cash deposits as part of their asset base unfairly imposes the loss

on a select few when all client funds were deposited in the same commingled account.

    The Receiver recognizes that no solution will be perceived as fair to everyone.  There

were also many expressions of the hardship and financial challenges clients face.  Clients who

accepted of the Loss Allocation approach as the best way to resolve the problem and move on

wanted to be sure that the nonpayment or lack of cooperation from other clients would not hold

them back from moving onto the successor administrator/custodian.  The Receiver does not

intend to hold any client back due to other clients' noncompliance, and will release accounts

promptly upon execution of the Plan.

37

Upon Court approval, the Loss Allocation will be applied to all accounts that are not specifically excluded as recommended by proposed changes to the Plan.  The allocation will only be made to the account value on April 25, 2014 – not to subsequent contributions or increases or decreases in value.

       **b.**       **<u>Category 3(b) - Exclusion of Former Clients or Those Current Clients who Took Distributions.</u>**  (Recommend No Change.)

This sub-category sought to identify those respondents who argue that loss should be allocated to former APS clients, either all former clients (approximately 8,000) or those who took out large cash distributions.  Stated differently, these respondents were looking for the Receiver to seek clawback remedies against those who they believed profited from their prior association with APS.

The general theme here focused on clients arguing that the Liquidation Plan does not provide for an avenue to make former APS clients contribute to the Loss Allocation and/or claw back the gains they received by terminating their association with the Bank and APS.  The comments focused on the notion that the burden of the loss should be borne equally by all accounts and it is unfair to have the current account owners shoulder the entire loss.  (Response Nos. 12, 13, 65, 431, 455, 498, 680, 766.)  As one respondent noted, "clients who transferred their accounts out of APS prior to April 25, 2014 [are] escaping liability and escaping with money that was defrauded."  (Response No. 112.)  Others criticize the Receiver for the arbitrary application of the Loss Allocation by not pursuing prior APS clients to contribute.  Their concern centers upon the fact that clients who exited APS before the Receivership get off "scott-free,"

while they are required to contribute to the loss.  A similar argument is voiced that it is "possible to identify clients whose accounts contained funds during the period of misappropriation" who should have to contribute to the loss.  (Response No. 220.)  Still others claim that it is only logical that the accounts who were benefiting from "fraudulent investments" should shoulder a larger pro rata share than others.  (Response No. 248.)  Included within this category are also those respondents who suggest consideration should be given to pursuing "'Clawbacks' from sizeable account holders who moved their accounts prior to April 25, 2014."  (Response No. 496.)  A final view of the same objection is that it is not equitable for the 5,500 clients to bear the financial burden.  Thus, the Receiver should seek to include all 14,000 clients in the Loss Allocation.  (Response Nos. 735, 736, 777.)

**RESPONSE:**

The Receiver has carefully examined whether pursuing clawback actions against current and former APS clients would be beneficial for the Receivership Estate.  The Receiver has determined that pursuing clawback actions would not be beneficial for the Receivership Estate due to legal issues associated with fraudulent transfer lawsuits, the costs of pursuing such actions, and likely minimal recovery.  For a more detailed discussion of why the Receiver has determined clawback actions would not be beneficial, see category 11 below.

      **c.**     **<u>Category 3(c) - Allocate Only to Clients with Cash at Time</u>**
            **<u>Receivership Commenced.</u>**  (Recommend No Change.)

This sub-category identifies those who believe loss should only be allocated to APS clients with cash balances in their accounts as of April 25, 2014 and not to those with non-cash assets.  A total of 26 out of the 835 Responses fall within this sub-category.

The argument that the Receiver should allocate the loss solely to clients with a cash balance takes several forms.  In one instance, the argument is focused on prorating the loss based on the account holders "average daily balance" in the cash account.  (Response Nos. 622, 777.)  Others voiced their objection to, not necessarily clients with cash balances, but simply that their assets are held in assets which will be difficult to liquidate.  (Response No. 645.)  Another respondent suggests that those who chose to park their money with APS bore the sole risk of their self-directed choice to hold funds in cash accounts instead of another investment.  (Response No. 640.)  Accordingly, the gain or loss in the cash account should be viewed the same as if they had invested in the stock market and lost the value of their investment.  (*Id.*)  Finally, some argued that they have no cash in the account, have not suffered a loss and should not have to participate in the loss caused by the misappropriation.  (Response Nos. 473, 474.)

    **RESPONSE:**

Clients with illiquid assets have asserted they cannot fund their loss and thus only customers with cash should bear the loss.  The Receiver has great sympathy with the dilemma that these clients are in.  Sale of property may be difficult and values may have gone down.  Costs must be incurred to sell.  The Receiver plans to discuss options with the IRS to address this

issue, including qualifying loans, contributions, or payment plans. *See* Category 5 below for a more detailed discussion.

The Receiver has addressed above the unfairness in allocating 100% of the loss to only clients with cash deposits.  Neither the Receiver nor the clients can escape the commingling of all IRA and 401(k) account owner funds into the Master Trust Account.

        **d.**    **Category 3(d) - Amend Loss Allocation to Consider Time and Account Size**. (Recommend No Change.)

This sub-category identifies those who believe the Receiver should revise the pro rata 10% allocation of loss proposal and implement an allocation formula that takes into account how long the client was a client of APS and the size of the account balance.

The responses categorized under 3(d) appeared to be focused on suggesting an alternative means of allocating the loss.  One interesting idea was to have long-term clients (who had more opportunity for growth and earnings) to "pay a commensurate percentage of the shortfall based on the age of their accounts."  (Response Nos. 604, 605.)  The respondent also suggested that clients should also pay based on the "percentage of increase in the value or earnings of their APS accounts since being opened."  (*Id.*)  This response, however, then settles on the notion that since the respondent is a newcomer, in which his account did not see an increase in value, he should not have to bear the loss.  (*Id.*, *see also* Response No. 653.)  Another respondent suggested the Receiver should allocate the loss proportionally based on the "length of time that their monies/accounts were in APS funds during the subject time frame (2002 until April 24, 2014)."  (Response No. 766.)

**RESPONSE:**

The Receiver does not believe an exception to the Loss Allocation should be made based on the length of time or account size of the client.  First, because once a client's funds were deposited in the commingled Master Trust Account, the funds lost their identity, became impossible to trace and part of DeYoung's fraudulent scheme.  Therefore, the length of time or account size is irrelevant.  The Receiver understands that some clients would like the Receiver to analyze each individual client's circumstances to determine what Loss Allocation would be appropriate, but that simply is not viable from an economical and efficiency standpoint.  It would take considerable time and resources to implement a formula for each client, based on their unique circumstances. If the Receiver were to do so, it would likely increase the administrative fees to a point that would no longer be beneficial for the clients.

e. **Category 3(e) - Refusal or Requesting Alternatives to Requirement to Liquidate Assets to Pay Loss Allocation.**  (Recommend No Change.)

This sub-category identifies those who refuse to or state they cannot sell property to facilitate account adjustment for the loss.  Reasons include not wanting to sell property in a down market, needing adequate time to sell property, relying on monthly rental income generated by property to pay for living expenses, incurring brokerage fees and other losses that will be sustained in order to sell property.  Some clients believe their allocation of loss should be reduced commensurate with the amount of cost they will incur from having to sell property.  Although this objection was voiced by a number of others whose responses are not categorized

specifically under 3(e), the request to allocate the losses differently for those with illiquid assets was a common response.

**RESPONSE:**

The question of how to deal with APS clients whose account assets are illiquid has been and is of significant importance to the Receiver. (*See* Category 3(c) above.)  There are many APS clients whose Loss Allocation exceeds the cash balance in their APS account.  In part, this is because a large number of APS clients hold assets in illiquid investments, such as real estate. Many APS clients have responded that they do not want to divest their illiquid assets to pay a Loss Allocation because they rely on income from those investments, and they would incur an additional loss if such assets are sold.  Additionally, the Receiver recognizes that it would take a substantial amount of time for clients to convert illiquid assets into cash to cover their Loss Allocation, thereby extending the Receivership.

Some clients inquired as to whether they may increase their liquidity before the end of the year.  Although the Receiver is not in a position to encourage or dissuade clients from doing so, if clients are eligible and so inclined, they may make contributions for 2014 that will increase their liquidity and which, if sufficient, would enable to them to more readily move to the successor administrator/custodian.

A client could make a contribution by April 15, 2015 to cover all or part of their Loss Allocation.  However, the Internal Revenue Code of 1986, as amended (the "Code") limits the maximum annual contribution an individual may contribute to his or her IRA.  In 2014, the limit is the lesser of $5,500 ($6,500 if age 50 or older) or the clients taxable compensation.  Therefore,

43

APS clients will be unable to fully fund their Loss Allocation by making a contribution to their account.

In 2001, the Internal Revenue Service ("IRS") issued a private letter ruling ("PLR") which held that contributions to an IRA for the purpose of funding a loss allocation in connection with a receivership are subject to the annual limit set by the Code.  Subsequently, in 2007, the IRS issued a PLR which held that contributions which are considered "restorative payments" to an IRA are not subject to the annual limits of the Code.  Each PLR is applicable only to the taxpayer who submitted the request and therefore they are not binding on the Receiver or APS clients but rather serve as informal guidance.  The Receiver believes that, under the current situation, there is a strong argument for the IRS to consider APS clients' contributions as restorative payments.  The Receiver has filed a separate request for a PLR asking that the IRS grant relief to APS clients by permitting contributions to their accounts in order to fund their Loss Allocation without applying the annual contribution limit. (*See* Category 5 below).  The PLR request also seeks to allow APS account holders who have sufficient cash in their accounts to transfer this cash to cover their Loss Allocation without such transfer being considered a taxable distribution to the account holder,

The ability of the Receiver to expeditiously implement and complete the Liquidation Plan is dependent on this ability of APS clients to fund their Loss Allocations from sources outside of their IRA accounts.  The PLR request is critical to determining whether APS clients will be able to make the necessary contributions to their accounts without facing adverse tax treatment.  The Receiver is communicating with the IRS to expedite its review and response to the PLR,

however the IRS has indicated that it is not possible to receive a response before the end of the

calendar year.  However, the Receiver is confident that it would take a significantly longer

period of time to assess the value of and sell clients' illiquid assets in order to fund their Loss

Allocations.  As such, a delay of the Liquidation Plan until the IRS responds to the PLR request

is in the best interests of all APS clients.

