Mark R. Gaylord (#5073)
Melanie J. Vartabedian (#10148)
Tesia N. Stanley (#13367)
Scott S. Humphreys (*admitted pro hac vice*)
BALLARD SPAHR LLP
One Utah Center, Suite 800
201 South Main Street
Salt Lake City, Utah 84111-2221
Telephone:  (801) 531-3000
Facsimile:  (801) 531-3001
gaylord@ballardspahr.com
vartabedianm@ballardspahr.com
stanleyt@ballardspahr.com
humphreyss@ballardspahr.com

*Attorneys for Court-appointed Receiver,*
*Diane A. Thompson*

## IN THE UNITED STATES DISTRICT COURT
## DISTRICT OF UTAH, CENTRAL DIVISION

| | |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION,<br><br>          **Plaintiff,**<br><br>v.<br><br>**AMERICAN PENSION SERVICES, INC.,** a Utah Corporation and **CURTIS L. DeYOUNG,** an individual,<br><br>          **Defendants.** | **RECEIVER'S FINAL REPORT, FINAL ACCOUNTING, AND MOTION TO TERMINATE RECEIVERSHIP**<br><br><br>**Case No.:  2:14-cv-00309-RJS-DBP**<br><br>**Judge Robert J. Shelby**<br>**Magistrate Judge Dustin B. Pead** |

Diane Thompson, Court-appointed Receiver ("Receiver"), of American Pension Services, Inc. and its related entities, submits this Final Report, Final Accounting, and Motion to Terminate Receivership (the "Final Report").[1]

## INTRODUCTION

1.   On April 24, 2014, the Securities and Exchange Commission ("SEC") filed the above styled civil enforcement action.

2.   On April 24, 2014, the Court appointed Diane Thompson as Receiver of American Pension Services, Inc. and any related entities owned, controlled, or under common control by or through American Pension Services, Inc. and all assets of Curtis L. DeYoung (collectively referred to as "Receivership Defendants").  *See* Order Appointing Receiver, Freezing Assets, and Other Relief 1–3 (Dkt. 9) ("Receivership Order").  These entities include American Pension 401K Services, Inc. ("APS 401K" or "AP4S"); LJP LLC; Interim Funding LLC; First Silverado Properties LLC; LIC Environmental; and Quicksilver Management LLC.  *Id.*  American Pensions Services, Inc. and related entities owned, controlled, or under common control of American Pension Services, Inc. are collectively referred to as APS.

3.   The Receiver, with approval from the Court, engaged Ballard Spahr LLP as legal counsel to the Receiver, Piercy Bowler Taylor & Kern ("PBTK") as forensic accountants, Precision Discovery, Inc. as forensic information technology specialists, Richards Brandt Miller Nelson as insurance coverage counsel, Orange Document Services to perform forensic

---

[1] The Receiver includes in this Final Report her Sixteenth Quarterly report, covering the first quarter of 2018.  Attached as Exhibits A and B are the first quarter cash reports for the APS operating account and first quarter 2018 cash report for the APS trust account.  *See also* paragraph 44 below.

computer services, Gary Free as an independent appraiser, and Jonathan Cook as an independent appraiser. *See* First Quarterly Report of Receiver 1–2 (Dkt. 169); Order Granting Motion to Retain Gary Free as Appraiser (Dkt. 208); Order Granting Motion to Retain Jonathan Cook as Appraiser (Dkt. 639).

4.   The activities of the Receiver and the professionals who have worked with her (collectively, the "Receivership Team") have been described in various reports and other filings made during the course of this case including the following:

- The Receiver's Preliminary Report and Quarterly Reports (Dkt. 47; Dkts. 169, 311, 425, 523, 579, 640, 699, 750, 796, 821, 856, 907, 932, 955, 981);

- Motion and Memorandum for Order Clarifying Order Appointing Receiver, Freezing Assets, and Other Relief (Dkt. 117);

- Amended Clarifying Order (Dkt. 434);

- The Receiver's Amended Modified Plan of Liquidation (Dkt. 458);

- Order Requiring Transfer of All APS Clients to Equity Trust Company (Dkt. 592);

- The Receiver's Motion to Approve [Equity Trust Company] as Successor Custodian/Administrator (Dkt. 408);

- Receiver's Motion to liquidate client account assets to fund Court-ordered loss allocation payments (Dkts. 841 and 852 (seeking liquidation of real property from APS accounts), 842 and 851 (seeking liquidation of promissory notes from APS accounts), 850 and 853 (seeking judicial dissolution of LLCs from APS accounts); and 843 and 854 (seeking liquidation of stock from APS accounts);

- The Receiver's Proposed Plan of Distribution (Dkt. 947);

- The Receiver's Applications for Interim Compensation of Receiver and Professionals for Services Rendered (Dkts. 178, 330, 428, 533, 580, 651, 710, 755, 802, 829, 858, 917, 935, 962);

- Various motions to approve settlements with third-parties. *See, e.g.*, Dkt. 621 (seeking approval of settlement with First Utah Bank); Dkt. 693 (seeking approval of settlement with Michelle DeYoung); Dkt. 80 in case no. 2:14-cv-00744 (seeking approval of settlement with Michael Memmott, Sr. and Shauna Memmott); Dkt. 89 in case no. 2:14-cv-00744 (seeking approval of settlement with Deni Memmott, as Personal Representative of the Estate of Michael Memmott Jr.); Dkt. 20 in case no. 2:16-cv-00792 (seeking approval of settlement with LDS Church).