    **f.**   **Category 3(f) -- Other.**

   Other reasons individuals object to the allocation of loss not fitting into the categories

above.  For example, one person was simply concerned on how the deed to property owned by

his IRA will be transferred.  (Response No. 14), while another provided three different options to

the Loss Allocation which involved immediate transfer of accounts and/or holding accounts until

an actual Loss Allocation could be determined with certainty.  (Response No. 153.)  Another

believed that the Receiver's proposal was providing a "windfall to the IRS."  (Response No.

167.)  One respondent argued that since four out of five similarly situated clients had moved

their IRAs into a combined 401(k) account, he should be able to do the same without the

obligation to participate in the Loss Allocation.  (Response No. 239.)  Many noted that they

opened accounts shortly before the Receiver was appointed, suggesting to reduce the Loss

Allocation due to the short term of involvement.  (Response No. 385.)

   **RESPONSE:**

   Since these issues do not bear directly on the Liquidation Plan, the Receiver incorporates

her responses herein.

**4.**   **Category 4 - Valuation.** (<u>Recommend Some Changes</u>.)

This category sought to identity those respondents who expressed concerns about the value of their APS client accounts as of April 25, 2014.  Because the proposed Liquidation Plan contemplates using the statement value of assets held in each client's account as of April 24, 2014, many raised objections asserting APS failed to properly value their assets resulting in the possibility that they will have to contribute a greater share of the Loss Allocation.  Again, the Receiver created several sub-categories to better address and identify these concerns. The Receiver believes that the Plan should be amended to respond to the following comments related to valuation issues.

**a.**   **Category 4(a) – Non-recourse (i.e. Loans Collateralized by Property)** (Recommend Change.)

This sub-category identifies respondents whose account includes encumbered real estate who assert the value should be reduced by the amount of the encumbrance.  Clients advised the Receiver that their accounts with real property were incorrectly overvalued (and requests to correct this situation were rebuffed), because the property was shown at a value unreduced by the actual debt encumbering the asset.  They surmised this was done by APS to charge fees on the higher amount.  Examples of responses in this category include:  Response No. 10; Response No. 39; Response No. 40; Response No. 40; Response No. 360 (stressing importance of treating all account holders exactly the same with respect to any adjustments to valuations) \; Response No. 761  (noting a non-recourse loan should be considered a liability and not an asset in APS account).

46

**RESPONSE:**

The Receiver has been advised by her accountants that APS' policy of valuing what it called "non-recourse loans" based on the equity plus debt is incorrect and that these types of loans should be valued only at equity.  Therefore, the Receiver will consider making adjustments to these assets upon the affected client coming forward to present the Receiver with evidence of the error.  This will impact the Loss Allocation calculation as it will likely reduce the collective value of all IRA and 401(k) accounts.  See below for a detailed discussion of the process the Receiver contemplates for addressing valuation issues.

      b.    **<u>Category 4(b) – Write Down Request Refused by APS.</u>** (Recommend No Change.)

This sub-category identifies respondents who requested prior to the Receivership that APS write down/re-value an asset in their account, but APS rebuffed/refused.  Also includes clients who requested APS close their account, but APS refused.

Most respondents indicated they requested that APS revalue their assets only to be told by APS that additional documentation was needed.  (*See, e.g*., Response 783 (tried for years to revalue and finally gave up trying); Response No. 354 (tried to revalue with M. DeYoung since 2010); Response No. 401 (invested in promissory note secured by a deed of trust on two lots that are overvalued.  "I am one of those investors who sought to have APS adjust my account value on 2 or 3 occasions between 2009 and 2010 at no avail.  The APS managers/employees could not give me a reason for not adjusting the value"); Response No. 419 (disputed several times with APS personnel that a note held in account has no market value because is seven years in default.

Was told APS keeps face value of note on record.  Has been paying APS management fees on note and feels it will be unfair to pay 10% on note, which is valueless).

Respondents asserted Mrs. DeYoung required an impossible amount of paperwork, so much so that the respondents would give up.  Others wrote that Mrs. DeYoung advised the account could not be revalued for a variety of reasons, or in some cases, that the account would be closed or revalued only to now learn it was not.  (*See, e.g.,* Response No. 469 ("I have 0 idea where the account value comes from.  I have no money at APS and understood my account was closed at APS.")

Others indicated they did indeed fill out the necessary valuation paperwork, but APS refused to update their records. (*See, e.g*., Response No. 357  (respondent sent fair market valuation form to APS shortly before the receivership that was not processed). Response Nos. 456, 457 (APS received K-1 reports showing the values are lower than what they reflect and yet APS made no adjustments); Response No. 647  ("Even when clients did do an annual valuation of their account, APS did not update the value of the account to match the Fair Market Valuation that was done for the account.")

Another respondent indicated agreement with the Plan's proposed valuation method for those that were rebuffed by APS previously and simply requests that a process be implemented for adjudication for what documentation will be required and what methodology will be used. (*See* Response No. 35.)

**RESPONSE:**

As part of the proposed Liquidation Plan, the Receiver has already proposed to allow clients the right to correct valuation prior to the Receivership provided the client produces sufficient records to the Receiver to not only verify the correct value of the IRA account as of April 24, 2014, but that they took the requisite steps to revalue and were expressly denied by APS.  See below for a detailed discussion of the process the Receiver contemplates for addressing valuation issues.

        c.        **Category 4(c) – Write Down Due to Worthless or Lower Value of Asset.** (Recommend No Change.)

This sub-category identifies those who disagree with their account value as of April 25, 2014 and contend **post-Receivership** that their account value should be written down/re-valued because it is not worth what is reflected on APS' system or is not worth anything at all. Examples of assets clients want written down/re-valued include promissory notes that have not been paid back in years and which the clients believe will never be paid back or real estate that has been incorrectly valued at an inflated level by APS so that more fees could be charged.  A total of 98 out of the 835 Responses fall within this sub-category.

Examples of responses received are as follows:  Response No. 1 ("Receiver states she has no knowledge of actual valuation so has taken the last statement written by APS, a company which she acknowledges is beyond the pale of sloppy bookkeeping.  Account holder has delivered to Receiver written evidence to Receiver of actual value."); Response No. 230  (stating APS records show a life insurance policy which is not held by APS);  Response No. 348

(account holding real estate is over inflated because expenses for real estate such as maintenance and re-occurring expenses have not been deducted); Response No. 356 (inflated real estate values); Response No. 422 (investment lost due to housing crisis, and promissory note that will not be paid); Response. No. 561 ("The recent recession greatly reduced the value of my account assets.  Nevertheless, APS still showed them with a value as of the time of their acquisition.  My real estate assets aren't worth what they were when I bought them years ago."); Response No. 742 (stock with 0 value); Response No. 749 (reduced value based on K-1); Response No. 821 (oil and gas leases and has no idea of value); Response No. 693 (never asked to value account by APS).

**RESPONSE:**

Many clients did not disagree with the general idea of the Loss Allocation, but were quick to point out that it should only apply to the valuation of their account on a current basis, not on April 25, 2014 as set forth in the proposed Liquidation Plan.  The Receiver believes that the Plan should not be revised, nor should the Receiver generally accept requests for revaluation on April 25, 2014 for the following reasons.  The clients had a duty and responsibility to value assets annually as set forth in the custodial account agreement governing the account.  The annual form 1099 filings were sent to the clients several months before the Receiver stepped in with plenty of time for these valuations to be corrected or disputed.  Thus, unless the client can demonstrate they in fact did so in a timely fashion, produced appropriate documentation, and were rebuffed or not processed, the Receiver believes the valuation on the date of the Receivership as set forth in the Proposed Plan should govern.

50

  **d.**  **Category 4(d) -- Foreign Currency.** (Recommend No Change.)

This sub-category identifies those who want to re-value their foreign currency, which values fluctuate frequently.  Some suggest the Receiver should contact the currency exchange (Sterling) from where the foreign currency was purchased for a more accurate valuation assessment.  A total of 12 out of the 835 Responses fall within this sub-category.

Examples of responses in this category include: Response No. 47 ("My statement reflects the amount that I actually paid for the [Iraqi Dinar] not what I can sell it for.  With currency as you may know there is a sell price and buy back price.  The buy back price is about $850 per million while the buy price was over $110 per million.  I would like to submit a letter or some sort of proof (which can easily be verified from the dealer's website that we bought the currency from, The Sterling Currency Group,) and be able to provide the actual value of my account which is significantly less than my statement reflects."); Response No. 124  ("The value of the Dinar should at least be adjusted to the exchange rate as of the date you selected for valuing my account."); Response Nos. 402, 403 (noting the value of dinar has decreased since date of purchase and should be adjusted.)

  **RESPONSE:**

The Receiver believes the valuation for all assets (including foreign currency) should be as of April 25, 2014.  If the Receiver were to make an exception for foreign currency because the values tend to fluctuate, clients with real estate assets or other assets would similarly argue that an exception should be made, because those values also tend to fluctuate.

e.    **Category No. 4(e) -- Other**.

Other reasons individuals object to valuing APS accounts as of April 25, 2014.  A total of 23 out of the 835 Responses fall within this sub-category.

One respondent indicated that the respondent's account was incorrectly devalued, which is interesting because all other responses indicated their accounts had inflated values.  Response No. 553.

Another respondent indicated "I agree that the financial burden should be shared equally by the current 5,500 APS clients but based on the actual cash value of the account not the total account value.  Only the cash portion is missing, the portion the client has invested has not been misappropriated."  Response No. 2.

Some APS clients' cash was invested in an investment of Curtis DeYoung's choice (often with one of the Memmotts or their entities) involving forgery or without the clients' knowledge or consent.  These investments are worthless because they were made with companies and/or individuals who either will not or cannot pay back the loans Curtis unilaterally made on the clients' behalf.  Yet, the full value of the investment shows on APS' records when it should have been written down to 0.  APS wrote down some of these investments (often for family members) but not others.  Therefore, if these unauthorized and worthless investments are properly established and verified, the account values should be corrected, which will impact the 10% Loss Allocation calculation and must be analyzed.