5. All of the reports and filings were filed publicly, many were posted to the Receiver's website, www.apsreceiver.com, and all are incorporated into this Motion. Therefore, a detailed description of this Receivership will not be repeated herein.

6. In identifying the possible assets to be recovered, the Receiver made every effort to locate, identify, and collect the assets without lengthy and expensive litigation. In fact, she only filed three ancillary lawsuits to recover assets for the benefit of the Receivership Estate due to her efforts to recover the bulk of the Receivership Estate assets without litigation. The lawsuits and the outcomes of each are as summarized as follows:

- *Thompson v. Michael Memmott, Jr. et al.,* 2:14-cv-00744, in which the Receiver filed fraudulent transfer and other claims against Michael Memmott Jr., and his

parents Michael Memmott Sr. and Shauna Memmott asserting the Memmotts and a host of their entities participated in a fraudulent scheme with DeYoung, receiving approximately $4.5 million in funds DeYoung fraudulently transferred to them from APS accounts.  Mr. Memmott Jr. passed away during the pendency of the proceedings.  The Receiver substituted Mr. Memmott's wife, Deni Memmott, as Personal Representative of his estate.  The Receiver's investigation revealed that the Memmotts have little to no assets.  In order to avoid costly and protracted litigation, the Receiver settled with all parties.  As part of the settlement, Deni Memmott turned over to the Receiver a $65,000 bank account she discovered belonging to Mr. Memmott, Jr.  In addition, all of the Memmotts provided, under penalty of perjury, a list of all of their assets, which revealed very few assets.  Pursuant to the parties' settlement agreement, should any other assets be uncovered that were not disclosed in settlement, any such assets belong to the Receiver.  Should the Receiver receive any tips regarding later-discovered property belonging to the Memmotts not disclosed in the settlement agreements following the close of the Receivership, the Receiver will immediately alert the Department of Justice ("DOJ") so that they may investigate and seize any such assets for restitution to victims.

- *Thompson v. Curtis DeYoung and Michelle DeYoung*, 2:14-cv-00870, in which the Receiver brought suit to recover funds fraudulently transferred to Curtis and Michelle's retirement accounts and the disgorgement of ill-gotten gains of the

DeYoungs in the form of excessive compensation over several years from APS.[2] After two days of mediation with Federal Magistrate Judge Pead, the parties reached settlement whereby Michelle, in exchange for a half of the cash held in two retirement accounts and the Receiver's abandonment of her residence, relinquished to the Receiver: (i) any interest she had in fourteen business entities; (ii) her rights in eight retirement accounts; and (iii) two real properties. Additionally, the settlement barred Michelle from any further interference with the Receivership.  Michelle provided a full financial statement under penalty of perjury to the Receiver as part of the settlement agreement.  The Receiver agreed to dismiss Curtis from the lawsuit once he was sentenced to ten years in federal prison and a restitution order of over $24 million was entered in the parallel criminal proceeding.

- *Thompson v. The Corporation of the President of the Church of Jesus Christ of Latter-Day Saints,* 2:16-cv-00792, in which the Receiver sought to claw back $239,775.00 in tithing and other charitable contributions Curtis and Michelle made to the LDS Church based on fraudulent transfer claims, among others.  The Receiver and the LDS Church settled to avoid expensive and protracted litigation in the amount of $150,000.00.

---

[2] During the pendency of the action, Curtis and Michelle DeYoung initiated a divorce in which, pursuant to the Divorce Decree, Curtis relinquished virtually every asset of value to Michelle.

7.   The Receiver engaged in lengthy mediation and settlement negotiations with First Utah Bank and its insurer, Everest, culminating in First Utah and its insurer's payment to the Receiver of $5 million cash and other credits to the Receivership Estate cancelling prior Bank indebtedness of DeYoung and APS.  The settlement included a claims bar order, which prevented any individual APS client from suing First Utah independent of the Receiver's lawsuit.  Three former APS clients challenged the authority of the Court to issue the claims bar order.  Upon losing their challenge in this Court, the three former APS clients took their challenge to the Tenth Circuit Court of the Appeals.  After a lengthy dispute, appellate briefing, and oral argument, the Receiver prevailed.

8.   The Receiver pursued an insurance claim on a "Crimeshield Advanced" policy issued by the Hartford to APS with $1 million limits.  The Receiver avoided the expense of preparing and filing a lawsuit, and expeditiously settled with the Hartford for $405,000.00.