The Receiver in the National Note of Utah receivership submitted a response (Response No 725) indicating "The NNU Receiver is concerned, however, with the potential disparate

negative impact that the Plan may have on APS-NNU Investors vis-à-vis other APS clients affected by the Plan, which is based on the information herein, would be inequitable.  Payment of the Loss Allocation by APS-NNU Investors is concerning because under a rising tide plan anticipated to be used in the NNU Case, many APS –NNU Investors will receive no distribution, even if they lost a good portion of their Principal Investment.  If there is no distribution made for losses in the NNU Case and they are forced to pay the Loss Allocation, they will be suffering losses as a result of fraud far greater than other APS clients.  Also, given the anticipated percentage distribution that may be made, any recovery for losses in the NNU Case likely will be consumed in whole by the Loss Allocation in the APS Case.  This is unfair because the APS-NNU Investors, unlike other APS clients with legitimate investments, will not, as anticipated in the Plan, obtain the benefit of freeing themselves from the APS enterprise by paying the Loss Allocation- they have no valid investments through the NNU Promissory Notes to roll over to another IRA or another custodian.  In short, APS-NNU Investors will receive no consideration after being obligated to pay the Loss Allocation. . . . In short, the NNU Receiver believes that there is ample evidence that the NNU Promissory Notes should be revalued in an amount of zero."  The Receiver believes investments in NNU were previously written down by APS.  If these investments have not been written down, the Receiver will make necessary corrections if these investments are properly established and verified.  This will impact the Loss Allocation calculation.

The Receiver is aware of investments made with other entities currently under receivership—namely Management Solutions, Inc. ("MSI").  It is the Receiver's understanding

that Management Solutions investments have some value and she has not received a response

from the Receiver in MSI.  Therefore, the Receiver proposes that she assess these investments as

of their book value on April 25, 2014 and consider adjusting at a later time if timely, proper

documentation and verification of the reduced value is provided.

**RESPONSE:**

For the limited exceptions as noted (1) Non-recourse debt or other valuation requests

previously refused by APS; (2) Unauthorized investment not written down for some but written

down for others or (3) National Note investment not written down previously, the Receiver

proposes the following procedure.  No later than 60 days following receipt of notice of the

Court's approval of the Liquidation Plan, APS clients fitting in the above three categories may

submit a form similar to one attached hereto as Exhibit 3 indicating their total account value as

of April 25, 2014 and documentation supporting their request.  Acceptable documentation must

show (1) nature of non-recourse debt (2) attempts made by the APS client to have their account

revalued prior to April 25, 2014, which were rejected by APS; (3) an administrative error as to

account valuation prior to April 25, 2014; (4) Statement that an investment was not authorized or

a direction letter was forged and the investment is worthless. The Receiver will need to evaluate

the client's file and investment to verify the investment appears to have been unauthorized and

that it is an investment APS wrote off for some but not others.  The Receiver will review the

form and documentation and determine whether each request for a revaluation should be granted.

The Receiver proposes to charge each such client making a valuation request a flat fee of $500,

which fee must accompany the valuation request.  This fee will both help to defray the costs of

54

evaluating and adjudicating the requests, but it will also dissuade those with no legitimate

valuation claim from making such a request.

In proposing the foregoing valuation adjustment, the Receiver believes it is simply not

economically feasible for the Receiver to entertain each and every valuation adjustment request.

To do so would take valuable time and cost additional administrative fees, ultimately harming

the Receivership Estate.  Timely adoption of the Plan of Liquidation would not be possible

because until all revaluation requests are adjudicated, the total APS client account value is not

known, and the final Loss Allocation percentage cannot be determined.  Therefore, entertaining

each and every valuation request violates the Receiver's keystone principals:  economy and

efficiency.  The approach set forth above of entertaining valuation requests in the three limited

categories will result in a more economical and efficient resolution of this matter.

     **5.**     **<u>Category 5 - IRS Treatment of Loss Allocation.</u>**

This category identifies those with questions regarding whether and how contributions

made from outside their IRA accounts to cover the allocation of loss will be treated by the IRS.

Includes questions about what other options clients will have available to pay the allocation of

loss, including whether clients may take a loan against an investment/asset.  Also includes clients

who want an answer from the IRS before a decision is made on the Proposed Plan of

Liquidation.

     **RESPONSE:**

The Receiver filed a PLR request with the IRS on October 3, 2014 to address the many

tax questions posed by the clients.  Various approaches and questions were raised on how the

Loss Allocation, possible contributions or restoration payments made to fund the Loss

Allocation, and reimbursement of recovery would be treated for income and excise tax purposes.

Many clients with illiquid assets want a way to convert their proportionate share of Loss

Allocation without adverse tax consequences.  The Receiver strove to promptly file the IRS

request after the Liquidation Plan was submitted to the Court.  Expedited processing was

requested.  The IRS responded in a letter dated November 12, 2014, indicating that due to their

internal reorganization and processing timing, the request for a conference to discuss their views,

and the time needed to evaluate the ruling will not be possible until six months from the date of

assignment of the request.  Although the request has been assigned, the IRS may need to reassign

due to an internal reorganization that is in process.  On December 2, 2014, the IRS informed the

Receiver that it is working the case, is coordinating with Counsel to schedule a conference call to

discuss and they will notify us of a conference date as soon as they are able.  The Receiver will

continue to vigorously pursue obtaining an expedited Letter Ruling from the IRS.

    The tax treatment of the steps outlined in the Liquidation Plan is critical to its

acceptability and execution.  Many clients voiced their opinion that taking action to finalize the

Plan prior to understanding the tax implications was premature, imprudent, and potentially

damaging.  The Receiver agrees.  However, the Receiver believes it is in the best interest of all

clients to have the Court approve the Liquidation Plan as amended, conditioned on certain events

occurring.  By doing so, those clients not directly impacted by receipt of the PLR can move

forward with transferring their account to the new custodian.  f

The Receiver recognizes that she has been emphasizing expediency for cost reasons and based on client input.  However, the Receiver believes delay to procure certainty on this aspect of the Plan is warranted and prudent.  In order not to impede progress, other aspects of the Proposed Plan could be approved by the Court so that the Receiver can continue to finalize the Plan during the delay.

6. **Category 6 – Objection to Fees.**

    a. **Category 6(a) – Management Fees.**

This sub-category sought to identify respondents who objected to the payment of the APS management fees, or the management fee should be reduced, because their accounts are frozen and they are unable to self-direct their investments.  An overarching objection focuses on the belief that they should not be forced to pay "any further [management] fees" because they are "being forced to keep [their] account at APS," and the Receiver is not "administer[ing] my account at this point."  (Response No. 12; *see also* Response Nos. 79, 130, 175, 262, 366, 377, 379.)  Other respondents merely objected to past management fees paid to APS based on an inflated value of their assets.  (Response Nos. 77, 176, 177, 422, 478-82, 683, 755.)  Objections also focused on wanting to move away from having to pay "excessive management fees," and move to a company that charges no such fees.  (Response No. 265.)

**RESPONSE:**

The Receiver understands and appreciates the respondent's objections over the payment of on-going (and past) management fees as she performs her tasks assigned by the Court.  She also appreciates the fact that many of these clients claim they were rebuffed by the DeYoungs

when they asked for fee reductions, or that fees were computed incorrectly on inflated values.

Unlike many SEC cases in which a receiver is appointed to take over a company and immediately cease operations, in this case the Court determined it was in the best interest to keep APS operating as a going concern until the Receiver can facilitate and complete the transfer of all IRA and 401(k) accounts to a new custodian/administrator. Until this occurs, the Receiver has asked for and obtained Court approval to allow ALL clients to continue to self-direct their investments subject to certain conditions imposed by the Court. (*See* Clarifying Order [Dkt. 79].) In this regard, the Receiver has been receiving and facilitating investments at the direction of account holders. In the meantime, the Receiver has made certain required filings on behalf of all current clients with the Internal Revenue Service, maintained APS's business operations, and retained a minimum number of employees and staff to service the needs of ALL clients. She will be called upon to make additional filings and reports at the end of the year. These services provide an overall benefit to the Receivership Estate. Because the Receiver continues to provide the service in most areas and must continue to operate until the Liquidation Plan is approved and implemented, it is the Receiver's belief that all clients should be required to pay a management fee until their account is transferred out of APS.

The Receiver recently sent collection letters to APS clients for past due management fees prior to the Receiver's appointment, as well as current fees, to which many clients have reacted negatively. As noted above, management fees are needed to continue the operations of APS. However, to the extent the Court agrees with the Receiver's proposal that all fees must be paid

before a client may move to the successor administrator/custodian, the Receiver will not need to pursue collection efforts.

Another justification for continuing the payment of management fees is that it is a source of revenue that will reduce the administrative fees being charged to the Receivership Estate.  As noted in her quarterly reports, the management fees charged prior to the Receiver's appointment generated between $1.2 and $1.5 million a year.  Assuming these fees continue to be collected from ALL clients based on the value of their respective assets, the Receiver can look to these fees to cover not only the APS's operation costs, but will be available to cover some (if not most) of the Receiver's administrative fees leaving more to be distributed from the monies she recovers from third parties and the sale of assets.

**b.      Category 6(b) - Administrative Fees (Receiver).**

This sub-category identifies respondents who object to paying an administrative fee for the Receiver, or who believe the Receiver's fee is too high.  Others seem to believe the administrative fee should not be a "share all" fee, but a "flat-fee" allocation.  (Response No. 745.)  Similarly, there are respondents who believe that the administrative fee should be a "set fee rather than a fee based on the total [value] of our assets."  (Response No. 308.)  Some of the respondents object because they believe a portion of the Loss Allocation will be used to cover administrative fees.  (Response No. 4.)  Finally, there are some respondents who believe the administrator should be paid on a "contingency" basis and/or engage outside counsel to take on recovery claims on a contingency fee basis.  (Response Nos. 496, 685.)  In one instance, a

59

respondent asks the Court to appoint a committee to act as a non-biased third-party to oversee the Receiver's costs and fees.  (Response No. 496.)