9.   The Receiver also engaged in negotiations with Chubb on a claim for coverage under an Errors and Omissions Policy issued to APS with policy limits of $1 million.  Curtis and Michelle DeYoung also made claims on the Policy asserting it covered their defense costs. The Receiver aggressively pursued the full $1 million policy limits and ultimately prevailed on her motion for summary judgment.  The Court awarded the full $1 million policy limits to the Receiver for the benefit of the Receivership Estate.

10. Despite her efforts to informally resolve disputes over assets of the Receivership Estate, the Receiver had to expend significant resources due to Curtis's recalcitrance, complete lack of cooperation in helping identify and locate assets, and numerous violations of Court orders, including the following:

- Destroying over 200 emails and hiding APS documents;

- Loading a 30-foot trailer with personal property subject to the Receivership Order and hiding the trailer;

- Using Michelle DeYoung and former APS employee Dean Becker in an attempt to hide nearly $200,000.00 in newly-created LLC accounts held at Brighton Bank;

- Attempting to hide and then sell for $10,000.00 personal property that had been ordered frozen by the Receivership order;

- Hiding coins, jewels and other valuables appraised at a value of approximately $50,000 in the drop ceiling above Michelle DeYoung's employer's office in an effort to conceal those assets from the Receiver;

- Asserting claims to defense costs from the insurance policy issued by Chubb Insurance to cover for fraudulent conduct committed by employees, including Curtis.

*See, e.g.,* Writ of Seizure (Dkt. 55); Notice of Non-Compliance with Receivership Order (Dkt. 748).

11. Curtis's wife, Michelle DeYoung, also caused the Receiver to expend significant resources due to her multiple attempts to interfere with the orderly resolution of the Receivership, numerous legal challenges, and multiple actions to intervene, including but not limited to the following:

- Sending a letter to Equity Trust Company threatening legal action in an attempt to derail the Receiver's transaction and agreement with Equity Trust Company on

the eve of the Court's approval of the transaction.  Notice of Submission of Letter from M. DeYoung to Equity Trust Company.  (Dkt. 453);

- Moving to intervene in the SEC action three times to prevent the Receiver from lawfully selling Receivership Assets for the benefit of the defrauded clients. Orders Denying Motions to Intervene.  (Dkt. 371, 441);

- Filing an appeal of the Court's denial of her first motion to intervene in the Tenth Circuit Court of Appeals.  Notice of Appeal.  (Dkt. 469);

- Moving to enforce the Settlement Agreement between the Receiver and Michelle DeYoung before Michelle had performed all of her obligations therein.  (Dkt. 762);

- Violating the terms of her settlement agreement with the Receiver by failing to disclose hidden assets from the Receiver.  Notice of Non-Compliance with Receivership Order.  (Dkt. 748);

- Providing the Receiver with a list of "Collectibles and Judgments" claimed to be valid and collectible in the amount of over $44 million, but then failing to provide any supporting information regarding the collectability of the assets (other than publicly available documents), requiring the Receiver to independently evaluate the collectability of the assets at the expense of the Receivership;

- Most recently, on or about March 16, 2018, Michelle DeYoung retained counsel to informally make a demand for the Receiver to turn over any and all "Collectibles and Judgments" she identified that went uncollected.  The Receiver has responded to Michelle's claims and seeks resolution of this latest attempt to

undermine the orderly resolution of this Receivership in this Final Report.  *See* "Informal Demand by Michelle DeYoung," below.

12. This was a unique Receivership because the Receiver continued to operate APS for a period of approximately one and one-half years in order to minimize the harm to the defrauded investors.  For example, the Receiver continued to collect rents, pay taxes on client account property, and allow clients to make certain limited transactions within their retirement accounts on a case-by-case basis as reviewed and approved by the Receiver.

13. The Receiver and her team managed and administered over 5,500 tax qualified accounts owned by investors located across the country.  In doing so, the Receiver not only conducted the day-to-day operations of APS, but she and her team conducted meetings and calls with clients, including through an advisory board of interested clients representing different asset types and amounts, and fielded thousands of calls and emails from clients during the pendency of the Receivership.

14. The Receiver conducted meetings with Receivers from other receiverships with common clients (including the Impact Cash, Management Solutions, Inc. and National Note receiverships), and sought appropriate orders for APS clients to receive distributions from other receiverships within their tax qualified accounts.  *See, e.g*., Order Granting Motion for Release of Interpleaded Funds Related to Management Solutions, Inc. Receivership.  (Dkt. 582, 598).

15. Because APS administered tax-qualified accounts, there were significant complications associated with IRS code and regulations.  For example, the Receiver sought a Private Letter Ruling from the IRS and legal opinion in an attempt to provide certainty to the clients on tax treatment of the loss allocation and any subsequent recovery, the sources from

which such loss allocation payments could be made, and transfer of the accounts to the successor administrator—Equity Trust Company.

16. On December 21, 2017, the Court approved the Receiver's Proposed Plan of Distribution (Dkt. 971) (the "Distribution Plan").

17. The Distribution Plan states: "[f]ollowing the distribution of all Distributable Funds as described above, the Receiver will submit a motion to close the Receivership and a final written report with the Court.  The final report will contain a final accounting and detailing of the steps taken to close the Receivership."  Distribution Plan, ¶ 61.