**RESPONSE:**

Respondents raise legitimate concerns about the cost of the Receivership and need for transparency and oversight.  Pursuant to the Receivership Order (and the requirements mandated by the Billing Instructions for Receivers in Civil Actions Commenced by the U.S. Securities and Exchange Commission), the Receiver has submitted Applications for Interim Compensation which seek approval of all professionals who have provided the Receiver assistance in managing APS and addressing the numerous legal and accounting issues facing this receivership.  As discussed above, the Receiver's continuing tasks fall into two general areas:  (a) management of APS; and (b) managing the legal proceedings.  With regards to management of APS, it is the Receiver's belief that much of these costs and fees can be covered by the management fees generated by her continued management of APS's business operations until the IRA and 401(k) accounts are transferred to a new third-party custodian.  In terms of the legal proceedings, as part of her duties and responsibilities, she is authorized to "bring such legal actions based on law or equity in any state, federal, or foreign court as the Receiver deems necessary or appropriate in discharging her duties as Receiver," which includes "pursu[ing] … all suits, actions, claims and demands which may now be pending or which may be brought by or asserted against the Receivership Estates."  (Receivership Order at 5-6.)  In this regard, the Receiver has been a party not only to the above-captioned case but has elected to file separate ancillary law suits in an effort to collect monies for the Receivership Estate to minimize the losses caused by DeYoung's

unlawful conduct.  This has been done with the approval of the Court.  More importantly, the

Receiver is mindful of the costs of taking this action and has no intentions of pursuing third-

parties if doing so is not likely to result in a fair recovery.  She is evaluating the economic return

she will achieve against the costs of achieving the result and determining whether the potential

risk is worth the cost.

With regards to those respondents who suggest a committee should be formed to oversee

and approve fees, the Receiver believes that the cost/benefit of such an approach is not warranted

and that the SEC and more particularly the Court's oversight of the Receiver's activities provides

sufficient protection for all clients and the Receivership Estate.  Since the Court must approve all

actions of the Receiver to bring suit for recovery of, sale of, or other activities expending funds,

the Receiver does not believe the additional cost of a committee, its advisors, and the delay

created by this additional administrative step is needed to protect the clients' interests.

**7.** **Category 7 - Transition to new Custodian/Administrator.** (Proceed with Plan.)

This category sought to identify those respondents who addressed the Receiver's

proposal to transfer the APS client accounts to a new custodian/administrator.  Some of the

respondents support selling their APS accounts to a new administrator and expressed a

willingness to move to the new administrator selected by the Court/Receiver.  These same

respondents insisted on making the move as quickly as possible.  There were other respondents

who opposed the Receiver choosing their new custodian/administrator because they want to

choose their own administrator/custodian.  There were still others who had questions about how

the new administrator is being selected and would like a choice between two or more.  Finally, there were respondents who wanted to know who the names of the potential new administrators.

**RESPONSE:**

The Liquidation Plan provided that the Receiver would seek to identify a prospective custodian/administrator to acquire the rights to provide administrative services to all APS clients. Many respondents support the timely and careful selection of a successor.  The Receiver was approached by and met with over 20 potential new custodians/administrators who expressed an interest in acquiring the rights to service the APS Clients.  She then narrowed the possible successors to three after consulting with her legal and accounting team, staff and the Securities and Exchange Commission.

Having selected three potential custodian/administrators, the Receiver invited each potential successor to the APS offices during different weeks for due diligence.  During the diligence meetings, the Receiver and her counsel provided the three potential successors with due diligence deliverables requested by them and answered questions.

Following the conclusion of the diligence meetings, the Receiver provided each potential successor with a list of key terms and conditions to be included in any proposal.  The terms focused on several key factors in order to optimize the most efficient transition to a regulated, experienced custodian who could best service the APS clients.  These factors included, among other things the following:  (a) cash purchase price; (b) favorable of accountholder fees; (c) the speed, effectiveness and efficiency of the transition of accounts to the new custodian; (d) the

experience, safety and soundness of the potential successor; and (e) the assistance that such custodian would provide to the Receiver in supporting the transition.

After receiving the final proposals from each potential successor, the Receiver, with the assistance of her legal and accounting team, narrowed the possible successors to two and sent additional requests to each of the two potential successors to clarify and improve certain aspects of the final proposals.

Upon receipt of the supplements to the final offers, the Receiver and her attorneys and accountants conducted a final evaluation of the proposals. Based on such evaluation, the Receiver is prepared to make a recommendation to the Court that it approve moving forward with a successor custodian/administrator. This recommendation is based on evaluation of all offers, the expertise and experience of Successor Custodian, the benefits it will provide to the APS clients and the economic benefit to the Receivership Estate. Due to the confidential nature of the terms and conditions of the proposal, the Receiver will submit the final proposal which the Receiver is in the process of reducing to written form. In the meantime, however, and without revealing the name of the proposed successor, she can set forth the terms in generic form:

1)      The Successor Custodian will make an up-front cash payment to the Receiver for all the accounts, due at closing with no contingencies. The Successor Custodian offered one of the highest purchase prices out of the final offers with no contingencies to the payment upon closing.

2)      The Successor Custodian will waive account holder fees for a certain period of time post-closing. The Successor Custodian provided the most generous waiver of

63

accountholder fees post-closing out of the final offers.  Upon transferring their account,

clients will not be charged administration fees for their accounts for one (1) year.  This

will defray clients' account costs and allow them to test the services of the Successor

Custodian with little to no cost or expense to the clients.  The benefit of this term alone is

a savings to all clients of approximately $2.3 million.

3)       The Successor Custodian will waive termination fees for nine (9) months post-

closing.  Again, this represented the most generous termination fee waiver out of all of

the final offers.  Based on the comments received, the Receiver understands that such a

termination fee waiver is important to the clients and will give them sufficient freedom to

move their accounts if they are not satisfied with the service provided by the Successor

Custodian.  This term also eliminates the need to provide a second custodian and will

facilitate a transition of data and accounts.

4)       Timing of transition and ability and experience to execute.  The Successor

Custodian provided a detailed transition plan and timeline.  Moreover, it has conducted

more than a half-dozen portfolio acquisitions, including a 2010 acquisition in which it

became successor custodian to a division of a failed bank, which had over 8,000 clients

and approximately $1 billion in assets.  The Receiver believes that the Successor

Custodian's track record of successful acquisitions will aid it in performing a smooth and

efficient transition of the clients' accounts.

5)       Safety and soundness and regulated trust company status.  Successor Custodian is

a leader in the self-directed industry.  It has operated as a qualified IRA custodian since

64

1983, has over 130,000 clients in all 50 states and currently has over $12 billion of assets under custody.  The Successor Custodian meets all trust company capital requirements and is audited by its regulator every 18 months.  The Receiver believes that the Successor Custodian's size, experience, regulation and experience with transitions make it the lowest-risk option as Successor Custodian/Administrator.

6)       Ability to service all APS asset types, including 401(k) Plans.  The Successor Custodian has experience with all assets types held by APS accountholders.  With respect to IRAs, it has accounts with assets in real estate, metals, private equity, private debt and other alternative asset types that line up with the assets help in APS IRAs.  Additionally, it currently administers 2,000 multi-participant and Solo 401(k) plans and has over 20 years' experience servicing qualified plans, including through Expert Plan, which is the qualified plan record keeper currently used by APS.  The Successor Custodian's ability to service all APS asset types will facilitate a smooth transition of APS account holders' accounts to the new custodian.

7)       Insurance/audit safeguards.  The Successor Custodian's qualified plans are regulated by the Department of Labor.  Internally, it has an independent internal auditor that reports directly to the audit committee of the board of directors and its financials are audited on an annual basis by certified public accountants, which report their findings to the audit committee.  The audit committee oversees the activities of the Successor Custodian's internal and external auditors.  All account holders' un-invested cash is placed in FDIC-insured institutions where it is federally insured up to $250,000.  The

65

Successor Custodian also carries insurance for Banker Blanket Bond and Professional Liability Insurance.

Given the cash purchase price, the waiver of administration and termination fees, Successor Custodian's experience in acquiring, transitioning and servicing accounts similar to the APS accounts, its size and leadership in the industry, and its safety and soundness, the Receiver and her attorneys and accountants believe that the Successor Custodian provides the lowest risk solution to achieve the Receiver's goals of recovering the enterprise value of APS and finding a successor custodian to efficiently serve the APS clients and minimize their losses going forward.  In addition, as discussed above, because the Successor Custodian will waive administrative and termination fees for a certain period of time, the Receiver believes the choice of a single Successor Custodian will not constrain the choice of the APS clients to use the custodian/administrator that they prefer.

While the Receiver believes that the Successor Custodian should be the single successor custodian of the APS accounts, due to client comments the Receiver did consider offering a choice of two new custodians, and even asked the final potential successors to provide proposals for both a one-custodian and a two-custodian scenario.  However, based on advice from the various parties involved and a review of the one-custodian versus two-custodian proposals provided by the three finalists, the Receiver determined that adding choice prior to the transition would increase cost, dilute the revenue the transaction could provide, create data transfer errors and delay, and increase confusion and the likelihood of client service problems.

66

A single-successor scenario will still provide the clients with the freedom to choose where their account will remain.  The Receiver will not ask for Court approval to enter into a contract binding the client for any specified period of time after the initial transition to the Successor Custodian which effectively provides clients with a choice.  Given the fee concessions that the Successor Custodian is willing to provide after the transfer and the clients' general freedom to move their accounts from the Successor Custodian after the closing of the transaction (subject to any restriction on movement prior to an APS client paying its Loss Allocation or fees), the Receiver believes that choosing one Custodian/Administrator will not constrain client choice.