## ACTIVITIES ENGAGED IN TO WIND UP RECEIVERSHIP ESTATE

18. As noted above, the Receiver has made numerous filings in this case regarding administration of the Receivership Estate, with nearly 1,000 docket entries.  In the paragraphs below, the Receiver provides an overview of the activities engaged in by the Receivership Team to wind up the Receivership Estate since the Court approved of her Distribution Plan on December 21, 2017.

19. The Receiver consolidated all bank accounts, finalized all calculations and distribution lists, and all communications to be sent to clients by the Receiver or Equity Trust with the distribution payment.

20. Pursuant to the Distribution Plan, on January 26, 2018, the Receiver made her distribution payment to all former APS clients holding a Contingent Repayment Agreement ("CRA").  Specifically, the Receiver distributed a total of $5,781,951.69 to 4,548 clients.  Only those APS clients who paid their full loss allocation payment received a distribution.  As noted in the Distribution Plan, this reflects the only distribution payment the Receiver will make to

clients holding a CRA.  Accordingly, clients left APS with approximately 92% of their account value.

21. The Receiver distributed $4,669,913.60 by wire to Equity Trust, who then distributed those funds to clients whose accounts transferred from APS to Equity Trust.  The Receiver sent a detailed chart to Equity Trust with each client name, account number, and the amount to be credited to each client.  Equity Trust credited accounts it held within one business day of receipt of the Receiver's wire.  Equity Trust sent payment to clients that transferred to a new administrator, or who took a distribution from Equity Trust, within three business days after receipt of the Receiver's wire.

22. The Receiver distributed a total of $1,112,038.06 via checks drawn from the Receiver's bank account and placed in U.S. First Class Mail for clients holding a CRA who received an assignment and distribution from the Receiver and did not transfer to Equity Trust.

23. Along with the check, each client also received a customized communication letter from the Receiver depending on how and from whom the distribution was sent to the client:

  a.  Clients receiving a check from the Receiver were sent a letter explaining: (i) the payment reflects the only payment the client will receive from the Receiver, thus, their CRA should be revalued to $0 and cancelled; (ii) clients should cash the check within ninety (90) days of the date of the check or it would be forfeited; and (iii) providing the Receiver's website if the client has any questions.

  b.  Former Equity Trust clients received a payment notice drafted by the Receiver and sent by Equity Trust explaining: (i) the payment reflects the

only payment the client will receive from the Receiver; (ii) because the client's account was held by Equity Trust previously, the Receiver made payment to Equity Trust; (iii) Equity Trust was transmitting payment to the client by check or wire; (iv) if payment was sent by check, the client was advised to cash it within 180 days or it will be forfeited, per regulations governing Equity Trust; and (v) contact information for Equity Trust and the Receiver's website were also provided in the event of questions.

c.      Current Equity Trust clients received a payment notice drafted by the Receiver and sent by Equity stating:  (i) Equity has credited the client's account with the amount of the Receiver's payment; (ii) the payment reflects the only payment the client will receive from the Receiver; (iii) the client's CRA will be revalued to $0 and cancelled by Equity Trust; and (iv) including contact information for Equity Trust and the Receiver's website in the event of questions.

*See* Letters to APS Clients, attached as Exhibit C.

24. The Receiver posted a letter on her website for clients whose assets are held by new administrators and who need documentation for those new administrators to act on revaluation and cancellation of the CRA held by their account.  *See* Letter from Receiver, attached as Exhibit D.

25. Prior to mailing the distribution checks, the Receiver updated her website with numerous Frequently Asked Questions and Answers concerning the distribution. *See* FAQs regarding distribution payment, attached as Exhibit E.

26. The Receiver fielded dozens of calls and emails from former APS clients with questions about their distributions. The Receiver responded to each inquiry, referring clients to her website and the Frequently Asked Questions and Answers page as appropriate. The Receiver updated the FAQs as new commonly asked questions were received.

27. The Receiver has been in regular communications with Equity Trust regarding former APS client questions and issues with the distribution. To the Receiver's knowledge, all issues have been resolved.

28. As of the date of this filing, a total of $1,048,469.20 of the checks or 94.3% of checks sent by the Receiver have been cashed by the former APS clients.

29. As of the date of this filing, Equity Trust has distributed all of the funds wired to it pursuant to the terms outlined in the Distribution Plan.

30. On or about January 30, 2018, the Receiver sent tax form 1099-R ("1099") to remaining clients who received an assignment of assets and distribution during the tax year 2017. The Receiver has fielded many calls from clients who do not understand why they received a 1099 or dispute the amount reported on the 1099. The Receiver updated her website and the Frequently Asked Questions and Answers and has responded to each question accordingly.

31. The Receiver has terminated and distributed all assets in the APS employee 401(k) plan and has made arrangements with Equity Trust and EPIC for the filing of final tax forms in 2019.

32. The Receiver has or is completing the resolution of issues with the DeYoung family members' retirement accounts.

33. The Receiver has resolved and dismissed or is completing the dismissal of all pending lawsuits involving APS prior to the Receivership.