In addition, a sale of the APS accounts to a single custodian will result in the most expedient and most efficient transition, and the earliest and most efficient transition will serve to give back investment control and choice to the clients.  The challenges and cost of transferring data from the antiquated APS software system is daunting.  Moreover, there are approximately 500 boxes of paper files in storage or in active use that were generated before APS processes were set up for electronic storage.  Not only would having two successor custodians be an administrative nightmare with respect to the two successor custodians coordinating record transfers between themselves, but the Receiver must still set up a process for housing and sharing the multiple APS data sources for the foreseeable future during the continuation of the Receivership and the migration to a new custodian.  This task will be difficult enough with only one successor.  A transition to two custodians would overcomplicate the process and also increase cost.

Ultimately, the Receiver and her attorneys and accountants believe that a purchase by a the Successor Custodian will result in the best outcome for the clients, more revenue for the enterprise value of APS, and a clear and efficient transition of the accounts and systems.

8.    **Category 8 - Other sources of recovery and timing of pursuit relative to plan approval.**

Category 8 was intended to reflect the respondents' comments regarding the need to pursue other third-parties as a means of minimizing the losses to them by DeYoung's misappropriation. The most obvious targets were Curtis DeYoung himself, insurance companies who provided coverage for the wrongful conduct of DeYoung and First Utah Bank. The respondents expressed a desire to have the Receiver pursue other avenues of recovery, even before reaching a final determination on the Loss Allocation.

a.    **Category 8(a) – Bank.**

This sub-category identifies those who would like Receiver to pursue claims against First Utah Bank and believe the Bank is liable for the losses as the custodian of the accounts and/or wondering what is being done about First Utah Bank.

**RESPONSE:**

As the Receiver has mentioned in prior filings with the Court, the decision to pursue First Utah Bank is of utmost importance and consideration. At the present time, the Receiver is in discussions with the Bank to address its role as custodian to the more than 14,000 APS client accounts over the past twenty years. Those discussions will continue and could be a source of recovery for the Receivership Estate. As the Bank's largest depositors, the APS clients have a

vested interest in assuring the Bank's role is fully vetted and to the extent liability extends to the Bank that the Receivership Estate benefits from any recovery.

        **b.**      <u>**Category 8(b) – Insurance.**</u>

This sub-category identifies those who would like the Receiver to pursue any and all insurance claims, including insurance held by First Utah Bank.

**RESPONSE:**

Similar to the Bank, the Receiver is pursuing all available insurance policies that provided coverage for the wrongful conduct of either APS or DeYoung. To date, claims have been submitted to Hartford Insurance Company and Chubb. The Receiver is awaiting responses from the insurers. At the present time, it is the Receiver's hope that the insurers will acknowledge coverage and she will avoid having to file suit to collect on a policy that counsel has advised provides coverage for the misappropriation of the $24 million, although policy limits are only $1 Million.

        **c.**      <u>**Category 8(c) – Other.**</u>

This sub-category identifies those who believe others are culpable for the loss and that the Receiver should pursue them, including DeYoung and the Memmotts. A number of respondents also argued that before the Loss Allocation is determined, the Receiver should exhaust other possible revenue sources, including suits against third-parties. A few thought the Receiver would have no incentive to follow other sources of revenue if it was not completed before the Plan is approved.

**RESPONSE:**

The Receiver has and will continue to pursue other sources of revenue to offset or restore the loss.  In fact, as of the filing of this memorandum, the Receiver has obtained Court approval for filing an action against the Memmotts and DeYoungs.  The Receiver's action against Curtis DeYoung and Michelle DeYoung seeks to recover in excess of $3.0 million based on excessive compensation and loans, which Curtis DeYoung declared uncollectible in 2013 on APS's tax returns.  Although the ability to collect from the DeYoungs is questionable in light of the limited assets, the Receiver intends to pursue all available sources.

Further, the Liquidation Plan attempts to balance the pursuit of third-parties with the clients desire to quickly free themselves of the restrictions of the Receivership.  The Receiver believes the best approach to achieve a balancing of the most positive and expeditious outcome is to proceed immediately with refining the Loss Allocation percentage, proceed to final contract on transition to a the Successor Custodian while continuing concurrently to pursue other sources of revenue, and then reimburse the Loss Allocation to the extent possible when or if funds become available.

9.    **Category 9 – Other/Miscellaneous.**

By this Category, the Receiver sought to identify responses that were unique or limited to a single respondent.  Although the subject matter raised by these respondents were not specifically identified, the Receiver addresses them here – case in point – the request for a "general release" once the client complies with the Liquidation Plan.  Other isolated comments or suggestions are set forth herein along with the Receiver's response.

70

### a.       Category 9(a) – SEC Liable for Recent Losses.

This sub-category identified those respondents who believe the SEC should have warned the public that APS was under investigation and that the SEC is liable for losses sustained from the time the investigation was commenced to the entry of the Receivership Order.  (Response No. 329, 830.)  A slightly different perspective is that the SEC should at the very least pay the cost of pursuing DeYoung as the "law enforcement agency."  (Response No. 335, 359.)  A total of 6 out of the 835 Responses fall into this sub-category.

**RESPONSE:**

These responses reflect a general misunderstanding of the role of the SEC, and the Receiver.  The Receiver's only response is that the SEC is not a guarantor of the unlawful and criminal conduct of DeYoung, or saddled with the liability caused by DeYoung's wrongful conduct.  The Receiver understands that the SEC is in negotiations with DeYoung to settle its civil case, which will include an obligation on the part of DeYoung to disgorge all ill-gotten gains, including assets that are frozen and the subject of the Receivership Order.

### b.       Category 9(b) -- Requests for Additional Information.

This sub-category sought to identify those respondents who sought additional information relating to the Liquidation Plan and/or their individual IRAs or 401(k) accounts.  A total of 12 out of the 835 Responses fall into this sub-category.  The inquiries ran the gamut including (a) how much cushion does an account holder need; (b) are there additional fees to be assessed; (c) is the 10% based on "current" value or what is listed on the books; (d) how long will we have to liquidate assets to cover the loss allocation; (e) once the 10% loss allocation is deposited, how

71

quickly can we move to a new administrator; (f) do we have to move our account to the new

administrator or can we move to our own third-party administrator; (g) is the Receiver going to

allow an adjustment in value for those who invested in National Note of Utah, LLC which the

NNU receiver has indicated is a 95% loss; (h) can the respondent write a check from their

account to open a new account; (i) what are the dates of the fraudulent transfers and withdrawals

made by DeYoung; (j) will any portion of the 10% loss allocation be returned the APS clients;

(k) will distributions made in 2013 and/or 2014 be included in the value of assets of the IRA

account owners; (l) why do I need to be charged 10% when my assets are in non-liquid real

estate investments; and (m) why can't DeYoung pay for his theft?  (*See* Response Nos. 46, 48-

49, 55, 94, 97, 142, 662, 667, 675, 827.)

**RESPONSE:**

The answers to many of these questions are answered hereinabove, and/or by the

Liquidation Plan.  The Receiver encourages all APS clients to examine this memorandum along

with the Amended [Proposed] Liquidation Plan which provides further clarification of what the

Receiver is trying to accomplish and how the Liquidation Plan will be implemented.

### c.      New Category 9(c) – Release of Claims.

This category is new and was not expressly identified in the Summary submitted to the

Court on November 4, 2014.  The reason is because only a single respondent suggested that the

Receiver should provide a "general release" once the IRA or 401(k) account owner contributes

his/her share of the Loss Allocation.  (Response No. 496.)  The only other respondent to discuss

a "release of claims" related to his offer to sign a "release" in order to "unencumber [his]

account."  (Response Nos. 1, 96.)

**RESPONSE:**

The notion that the Receiver provide a "general release" to all APS clients upon fulfilling

the requirements of the Liquidation Plan to move their account(s) to the new

custodian/administrator is a novel request that does not have support in matters involving a

receivership.  To begin with, the Receiver is not in a position to provide such a general release to

account owners upon fulfilling their obligations under the Liquidation Plan. The Receiver has not

undertaken an independent analysis of all 5,500 accounts to determine if there was any improper

actions taken with regards to these accounts.  To do so would not be economically feasible and

would unnecessarily delay the closing of this receivership.  Thus, to request a "general release"

from the Receiver is simply unreasonable.

Also, the Receivership Order expressly limits the liability of the Receiver in performing

her duties.  (*See* Receivership Order, Article XII.)  In proposing the Liquidation Plan, the

Receiver assumes that all clients will act in good faith, just as she is required to exercise "good

faith compliance with any order, rule, law, judgment or decree."  She will not be requesting a

"general release" from the clients and clients should not expect her to provide such a release as

well either on her own behalf or on behalf of APS and the related entities.

  d.  <u>New Category 9(d) – Committee.</u>

Early on in this process, the Receiver reached out and sought input from a diverse group

of clients as part of an ad-hoc committee to provide input to the Receiver as she prepared the

Liquidation Plan.  Following the hearing in September 2014, the Receiver distributed to those who participated on the ad-hoc committee their respective contacts.  Now, several respondents have suggested that if the APS account holders must be involved in both the liquidation and recovery process,  a committee should be appointed and/or volunteer to assure that a cross section of account holders provide input.  (Response Nos. 35, 240, 299, 455, 496, 759.)  One particular respondent went so far as to suggest that the Receiver should appoint a committee of "major account holders" to decide "whether to approve any use of the Surcharge [defined as 3.25% of the 10%] to pursue collection actions … before the Receiver acts."  (Response No. 496.)  This same respondent suggests the committee should be made up of the "seven (7) largest accountholders who are willing to serve," who would determine what expenses would be paid to the Receiver.  (*Id.*)  Others, however, have voiced objection to appointing a "time-wasting committee."  (Response No. 54.)  Still, others complained about not being able to participate on the committee, while some simply wanted the names and contact information of the "advisory committee."  (Response No. 238, 662.)

**RESPONSE:**

The Receiver has continued to support the appointment of an advisory committee to assist her in addressing the various issues she faces in developing and establishing a viable liquidation plan.  To that end, in September 2014, she forwarded contact information to all members of the "advisory committee" with the belief that they would reach out to each other to independently discuss the Liquidation Plan without input from the Receiver.  Recently, the Receiver reached out to this same group to see if they had formed a committee and was informed

74

that no such coordinated effort had occurred.  The Receiver, however, has offered to facilitate another meeting with those who expressed an interest in participating and having their voices heard.