34.  Pursuant to the Criminal Judgment in DeYoung's parallel criminal proceeding, the Receiver prepared a list of restitution victims, provided it to the Clerk of Court, and met with and discussed it with the Clerk to ensure it meets their needs and requirements (the "Restitution List").  The Restitution List includes both clients that fully paid their Court-ordered loss allocation and those that partially paid.  The total restitution amount included in the Restitution List credits Curtis for the Receiver's recoveries.

35. Pursuant to the Distribution Plan, any remaining Receivership funds shall be turned over to the Clerk of Court to distribute along with any restitution collected in connection with the parallel criminal proceeding whereby Curtis was ordered to pay nearly $25 million in restitution.  The Receiver has received no restitution payments from Curtis.  The Receiver inquired as to the status of collection of Curtis's jail pay and was informed that there was often a delay in processing payments.  The Clerk of Court is responsible for the receipt of and disbursement of any restitution from Curtis's jail pay or other sources.

36. The Receiver also had final discussions with the Department of Justice regarding any further information or items needed from the Receiver prior to closing the Receivership.

37. The Receiver has addressed all tax matters related to the Receivership Estate, including the payment of all taxes and the filing of all necessary final returns.  APS's final tax returns have been prepared and will be filed by the April 15, 2018 deadline.

## POST-DISTRIBUTION ITEMS

38. Following the distribution and in conjunction with the Receiver's filing of 1099 tax forms in early 2018 to reflect distributions made by APS to clients in 2017, and given upcoming deadlines for the filing of annual tax returns in April 2018 (occurring up through October 2018 depending on extensions), the Receiver has received multiple client and IRS inquiries associated with accounts that were not transferred to Equity Trust.  All inquiries for transferred accounts have been referred to Equity Trust.  However, the Receiver must respond to IRS subpoenas, challenges to 1099s, and requests from clients or title companies to re-title real property assets held by a former APS account, but still titled in the name of APS for the benefit of the client.[3]  Although the Receiver anticipates these requests will decrease over time, there will likely be additional requests through the end of 2018.

---

[3] Pursuant to the Distribution Plan, the Receiver distributed and assigned certain accounts to clients.  If the distributed account held real property as an asset, the assignment document provided by the Receiver could not re-title real property to remove APS as record title holder due to incomplete information available on the APS system and the client's failure to respond to the Receiver.  The Receiver has received numerous calls from former clients and title companies seeking to clear escrow requesting the Receiver sign a deed to re-title this real property in the name of the individual client so that they may sell or otherwise transfer their real property.  The Receiver has been working with these requestors by signing quit claim deeds to convey the real property.

## INFORMAL DEMAND BY MICHELLE DEYOUNG

39. On or about March 16, 2018, Michelle DeYoung engaged counsel to represent her to make an informal demand wherein she claimed she is enforcing her settlement agreement with the Receiver. *See* 3/16/18 Letter from K. Beckett to M. Vartabedian, attached as Exhibit F. Michelle claims that the Receiver failed to turn over certain physical files relating to Michelle and Curtis's retirement accounts and for failing to abandon and assign to Michelle the "Collectibles and Judgments" she claims the Receiver failed to pursue.

40. The Receiver responded to Michelle on March 29, 2018, a copy of which is attached hereto and incorporated by reference. *See* 3/29/18 Letter from M. Vartabedian to K. Beckett attached as Exhibit G. In summary, the Receiver has fully complied with her obligations under the terms of the settlement agreement. Significantly, the Receiver was never in possession of the retirement account files requested by Michelle because the files were missing from APS's office when the Receiver's took possession and control over APS, as noted in the Receiver's Preliminary Report. *See* Receiver's Preliminary Report (Dkt. 47 at 14-15); 3/29/18 Letter attached as Exhibit G.

41. As for the Collectibles and Judgments, the Receiver fully and timely complied with the Settlement Agreement. The Receiver met with Michelle to discuss the Collectibles and Judgments, wherein Michelle represented to the Receiver that the Collectibles and Judgments were valid and collectible. However, Michelle had no basis or documentation other than copies of court dockets that are publicly available to support why she believed they were valid and collectible. Based on Michelle's representations that the Collectibles and Judgments were valid and collectible, the Receiver timely elected to pursue all such assets for the benefit of the

Receivership Estate and informed the Court in her Notice of Intent to Pursue APS

Collectibles/Judgments Pursuant to Settlement with Michelle DeYoung (Dkt. 749) (stating "the

Receiver elects to pursue all of the items included on Michelle's List to the extent provided by

law and does not abandon to Michelle any of the items in her List.")  The Notice expressly

satisfies the Settlement Agreement's requirement that "pursuit of the Collectibles and/or

Judgments shall be made by making a Supplemental Filing with the Court requesting

permission to pursue said Collectibles and Judgments."  Settlement Agreement ¶ 7.  However,

the Receiver's efforts to pursue and collect on the list of Collectibles and Judgments did not end

there.