Although the Receiver remains willing to work with any committee that is formed, she objects to having the committee formed in the manner proposed in Response No. 496.  The committee proposed has already been ruled upon and rejected by the Court.  (*See* Docket 220.) In rejecting a request to appoint a formal committee, the Court expressed that many of the safeguards sought were already being provided by the Court as provided in the Receivership Order.  For example, the Receivership Order expressly requires the Receiver to obtain approval from the Court to file a lawsuit.  (Receivership Order, ¶ 47.)  The Court also requires the Receiver to submit all billing invoices to it on a quarterly basis, which invoices the Court has the discretion to approve, modify and/or reject.  (*Id*. ¶ 61-68.)  Accordingly, the Receiver acts at the behest of the Court and under the Court's direction.  As such, there are already sufficient safeguards in place to provide the APS clients with the comfort that the Receiver is acting in good faith and in the best interest of all parties affected by this Receivership.

### e.  New Category 9(e) – Recoveries/Expenses.

A common inquiry made by many respondents was "who is responsible for all the expenses" associated with the receivership and the liquidation of APS.  (Response Nos. 1, 12, 82, 384, 438, 460, 473, 496, 544.)  In at least a couple of instances, the respondent lobbied for the Court to limit the Receiver's recovery/expenses to "annual revenue" generated from APS's operations.  (Response Nos. 460, 716.)  Others expressed unfairness in permitting the Receiver to

reach into accounts without any cash to cover expenses, while another asserted that they do not

owe any fees and should not be required to provide funds for the "recovery of APS losses."

(Response Nos. 175, 544.)  Some respondents suggested that if a client wished to participate in

seeking recoveries from third-parties, they could create a separate entity and cover the expenses

independent of the Receivership.  (Response Nos. 35, 332, 450, 643.)  Another respondent went

so far as to suggest that any "recovery activities have nothing to do with the liquidation."

(Response No. 332.)

**RESPONSES:**

As noted above, the Receivership Order provides that the Receiver is working at the

direction of the Court.  The decision to pursue third-parties to recover losses caused by the

fraudulent transfer of monies to them without adequate consideration and/or to pursue third-

parties to disgorge ill-gotten gains will ultimately lie with the Court.  In addition, the Court is the

final arbiter for the payment of fees and expenses of the Receiver.  To date, the Receiver has

only been paid from revenue generated from fees charged to APS clients for administering their

IRA and 401(k) accounts during the pendency of the receivership.  Although the Receiver hopes

that the revenue will be sufficient to cover her expenses, due to the breadth of the work that she

has been compelled to undertake, which extends far beyond merely administering the client

accounts,[8] it is likely a portion of any monies recovered from third-parties may need to be used

to cover the Receiver's expenses.

---

[8] In addition to the day-to-day operations of APS, the Receiver is charged with having to use
"reasonable efforts to determine the nature, location and value of all property interests," to

10.   **Category 10 - Comments Regarding DeYoung.**

This category sought to identify APS clients who voiced anger towards DeYoung and believe he should be criminally prosecuted and spend a long time in jail.  A total of 53 out of the 835 Responses directly raised this as a concern that the Receiver (or someone else) should either pursue and/or make sure DeYoung is charged with his theft.  As part of this objection, however, there were several respondents who protested having to bear the loss when they had nothing to do with the theft.

**RESPONSE:**

As the Court knows, the Receiver has no control over whether Curtis DeYoung is criminally prosecuted for his conduct that led to the misappropriation of funds from the Master Trust Account.  That decision lies solely with the federal and state government.  This issue does not impact the terms and conditions of the Liquidation Plan except to the extent that the SEC, or criminal division of the U.S. Department of Justice, obtain a disgorgement order or restitution order compelling DeYoung to repay the victims of his criminal activity.  In that case, it is the Receiver's position that any monies recovered by the SEC and/or U.S.  Attorney General on behalf of victims of DeYoung's fraud could be allocated to all clients per the same allocation established by this Receivership and the Liquidation Plan.

---

"manage, control, operate and maintain the Receivership Estate" and to "bring such legal actions based on law or equity in any state, federal, or foreign court as the Receiver deems necessary or appropriate."  (Receivership Order, ¶ 7.)  The Receiver has and will continue to seek Court approval to pursue third-parties as well as for the approval of all fees and expenses incurred as part of the receivership, and as required by the Court.

11.     __Category 11 – [NEW] Responses of Counsel on Behalf of Clients.__

Although a majority of the respondents submitted their comments and/or objections without the benefit of counsel, there were a handful who did engage counsel to assist them in voicing their objections to the proposed Liquidation Plans.  In a number of instances, the arguments voiced by counsel do not differ significantly from those of the non-represented respondents and have been included and referenced above.  However, in the interest of being overly inclusive and responding to the arguments advanced by counsel, the Receiver feels compelled to respond to the legal arguments raised by counsel that do not neatly fit into any of the foregoing categories.

For example, in Response No. 25, counsel for a client voices objections on behalf of his client that one of his two IRA accounts should "not bear any loss associated with the receivership imposed on APS" because, among other things, he entered into a "prohibited transaction" on the "erroneous advice provided by APS's own staff."  (*See* Response No. 25.)  The Receiver does not intend to treat such respondents and/or clients any differently.  This objection parallels those raised in Category No. 4, in which clients opposed the proposed Liquidation Plan based on erroneous valuation of assets within their respective IRAs.

In Response No. 496, the respondent's counsel raises a number of arguments in an apparent attempt to bring attention to what the Receiver should consider in adopting a final Liquidation Plan.  The Receiver has responded to several of these suggestions throughout this memorandum.  However, there are additional arguments raised in this response that warrant discussion.  Specifically, the respondent implies that the Receiver proposes to "surcharge the

78

accounts of all Clients" by asking them to "forfeit or contribute, in cash, 10% of the stated value

of the Client's account … ."  (Response No. 496 at 3.)  The respondent then implies that the

Receiver intends to apply this "Surcharge" to cover estate losses resulting from: (a) appropriate

re-valuation of Client assets; (b) uncollectible payments from account holders who owe

administrative fees to APS; (c) the $24 million shortfall; (d) expenses relating to wrapping up the

Receivership; and (e) unpaid administrative expenses.  (*Id*.)  Finally, the respondent argues the

Receiver should consider "clawbacks from former APS clients that moved their account before

April 25, 2014.  (*Id*. at 4.)

       In addressing these objections, the Receiver wishes to emphasize that her proposed

Liquidation Plan does not seek a forfeiture.  Nor does it seek a contribution of cash per se.  The

Loss Allocation is not a "Surcharge" – it is an allocation of each client's proportionate share of

the loss caused by DeYoung.  It is a mathematical calculation of the loss caused by DeYoung's

defalcation when applied against the value of all APS client's assets as of April 25, 2014

[$25,000,000 divided by $366,000,000].  With the understanding that the value of some clients'

assets will change or be eliminated by the Liquidation Plan, the Receiver acknowledges she has

built-in an approximately three percent (3%) cushion to adjust for valuation changes, exemptions

and other contingencies so that clients may immediately move their accounts to a new third-party

custodian.  As such, the need for clients to convert a portion of their asset to cash is nothing more

than a re-allocation of the loss.  Yet, all 5,500 APS clients are suffering the very same loss.  As

such, the Liquidation Plan is not forfeiture or a surcharge, but the only way to distribute the

common loss equally across all affected accounts regardless of the type of asset.

79

Regarding clawback actions, the Receiver has evaluated the relative merits of such an undertaking.  However, as discussed above, the decision to commence clawback suits is a difficult proposition based on a number of factors.  First and foremost, this is not your typical "Ponzi scheme" case in which the wrongdoer was "stealing from Peter to pay Paul."  The Tenth Circuit has defined a Ponzi scheme as follows:

> A Ponzi scheme is "[a] fraudulent investment scheme in which money contributed by later investors generates artificially high dividends for the original investors, whose example attracts even larger investments. Money from the new investors is used directly to repay or pay interest to earlier investors, usually without any operation or revenue-producing activity other than the continual raising of new funds." BLACK'S LAW DICTIONARY 1198 (8th ed. 2004).

*Mosier v. Callister, Nebeker 7 McCullough, P.C.*, 546 F.3d 1271, 1273 (10th Cir. 2008.)

Here, there does not appear to be any evidence that DeYoung was receiving money from new clients to "repay or pay interest to earlier" clients.  Rather, DeYoung's scheme was to market APS in a manner that resulted in monies continuing to flow in so that when clients elected to transfer out of APS, his misappropriation of funds from the Master Trust Account would not be discovered.  Although he was using monies from new clients to allow former clients to close their accounts, the clients leaving were not taking profits or interest payments on monies invested with APS.  To the contrary, as many respondents recount over and over again, APS was merely the facilitator to complete the investments clients self-directed APS to complete in accordance with the Internal Revenue Code.  Any losses and/or gains realized by the IRA account from investments directed by clients were the result of the clients' directions, not APS or DeYoung.

This reality creates another hurdle when it comes to clawback actions.  Again, unlike the clawback actions when a true Ponzi scheme exists, here the Receiver has not uncovered evidence that former clients reaped financial gains directly from APS, as opposed to their own investments.  Conversely, the losses realized by other clients who made bad investments, such as worthless real estate, National Note of Utah, Inc. or Management Solutions, Inc. (two Ponzi schemes), were due to a bad investment decision, not because the bottom fell out of the APS fraudulent scheme.  The approximately 8,000 account holders who terminated their association with APS prior to April 25, 2014 were not necessarily "winners" as that term is used in the ordinary Ponzi scheme arena – that is they did not realize profit from being paid an exorbitant rate of return by DeYoung.  Rather, the Receiver is of the belief that they received what they were entitled to based on their own self-directed investments.