42. The Receiver undertook collection efforts with regards to the Collectibles and

Judgments including engaging collections professionals who ultimately advised the Receiver

that there was nothing more to collect.  She also directly pursued claims against third parties as

identified above.  Finally, she sought information from Michelle and others to determine the

veracity of the list provided by Michelle.  The fact that the Receiver may not have succeeded in

collection efforts for a particular Collectible or Judgment does not constitute an abandonment of

the Collectible or Judgment under the Settlement Agreement.  The Receiver has fulfilled all

obligations under the Settlement Agreement, and is under no obligation to assign or abandon

any Collectibles or Judgments to Michelle.

43. Accordingly, the Receiver seeks a declaration and order from the Court that the

Receiver has acted in full compliance of the Settlement Agreement, releasing the Receiver and

the Receivership Team from any and all claims and causes of action asserted by Michelle

DeYoung which might be brought against them for matters arising from the Receiver's

Settlement Agreement with Michelle DeYoung, and barring Michelle forever from any claim relating to the enforcement of the Settlement Agreement.

## FINAL ACCOUNTING

44. The Receiver's Final Accounting for the APS Operating Account and Final Accounting for the APS Trust (the "Final Accounting") is attached.  The Final Accounting includes the: (a) Business Operating Cash Receipts and Disbursements (April 24, 2014 through March 31, 2018) (Exhibit H); (b) Master Trust Account Cash Receipts and Disbursements (April 24, 2014 through March 31, 2018) (Exhibit I); (c) APS Business Operating Cash Receipts and Disbursements (1st Quarter 2018) (Exhibit A); and (d) Master Trust Account Cash Receipts and Disbursements (1st Quarter 2018) (Exhibit B). These documents represent the final accounting of the Receivership.

    a.    Exhibit H represents APS's operating account from which all expenses of the APS Receivership were paid.  It represents all receipts received by the Receiver from the liquidation of assets of APS and recoveries associated with APS's operations.  It also represents disbursements tied to the on-going operation by APS by the Receiver and expenses tied directly thereto, including the payment of administrative fees and costs approved by the Court.

    b.    Exhibit I represents receipts and disbursements out of the APS Master Trust Account.  The cash receipts reflect both "ordinary client cash receipts," which were derived from client activities and "extraordinary cash receipts," which reflect recoveries by the Receiver for the benefit of

APS clients (i.e. the settlement proceeds from First Utah Bank).  To the

extent that the receipts by the Receiver attributed to the operating account

were insufficient to pay administrative fees, the Master Trust Account

receipts covered the shortfall.  The distribution payment to the APS clients

was disbursed out of the Master Trust account.

c.     Exhibits A and B reflect the same information based on the first quarter of

2018.

## RECEIVER'S FEES AND EXPENSES

45. Pursuant to the Distribution Plan, the Receiver held back from the distribution

sufficient funds to cover the Receiver's Fifteenth Application for Interim compensation

(pending at Dkt. 984 in the amount of $264,623.72), and to cover administrative expenses to

process the distribution, prepare this final report, respond to client questions about the

distribution and tax issues, process returned checks from the distribution, complete tax

reporting, and pre-pay for document storage, among other remaining wind-up tasks.  The

administrative fees associated with these tasks took place between January 1, 2018 and March

30, 2018 and total approximately $150,000.00.  These fees will be submitted to the Court in a

Sixteenth and Final Fee Application.[4]

---

[4] Pursuant to the Receivership Order, the Receiver will submit her Sixteenth Fee Application to the SEC for review as early as possible in April 2018.  Once the SEC completes its review, a Sixteenth and Final Fee Application along with all supporting invoices (*in camera*) will be submitted to the Court, as the Receiver has done with all prior fee applications in this matter.

46. The post-distribution items described above (*see* ¶¶ 38-43 above) require that the Receiver continue to respond to client issues and inquiries.  As such, the Receiver requests that she be permitted to hold back and draw upon remaining funds in the Receivership Estate for resolution of these issues, with any remainder to be paid to the Clerk of Court by December 31, 2018.[5]  Thereupon, the Receiver will file a final notice with the Court indicating the total amount turned over to the Clerk of Court.  The Receiver will then be released from any obligations or further responses or assistance to former APS clients, who will be directed that they take independent steps to consult their advisors to obtain quiet-title to any property still in the name of APS as administrator for their former client account.

47. All non-cash assets of the Receivership Estate have been liquidated and, as of the date of this filing, $509,764.87 remains in the Receivership Estate (excluding the unclaimed distribution payments), which is sufficient to cover outstanding administrative fees and the proposed hold back for post-distribution items.

## PROPOSAL REGARDING USE OF MONIES REMAINING IN RECEIVERSHIP ESTATE

48. The Receiver will turn over to the Clerk of Court any remaining funds, and any unclaimed distribution payments by December 31, 2018 so that the Clerk may distribute those to the victims along with any restitution collected in connection with the parallel criminal proceeding that the Clerk collects from Curtis.  The Receiver has provided to the Clerk of Court the Restitution List with all victim names, addresses, and amount of restitution due and owing.

---

[5] Providing all remaining funds by December 31, 2018 will also alleviate the Clerk of Court from the need to potentially make two restitution payments to victims.