As such, were the Receiver to seek to have the more than 8,000 former APS clients share in the loss via clawback actions, it would require her to file 8,000 separate lawsuits.[9]  This would require her to: (a) identify all 8,000 former clients; (b) determine the whereabouts of each of these 8,000 former clients (some of whom may have passed away); (c) determine the status of each former clients' account as of the termination; (d) determine when and what each APS client account held in terms of assets when it was terminated; (e) determine the amount of money that flowed in and out of the Master Trust Account during the accounts existence; (f) prepare 8,000 separate complaints; and (g) file 8,000 separate lawsuits.  Ignoring the costs associated with

---

[9] A class action suit filed by the Receiver against 8,000 defendants is not a viable option as it runs counter to Rule 23 of the Federal Rules of Civil Procedure.

compiling the necessary information to include in all 8,000 complaints, the mere filing of 8,000

complaints with the Court would cost the Receivership Estate $3.2 million alone (8,000 x

$400/filing = $3,200,000) without any guarantee the Receiver would prevail in a single case.

   An additional concern about the clawback actions is the potential economic benefit that

such actions would confer on the Receivership Estate.  Even if the Receiver were selective in

pursuing larger accounts, for example only accounts whose assets exceeded $1.0 million, the

potential benefit of such a suit is likely outweighed by the costs.  It is estimated that the time and

expense to prepare initial pleadings would exceed $10,000 per action.  The Receiver would then

incur a filing fee ($400), service fee, and additional attorney's fees to prosecute the case.

However, with only a 10% Loss Allocation, the Receiver would be limited in seeking more than

10% of the value of a former APS clients account upon termination.  Assuming a $1.0 million

account, the Receiver's damage claim would only be $100,000.00.  Even if a defendant conceded

liability and paid the $100,000.00, the defendant's "Loss Allocation" would be added to the pot

of distribution of recovered funds.

   Accordingly, the Receiver is concerned that the economic benefits of the clawback

actions are outweighed by the costs.

   Another law firm, on behalf of fourteen APS clients, objects to the proposed Liquidation

Plan on a number of grounds.  (*See* Response No. 678.)  The Receiver will not recount each

objection, but focuses on key issues raised.  First, the respondents claim that the Receiver cannot

force third-parties to pay the Receivership Estate monies without a supporting right or cause of

action.  (*Id*.)  The respondents accuse the Receiver of confusing "loss allocation" with

affirmative claims and the "loss allocation simply refers to methods to distribute receivership assets– thereby reducing or allocating their losses. In other words, the respondents argue the Receiver cites to cases dealing with "<u>distribution</u> of <u>receivership assets</u> to creditors." (*Id*.)  Next, the respondents assert that their due process rights are being violated. Third, they also ask the Court to prohibit the Receiver from issuing a 1099 IRS tax notice to those who refuse to comply with the Liquidation Plan because doing so is not permitted. (*Id*.) Finally, like many other similarly situated clients, the respondents here object to the Liquidation Plan on the grounds that it is inequitable because it may force them to liquidate their IRAs if the account has insufficient cash in the Master Trust Account to cover the Loss Allocation. (*Id*.)

Each of these objections raise important issues that should be addressed. In terms of the Receiver's right to compel clients to pay monies without a supporting right or cause of action, the Receiver references the Court to her response above to Response No. 496 on this subject. Both Response Nos. 496 and 678 misconstrue the nature of the Loss Allocation. Although a component of the Liquidation Plan includes having clients either liquidate assets and/or contribute monies to the Master Trust Account, this is being done for the sole reason of equalizing the loss among all current clients regardless of the form of the assets held. She is mindful of the fact that there are clients who do not wish to sell their assets. The Receiver is working with the IRS to issue a private letter ruling allowing cash contributions so that a client can transfer 100% of their assets to a new custodian. (*See* category 5 above). The Court has the discretion to enter such an order in these circumstances.

83

In terms of due process, the Receiver and the Court have afforded all APS clients the opportunity to be heard.  This issue was front and center when the Court set the scheduling order to allow clients to submit their objections and/or responses to the Liquidation Plan.  The response process is the very essence of notice and opportunity to be heard.  It remains to be seen whether the Court will allow clients and/or counsel to be heard when the matter of approval of the Plan is set for hearing.  The Receiver welcomes any input from clients as a means of assuring the best solution and outcome can be reached.

The authority to issue 1099s is premised on current IRC regulations.  Administrators have a duty to report prohibited transactions and distributions on an IRS 1099 form.  To the extent a client's obligation relating to the Receivership is not satisfied and results in either a prohibited transaction or distribution, the Receiver will report such event accordingly on a 1099.

Finally, in terms of inequities, it is the Receiver's position that her Liquidation Plan attempts to and accomplishes an equitable outcome.  In similar SEC cases, Receivers rarely realize a 90% return.  Here, the Receiver is hoping for an even better return.  She has undertaken the task of determining how best to minimize the loss and decided it is not appropriate to solely burden those with cash deposits as of April 25, 2014 for the reasons discussed above.  The Master Trust Account was established for the benefit of all clients.  Deposits and withdrawals were made on a daily basis for the benefit of all clients.  Although many clients' deposits may have been there for only a short time, there is no realistic way to trace the funds to each client.  Hence, the Receiver has proposed what she believes is the only reasonable alternative.

84

In Response Nos. 679 and 680, a law firm advances arguments on behalf of clients asserting three main objections: (1) The Receiver's job is to collect the assets, "not to make a determination of what 'loss' has been suffered and allocate it among the claimants;" (2) the Receiver can only collect assets that are actually owned by APS and DeYoung, not assets held by the IRAs; and (3) the threatened seizure and sale of separately held IRA assets is illegal and improper under appropriate forfeiture laws. (Response Nos. 679 at 3-4 and 680 at 3-4.)

In response to the foregoing, the Receiver has addressed the forfeiture issue above. In terms of the right to allocate the loss among the clients, the Receiver disagrees with the notion she is not required to determine the loss suffered by the clients. Nor is her Liquidation Plan a "capital call" as suggested. (*Id*. at 4.) The Receiver is seeking to employ the only reasonable and equitable way of allocating the loss among all clients. If the Court were to accept the argument raised by Response No. 679, any client with illiquid assets or insufficient cash in the Master Trust Account would not bear any portion of the loss. Those with cash deposits would bear 100% of the loss. The Receiver contends that is an inequitable result. Finally, the Receiver recognizes and acknowledges that the assets of each IRA account are held separately. She further recognizes she has no discretion in what a particularly client does with the assets held in the IRA, even if it means making a "prohibited transaction" and/or liquidating a trust causing a taxable event. The Receiver is aware that APS clients in the past have elected to direct APS to liquidate their accounts despite the tax consequences. That being the case, the Receiver is not laying claim to any of the IRA assets. Nor has she acquired any greater rights in property than the debtor has or had. Rather the Receiver, with approval of the Court, seeks approval of a

85

Liquidation Plan that adequately, reasonably, and equitably addresses the issues facing all 5,500 clients in a way that will allow them to move their accounts to a new custodian, free of the restraints of this receivership.

In another combined response on behalf of at least twenty (20) APS clients, another law firm objects to the Liquidation Plan on the grounds that it is "abusive in nature to some or all account holders" and asks the Court to "use its broad powers to craft a new plan that does not include a pro rata assessment of cost to clients" counsel represents. (Response No. 756.) The respondents here ask for preferential treatment based on the fact that they all invested in "an undivided interest in the whole parcel of land acquired, according to their respective percentage interest purchased. (*Id.*) As such, the respondents argue their accounts are easily traceable and should not be included in the Loss Allocation. (*Id.*; *see also* Response No. 275 above.)

The Receiver has addressed this issue above and incorporates her response herein.

### 12.     Category 12 – [NEW] Responses of Creditors and Other Interested Parties.

In submitting the Summary to the Court on November 4, 2014, the Receiver admittedly lumped in with the other responses, those filed by "creditors" of APS and/or "other interested parties," such as the Receiver appointed to handle the *SEC v. National Note of Utah, Inc.* receivership.[10] The purpose of this section is to identify and respond to these objections.

---

[10] Although the Receiver has been careful to protect the identity and confidentiality of most APS clients, with the possible exception of those clients who have sought to intervene in the main SEC action, she contends that the creditors stand in a different position. The Receiver has already identified these creditors in the Preliminary Report, First Quarterly Report and Second Quarterly Report.

a.      First Utah Bank.

In its response, First Utah Bank reveals that it is a secured and unsecured creditor of APS and Curtis DeYoung, individually.  (Response No. 674.)  As reported in the Receiver's Preliminary Report [Dkt. 47], First Quarterly Report [Dkt. 169], and Second Quarterly Report [DKT. 311], the Bank indeed extended credit to Mr. DeYoung, which loan was secured by a home located at 1574 Iron Horse Blvd., Riverton, Utah (the "Iron Horse Property") and a commercial condominium located at 11027 South State Street, Unit 2, Sandy, Utah (the "Sandy Property").  The Iron Horse Property is owned in fee simple by Curtis DeYoung, while the Sandy Property is owned by LIC Environmental, LLC.  (*See* First Quarterly Report, Exh. B [Dkt. 169].)  In addition, the Bank identifies the unsecured claims to include a line of credit extended to APS "in the original amount of $150,000;" a personal loan to Mr. DeYoung "in the original amount of $50,000;" an overdraft protection agreement with Mr. DeYoung in the original amount of $10,000, and a possible deficiency claim arising from the secured loan to Mr. DeYoung identified above.  In addition, the Bank makes additional "unsecured" claims based on its written lease agreement with APS as tenant and First Utah Bank as landlord for the Riverton office, a contractual claim as an "additional insured or loss payee under APS's employee dishonesty and errors and omissions insurance policies; and breach of contract claims based on the right to indemnity pursuant to the Custodial Services Agreement and IRS Form 5305-A's signed be each client.  (*Id.*)  The Receiver mentions these claims because the Bank argues against the Liquidation Plan to the extent that it (a) seeks a finding from the Court that the Receivership Estate has no equitable interest in the Iron Horse Property and (b) improperly seeks to provide a

87

priority recovery over in favor of "investors"[11] ahead of the Bank; and (c) require the Receiver to either reject or assume the contracts, and if assumed, must cure any defaults and fully perform her obligations.  (*Id*. at 2-3.)  The Bank further urges the Court to prohibit the Receiver from "commencing any lawsuits that would only result in a concomitant indemnification obligation against the Receivership Estate."  (*Id*. at 3.)