The Receiver will not be paid her administrative fees or costs exceeding the amount held back by the Receiver.

## **TERMINATION OF RECEIVERSHIP**

49. With the administration of the Receivership Estate and final distribution complete, it is appropriate to terminate this Receivership.

50. Accordingly, the Receiver requests that this Court enter an order:

- Authorizing the Receiver to destroy the following records:

  - o APS client files for accounts closed prior to the Receivership may be immediately destroyed.

  - o Files taken from the APS office and in the possession of the Receiver will be stored and may be destroyed on an ongoing basis once they reach seven years old from the date of the Receiver's appointment on April 24, 2014.

  - o Files generated by the Receivership Team during the Receivership will be retained by Ballard Spahr and destroyed according to Ballard Spahr record retention policies, and/or seven years after the close of this case.

- Discharging the Receiver and the Receivership Team of all of their obligations under the Receivership Order and under any orders entered in this case or any ancillary case, as well as any other duties or obligations incident to the Receiver's appointment or service as Receiver or advisor to Receiver in this case;

- Releasing and discharging the Receiver and the Receivership Team from: any and all claims, causes of action, suits, charges, complaints, counterclaims, actions, grievances, demands, rights, accounts, judgments, costs and all other liabilities of any kind or description whatsoever, either in law or equity, which might be brought against them for matters arising from their administration of the Receivership Estate, including, without limitation, any claim concerning or relating to the filing of any local, state, or federal tax returns for the Receivership Estate or any of the APS clients and/or the reporting of any income, assets, or tax consequences to any person or entity; any liability to any person or entity for any action taken in good faith in connection with carrying out the procedures set forth in any orders entered in this case, or any other actions taken in good faith in connection with the Receivership, and providing for payment of defense costs of any such claim so asserted, even if willful misconduct is asserted;

- Approving of the Fifteenth Fee Application (Dkt. 984), the forthcoming Sixteenth and Final Fee Application, and the hold back of remaining funds for post-distribution items, and finally approving all professional fees and expenses paid out of the assets of the Receivership Estate;

- Declaring that the Receiver fully complied with the Settlement Agreement between the Receiver and Michelle DeYoung, releasing the Receiver from any claims that may be brought by Ms. DeYoung against the Receiver relating to the parties' Settlement Agreement, and barring Ms. DeYoung from making any claim to enforce the parties' Settlement Agreement;

- Terminating the Receivership effective immediately, subject to finalizing any remaining former APS client issues including the Receiver's execution of quit claim deeds for clients holding real property still titled in the name APS. The Receiver shall deposit remaining funds and unclaimed distribution payments with the Clerk of Court no later than December 31, 2018. The Receiver will file a notice with the Court indicating the total amount turned over to the Clerk of Court. The Receiver will then be released from any obligations or further responses or assistance to former APS clients, who will be directed that they take independent steps to consult their advisors to obtain quiet-title to any property still in the name of APS as administrator for their former client account.

51. A proposed order is attached hereto as Exhibit J.

52. The Receiver will send this Final Report to all APS clients via electronic mail at their last known email address and post it on her website, www.apsreceiver.com, within three business days of its filing with this Court.

## CONCLUSION

For the foregoing reasons, the Receiver respectfully requests that the Court enter her proposed Order attached as Exhibit J and terminate this Receivership.

DATED this 30th day of March, 2018.


/s/ Melanie J. Vartabedian
Mark R. Gaylord, Esq.
Melanie J. Vartabedian, Esq.
Tesia N. Stanley, Esq.
Scott S. Humphreys, Esq. (*admitted pro hac vice*)
BALLARD SPAHR LLP
*Attorneys for Court-appointed Receiver, Diane A.*
*Thompson*

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct of copy of the foregoing **RECEIVER'S FINAL REPORT, FINAL ACCOUNTING, AND MOTION TO TERMINATE RECEIVERSHIP**

was served to the following this 30th day of March, 2018, in the manner set forth below:

[ X ] Through the CM/ECF System for the U.S. District Court

[  ] Hand Delivery

[  ] U.S. Mail, postage prepaid

[  ] E-mail:    olivera@sec.gov; #slro-docket@sec.gov; ahardenbrook@swlaw.com;
docket_slc@swlaw.com; jpollard@swlaw.com; miller@millertoone.com;
mahoney@millertoone.com; miller@ecf.inforuptcy.com;
miller.blaked@gmail.com; moric@sec.gov; howe@millertoone.com;
danny_quintana@yahoo.com; dleta@swlaw.com; wsmart@swlaw.com;
dsbyers@hollandhart.com; bknoble@hollandhart.com;
gdoctorman@parsonsbehle.com; ecf@parsonsbehle.com;
ghofmann@cohnekinghorn.com; dhaney@cohnekinghorn.com;
jthorsen@cohnekinghorn.com; jsteed@kmclaw.com; mglauser@kmclaw.com;
jchandler@djplaw.com; cfrandsen@djplaw.com; judsonpitts@hotmail.com;
judson@wimmerpitts.com; justin@hsblegal.com; krw@scmlaw.com;
ec@scmlaw.com; intakeclerk@scmlaw.com; markjgregersen@hotmail.com;
saltlakedocketclerk@ballardspahr.com; feindtp@sec.gov; pmoxley@djplaw.com;
cwatters@djplaw.com; jadamson@kunzlerlaw.com; robert_hunt@fd.org;
geri_wynhof@fd.org; utx_ecf@fd.org; steve@skclawfirm.com;
jen@skclawfirm.com; sara@actionlawutah.com; speck@djplaw.com;
utfedcourt@djplaw.com; mpugsley@rqn.com; bwride@rqn.com;
EDonohue@hinshawlaw.com; ben@BBG-Law.com; jeff@cgsutahlaw.com;
armand@hwmlawfirm.com; jerrym@mooneylaw.com; frank@fiber.net;
Kristian@Beckettlegal.com