**RESPONSE:**

As an initial matter, the Bank raises an important issue that the Receiver must address – that is how are creditors of APS being treated in relation to the clients of the Bank, as custodian, and APS, as the third-party administrator.  At page 40-41 of the proposed Liquidation Plan, the Receiver sets forth how the Liquidation Plan intends to treat creditors of APS, including the source of funds that may be available to pay creditor claims.  (Receiver's Proposed Plan of Liquidation [Dkt. 186].)  Specifically, the Liquidation Plan proposed that:

> to the extent monies are recovered by the Receiver from the sale of assets of the Receivership Defendants, including accounts receivable maintained on the books and records of APS, then the Receiver shall distribute said proceeds to all creditors (including APS clients) on a pro-rata basis.

(*Id*. at 39.)  What the Liquidation Plan did not allow was that any monies the Receiver collects and/or recovers from sources other than the sale of assets that are directly attributable to DeYoung's misappropriation be shared with creditors.  For example, the Receiver has filed an

---

[11] The Bank's use of the term "investors" is misplaced.  The more than 5,500 clients all executed an IRS Form 5305-A which expressly appointed the Bank as "Custodian" of their IRA accounts. Although APS was the designated third-party administrator, the Bank was custodian of all IRA accounts and the label of "investor" is a mischaracterization of the clients' relationship to the Bank and APS.

action against Curtis and Michelle DeYoung on a variety of claims, including fraudulent transfer. There are other third-parties the Receiver is pursuing or intends to pursue who the Receiver contends have culpability and/or were recipients of misappropriated funds. The Receiver believes, if successful, any recoveries from these parties should be used to pay back the losses incurred by the IRA account owners, not creditors of APS. The reason is simple: the monies recovered in these instances is money misappropriated from the Master Trust Account, an account no creditor would have the right to attach were it to file and prevail in an action against APS. In contrast, to the extent the Receiver is successful in liquidating assets of APS and/or Curtis DeYoung, she contends that all creditors should share equally on a pro-rata basis, including all IRA and 401(k) account owners, who if not able to recover the $25 million misappropriated from the Master Trust Account become unsecured creditors of APS and DeYoung with an equal right to recover as any creditor.

In advancing this position, the Receiver is not preferring the IRA account owners over creditors. Nor is she preferring "investors" over creditors. The IRA and 401(k) account owners **are not** investors in APS. The sole shareholder of APS is Curtis DeYoung. The IRA and 401(k) account owners established their accounts with the Bank and APS pursuant to the IRS Form 5305-A, wherein they expected them to protect their deposits in the Master Trust Account and consummate investments they directed them to complete. The monies misappropriated from the Master Trust Account belong to the IRA account owners. Any recovery from third-parties who either (a) were the beneficiaries of funds from these accounts (i.e. DeYoung, Memmotts, and others) or (b) contributed to the misappropriation (i.e. the Bank) should be returned to their

89

rightful owners – the IRA account owners.  Hence, the Bank's reliance on *In re Geneva Steel Co.*, 281 F.3d 1173 (10th Cir. 2002) is simply misplaced and inapplicable in this context.

In terms of the executory contracts between APS and the Bank (i.e. the leases), as well as the Bank's concern regarding obligations of indemnification, the Receiver contends that these issues can be adequately addressed outside of the Liquidation Plan.  At the present time, the Receiver, in her capacity as receiver of APS and on behalf of all IRA and 401(k) account owners, and the Bank are presently having discussions regarding the issues raised in the Bank's objection.  It is the Receiver's good faith belief that, barring any unforeseen hurdles, the issues raised by the Bank, as well as others, will become moot as the parties are in discussions and may be able to reach an agreement that will benefit all interested parties including the Receivership.

      b.     <u>Receiver of National Note of Utah, Inc</u>.

As noted above, the Receiver of National Note of Utah, Inc. filed a response to the proposed Liquidation Plan.  (Response No. 725.)  The Receiver incorporates her response above which addresses the concerns raised by the NNU receiver.

      c.     <u>Judgment Creditors.</u>

The Receiver calls attention to a third creditor who filed a response to the Liquidation Plan, wherein the creditor claims that she should participate on an equal footing with the IRA account owners.  (Response No. 751.)  The creditor obtained a judgment against APS on September 19, 2013 in the matter *Reneau v. American Pension Services, Inc.* in the amount of $509,959.87.  Acknowledging that the respondent is an "unsecured creditor," she argues that by "virtue of the *Judgment*, the facts underlying the Lawsuit and the jury's verdict, it would be

inequitable for her to not share in the recovery on par with the IRA and 401(k) account owners.
(*Id.*)

Again, this respondent appears to overlook the distinction between creditors of APS and the IRA and 401(k) account owners who entrusted their monies with the Bank and APS only to have DeYoung misappropriate their cash from the Master Trust Account.  As discussed above, creditors' recovery, if any, can only reasonably be expected to come from assets of APS, not monies recovered for the benefit of the IRA and 401(k) account owners.  The Receiver is pursuing a number of third-parties who were direct beneficiaries of DeYoung's wrongful conduct, including DeYoung himself.  If successful, the Receiver contends it is only appropriate that these monies be returned to the IRA and 401(k) account owners.  To the extent that assets of APS itself are liquidated, the Receiver agrees that these monies should be shared equally among all unsecured creditors.

## **AMENDED LIQUIDATION PLAN**

Based on the foregoing, the Receiver has reexamined the proposed Liquidation Plan.
Despite the numerous responses received clients, creditors and interested third-parties, as a general matter, the Receiver believes the Liquidation Plan proposed in August of 2014 (with the revisions discussed above) continues to provide the most feasible, fair and equitable plan.  At its core, the Liquidation Plan seeks an outcome that provides the greatest return to all affected parties.  With the ability to more quickly distribute and/or allow the transfer of ninety percent (90%) of the assets held in each IRA and 401(k) account, the Receiver is putting the clients back in control of their accounts.  Alternatively, the notion of pursuing all 14,000 former and current

clients, pursuing clawback actions, and/or favoring one client over another is counter to the

underlying purpose and intent of the appointment of a receiver.

However, the Receiver has listened and considered the complaints of the IRA account

owners.  In light of these responses and as noted in the areas above, the Receiver is preparing and

will be submitting within the next forty-eight hours, her proposed Amended Liquidation Plan.

DATED this 3rd day of December 2014.


/s/ Mark R. Gaylord
Mark R. Gaylord, Esq.
Melanie J. Vartabedian, Esq.
Tesia N. Stanley, Esq.
Scott S. Humphreys, Esq. (*admitted pro hac vice*)
BALLARD SPAHR LLP
Attorneys for Court-Appointed Receiver, Diane A.
Thompson

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct of copy of the foregoing **RECEIVER'S**

**MEMORANDUM IN RESPONSE TO APS CLIENT RESPONSES AND OBJECTIONS**

**TO PROPOSED PLAN OF LIQUIDATION** was served to the following this 3rd day of

December 2014, in the manner set forth below:

[X] Through the CM/ECF System for the U.S. District Court

[  ] Hand Delivery

[  ] U.S. Mail, postage prepaid

[  ] E-mail:     ahardenbrook@swlaw.com; docket_slc@swlaw.com; jpollard@swlaw.com;
moric@sec.gov; wadleyd@sec.gov; #SLRO-Docket@sec.gov;
dleta@swlaw.com; docket_slc@swlaw.com; wsmart@swlaw.com;
gbh@pkhlawyers.com; dh@pkhlawyers.com; jt@pkhlawyers.com;
john@johnbagleylaw.com; jchandler@djplaw.com; cfrandsen@djplaw.com;
judsonpitts@hotmail.com; judson@wimmerpitts.com; krw@scmlaw.com;
ec@scmlaw.com; intakeclerk@scmlaw.com; markjgregersen@hotmail.com;
feindtp@sec.gov; pmoxley@djplaw.com; cwatters@djplaw.com;
tburns@djplaw.com; ajackson@djplaw.com; rpahnke@djplaw.com;
utfedcourt@djplaw.com; steve@skclawfirm.com;
saltlakedocketclerk@ballardspahr.com

Daniel J. Wadley, Esq.
Cheryl M. Mori, Esq.
Paul N. Feindt, Esq.
SECURITIES & EXCHANGE COMMISSION
351 S. West Temple, Suite 6.100
Salt Lake City, UT 84101

Paul T. Moxley, Esq.
Thomas J. Burns, Esq.
Z. Ryan Pahnke, Esq.
Joshua D. Chandler, Esq.
DURHAM JONES & PINEGAR
111 East Broadway, Suite 900
Salt Lake City, UT 84111

Judson T. Pitts, Esq.
WIMMER & PITTS, P.C.
11651 S. Harvest Rain Ave.
South Jordan, UT 84095

George B. Hofmann, IV, Esq.
PARSONS KINGHORN HARRIS
111 E. Broadway 11th Fl.
Salt Lake City, UT 84111

David E. Leta, Esq.
Andrew V. Hardenbrook, Esq.
SNELL & WILMER L.L.P.
15 West South Temple, Suite 1200
Salt Lake City, UT 84101

John P. Bagley, Esq.
BAGLEY LAW, PC
308 East 4500 South, Suite 175
Salt Lake City, UT 84107

Kim R. Wilson, Esq.
SNOW, CHRISTENSEN & MARTINEAU
10 Exchange Place, Eleventh Floor
Post Office Box 45000
Salt Lake City, UT 84145-5000

Mark J. Gregersen, pro se
10 West Broadway, Suite 505
Salt Lake City, UT 84101

Kent A. Jordan
844 N. King St., Unit 10
Wilmington, DE 19801

Stephen K. Christiansen, Esq.
311 South State Street, Suite 250
Salt Lake City, UT 84111

/s/ Mark R. Gaylord

# **INDEX**

Exhibit 1:      Index of Responses to Proposed Plan of Liquidation

Exhibit 2:      Declaration of Mark Hashimoto

Exhibit 3:      Fair Market Valuation Form