Cheryl M. Mori, Esq.
Paul N. Feindt, Esq.
Amy J. Oliver, Esq.
SECURITIES & EXCHANGE COMMISSION
351 S. West Temple, Suite 6.100
Salt Lake City, UT 84101

Paul T. Moxley, Esq.
Joshua D. Chandler, Esq.
DURHAM JONES & PINEGAR
111 East Broadway, Suite 900
Salt Lake City, UT 84111

Judson T. Pitts, Esq.
WIMMER & PITTS, P.C.
11651 S. Harvest Rain Ave.
South Jordan, UT 84095

George B. Hofmann, IV, Esq.
PARSONS KINGHORN HARRIS
111 E. Broadway 11th Fl.
Salt Lake City, UT 84111

David E. Leta, Esq.
Andrew V. Hardenbrook, Esq.
SNELL & WILMER L.L.P.
15 West South Temple, Suite 1200
Salt Lake City, UT 84101

Kim R. Wilson, Esq.
SNOW, CHRISTENSEN & MARTINEAU
10 Exchange Place, Eleventh Floor
Post Office Box 45000
Salt Lake City, UT 84145-5000

Mark J. Gregersen, Esq.
8 E. Broadway, Suite 338
Salt Lake City, UT 84111

Stephen K. Christiansen, Esq.
311 South State Street, Suite 250
Salt Lake City, UT 84111

Blake D. Miller, Esq.
Craig H. Howe, Esq.
MILLER TOONE, P.C.
165 South Regent Street
Salt Lake City, UT 84111

Gary E. Doctorman, Esq.
PARSONS BEHLE & LATIMER
201 S. Main Street, Suite 1800
Salt Lake City, UT 84111

R. Jeremy Adamson, Esq.
KUNZLER LAW GROUP, P.C.
50 West Broadway, 10th Floor
Salt Lake City, UT 84101

Jeffrey D. Steed, Esq.
KIRTON & MCCONKIE
50 East South Temple, 4th Floor
P.O. Box 45120
Salt Lake City, UT 84145-0120

Sara E. Bouley, Esq.
ACTION LAW LLC
2825 E. Cottonwood Pkwy., Suite 500
Salt Lake City, UT 84121

Danny Quintana
DANNY QUINTANA PLLC
4198 West 3860 South
Salt Lake City, UT 84120

Doyle S. Byers, Esq.
HOLLAND & HART LLP
222 S. Main Street, Suite 2200
Salt Lake City, UT 84101

Justin R. Baer, Esq.
HIRSCHI STEELE & BAER, PLLC
136 East South Temple, Suite 1650
Salt Lake City, UT 84111

Mark W. Pugsley, Esq.
Brent D. Wride, Esq.
RAY QUINNEY & NEBEKER P.C.
36 South State Street, Suite 1400
P.O. Box 45385
Salt Lake City, UT 84145-0385

Edward F. Donohue, Esq.
HINSHAW & CULBERTSON LLP
One California Street, 18th Floor
San Francisco, CA 94111

Robert K. Hunt, Esq.
OFFICE OF THE FEDERAL PUBLIC DEFENDER
DISTRICT OF UTAH
46 West Broadway, Suite 110
Salt Lake City, UT 84101

Benjamin B. Grindstaff, Esq.
BENJAMIN B. GRINDSTAFF, PLLC
5383 South 900 East, Suite 103
Salt Lake City, UT 84117

Jeffrey T. Colemere, Esq.
COLEMERE GIBBS & STOUT, PLLC
405 South Main Street, Suite 900
Salt Lake City, UT 84111

Armand J. Howell, Esq.
HALLIDAY, WATKINS & MANN, P.C.
376 East 400 South, Suite 300
Salt Lake City, UT 84111

Jerome H. Mooney, Esq.
WESTON, GARROU & MOONEY
12121 Wilshire Blvd., 525
Los Angeles, CA 90025

Franklin L. Slaugh, Esq.
880 East 9400 South, Suite 103
Sandy, UT 84094

Kristian Beckett, Esq.
BECKETT LAW FIRM
155 108th Ave. NE, Suite 202
Bellevue, WA 98004

/s/ Trista Lawson